**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 1:20-10410-HCM** |
| **3443 ZEN GARDEN, L.P.** | § | |
| | § | **Chapter 11** |
| DEBTOR. | § | |

**CHAPTER 11 TRUSTEE'S EMERGENCY MOTION**
**TO LIMIT ROMSPEN MORTGAGE LIMITED PARTNERSHIP'S CREDIT BID**

> **This pleading requests relief that may be adverse to your interests.**
>
> **The Chapter 11 Trustee is requesting emergency consideration of this Motion.**
>
> **If you oppose the relief requested herein, you should file a response immediately.**

Gregory S. Milligan, Chapter 11 Trustee (the "Trustee") of the bankruptcy estate (the "Estate") of 3443 Zen Garden L.P. (the "Debtor") in the above-captioned chapter 11 case (the "Case") files this *Emergency Motion* (the "Motion") *to Limit Romspen Mortgage Limited Partnership's Credit Bid*.

## I. INTRODUCTION

1.     Romspen Mortgage Limited Partnership's ("Romspen") prepetition inequitable conduct in systematically starving the Debtor of crucial – and contractually agreed to – funding, damaged the Debtor, halted redevelopment the Debtor's real estate project, and prevented the Debtor's payment of its creditors. In advance of the Trustee's Court-approved auction of the Debtor's real estate development, the Trustee will file an adversary proceeding seeking, among other relief, to equitably subordinate Romspen's asserted secured claims and liens on the sale assets, similar to creditor actions already pending. With Romspen's liens subject to potential

subordination and its claims otherwise disputed, Bankruptcy Code § 363(k) authorizes the Court "for cause" to prevent or condition Romspen's credit bid of contested secured claims in the auction. As detailed below, the Trustee requests the Court to condition any Romspen credit bid on Romspen's escrow of a $7.7 million cash deposit (equal to less than eight percent (8%) of Romspen's asserted $96.5 million secured claim) with the Trustee to ensure payment of all non-Romspen non-priority creditors upon the Trustee's successful subordination of Romspen's liens and claims.

2.      The Trustee presents this limited relief, consistent with Romspen's voluntary agreements in the existing Credit Bid Stipulations (defined below), leaves Romspen's credit bid rights well in tack, to the tune of almost $90 million in available non-cash consideration, and permits the Trustee to complete the auction of the Estate's assets in a timely fashion. In the alternative, absent such a deposit, the Trustee requests the Court deny Romspen's credit bid of its contested secured claims and permit only cash bids at the auction.

3.      The Trustee requests the Court rule on this Motion on September 23, 2020, in advance of September 29, 2020 auction and related deadlines.

## II. JURISDICTION AND VENUE

4.      This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), (M), (N) and (O). Venue of these chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested in this Motion are Bankruptcy Code §§ 105, 363, 506, 507, 510 and 1129(b)(2)(A)(ii).

# III. BACKGROUND

5.      The Debtor is the developer of the former Motorola campus located in Austin, Texas (the "Campus").  Prepetition, the Debtor formulated and initiated the redevelopment of the Campus into a visionary 110-acre mixed use project to consist of offices, hotels, and retail spaces using renewable energy resources, energy-efficient technologies, and sustainable design (hereinafter, the "Project").

6.      In early 2018, Romspen committed to extend a $125 million construction loan (the "Loan") to the Debtor. Critically, in connection with the Romspen Loan, Romspen specifically consented to the Debtor obtaining a separate, supplemental loan under the Property Assessed Clean Energy Act[1] from another lender (the "PACE Loan"), which would fund key environmental and energy saving components of the Project. The Debtor planned, budgeted, and undertook redevelopment of the Project based on this total available funding, including both the Loan and the PACE Loan.

**The Bankruptcy Case**

7.      Certain petitioning creditors, all unpaid vendors and contractors that performed work and provided materials to the Debtor and Project (the "Petitioning Creditors"), initiated the Case by filing an involuntary chapter 11 petition on March 22, 2020 (the "Petition Date").

8.      This Court entered its Consent Order for Entry of Relief (ECF No. 11, the "Relief Order") on April 8, 2020.

---

[1] The Property Assessed Clean Energy (PACE) program provides low-cost, long-term financing for water and energy efficiency and conservation improvements to commercial and industrial properties under Chapter 399 of the Texas Local Government Code. Additional PACE information is available at: https://comptroller.texas.gov/programs/seco/funding/pace.php

9.      On April 9, 2020, the Petitioning Creditors filed their Expedited Motion for Order Requiring Appointment of a Chapter 11 Trustee. *See* ECF No. 14. This Court entered its Order Requiring Appointment of a Chapter 11 Trustee on April 15, 2020. *See* ECF No. 27. The United States Trustee filed its Application for Order Approving Appointment of the Trustee and the Court granted it on April 22, 2020 (the "Appointment Date"), appointing the Trustee. *See* ECF Nos. 35 & 36.

**Funding the Estate**

10.      Upon appointment, the Trustee performed an assessment of the status and condition of the Campus and Project consulting with all key stakeholders and brokers and professionals familiar with the Campus and Austin commercial real estate market. The Trustee determined an orderly sale process will maximize the value and minimize the risk to the Estate. Consistent with this assessment, the Trustee commenced a marketing process.

11.      As the Campus and related Project remain incomplete, the Estate generates no cash flow to fund maintenance of the Campus, administration of the Estate, or otherwise to preserve value to permit the sales process to advance. Accordingly, the Trustee required access to cash to avoid immediate and irreparable harm to the Estate that will result if the Trustee is unable to fund the chapter 11 process.

12.      Given the exigencies of this Case, the impact of the COVID-19 pandemic on the economy, and the Romspen's preexisting interest in the Property, after extensive consultations with parties in interest in the Case, the Trustee negotiated post-petition financing with Romspen.

13.      On May 18, 2020, the Trustee filed a motion for interim and final orders approving the Romspen post-petition financing, which the Court approved on an interim and then final basis. On June 30, 2020, the Court entered the Amended Final Order Granting Chapter 11 Trustee's

Motion to Obtain Secured Credit on an Interim and Final Basis (the "<u>Financing Order</u>", ECF No. 144).

**The Trustee's Sale and Auction Process**

14.     While securing funding, the Trustee, with the assistance of his Court-approved brokers, Cushman and Wakefield and other professionals, advanced marketing of the Campus, communicating with prospective purchasers, populating a due diligence data room, signing parties to confidentiality and nondisclosure agreements, and providing parties with due diligence materials and arranging for site visits as necessary for such parties to decide whether to make purchase offers.

15.     The Trustee formalized the sale's process with proposed bid and auction sale procedures. On August 24, 2020, the Court entered its Order (I) Authorizing and Approving (a) Bid Procedures, and (b) Form and Manner of Notices for the Bid Procedures and Resulting Sale, (II) Scheduling an Auction to Determine the Highest and Best Offer; (III) Scheduling a Hearing to: (a) Approve the Sale of Assets to the Successful Bidder Free and Clear of Liens, Claims and Encumbrances, and (b) Authorize the Debtor to Assume and Assign Executory Contracts and Unexpired Leases in Connection with the Sale; and (IV) Granting Related Relief (the "<u>Bid Procedures Order</u>", ECF No. 194).

16.     Pursuant to the Bid Procedures Order, potential bidders must serve a qualifying bid to the Trustee by September 25, 2020 (the "<u>Bid Deadline</u>"), with the Trustee conducting an auction on September 29, 2020 (the "<u>Auction</u>").

17.     To date, the Trustee and his professionals have sent over 2,500 emails to potential bidders, with almost 1,200 email views. The Trustee has executed seventy-three confidentiality agreements with potential bidders to facilitate due diligence and guided numerous Campus tours

with serious buyer candidates. In sum, the Trustee and his professionals advanced a robust sale and auction process.

**Credit Bid Challenges and Deadlines**

18.     In addition to cash bids, the Financing Order and Bid Procedures Order reserves the potential for Romspen to elect to submit a credit bid, subject to the Trustee's and other parties' rights to object to such credit bid. Romspen represents it intends to submit a credit bid under the Bid Procedures Order.

19.     Romspen filed Proof of Claim No. 14 asserting a secured claim in the amount of not less than $96,495,021.72 (the "Romspen Claim").

20.     The Financing Order provided deadlines, including a "Challenge Period" by which the Trustee may assert any adversary proceeding or contested matter against Romspen challenging Romspen's liens and claims, and a deadline to adjudicate any "Credit Bid Challenge" by which any action to impede Romspen's credit bid rights must be decided by the Court. Financing Order at pp. 14, ¶ 11(c) and 21-22, ¶ 18.

21.     Pursuant to the Financing Order and related extension stipulations, on August 20, 2020, Austin Glass & Mirror, Inc., ACM Services, LLC, Koetter Fire Protection of Austin, LLC, Capital Industries, LLC, Hill Country Electric Supply, LP, Lyle America, Inc. d/b/a Glass.com of Illinois, Summer Legacy, LLC, Texas Air Industries, LLC, Ferguson Enterprises, LLC, American Builders & Contractors Supply Co., Inc. d/b/a ABC Supply Co., Inc. (together, the "M&M Lien Plaintiffs"), and Panache Development & Construction, Inc. ("Panache") filed an adversary complaint against Romspen in this Court, objecting to Romspen's proof of claim, seeking a determination of the priority of Romspen's liens, seeking to subordinate Romspen's claims and

liens and challenging Romspen's ability to credit bid at the Auction ("Creditor Challenge Adversary", ECF No. 192).

22.     Similarly, Dan White (an equity holder in the Debtor) and related entities filed a separate adversary complaint against Romspen, Romspen affiliates, Panache and Adam Zarafshani, including counts objecting to Romspen's proof of claim, seeking a determination of the priority of Romspen's liens, seeking to subordinate Romspen's claims and liens, and challenging Romspen's ability to credit bid at the Auction ("White Adversary", ECF No. 191).

23.     After filing the Creditor Challenge Adversary, on September 10, 2020, the M&M Lien Plaintiffs and Romspen filed a stipulation (ECF No. 204) proposing to resolve the M&M Lien Plaintiffs' opposition to Romspen's submission of a credit bid at the Auction in exchange for Romspen depositing almost $3.8 million in the registry of the Court for the benefit of the M&M Lien Plaintiffs to be released upon later adjudication or resolution of the Creditor Challenge Adversary (the "M&M Credit Bid Stipulation"). Since the M&M Credit Bid Stipulation provides for Romspen to support its bid with actual cash deposits sufficient to satisfy the M&M Lien Plaintiffs' claims in full, in essence, the M&M Credit Bid Stipulation resolves the M&M Lien Plaintiffs' credit bid challenge through Romspen submitting a dedicated cash bid for the sole benefit of the M&M Lien Plaintiffs.

24.     On September 14, 2020, Panache and Romspen filed a substantially similar stipulation (ECF No. 208) resolving Panache's opposition to Romspen's submission of a credit bid at the Auction in exchange for Romspen depositing almost $1.4 million in the registry of the Court for Panache's benefit to be released upon later adjudication or resolution of the Creditor Challenge Adversary (the "Panache Credit Bid Stipulation", together with the M&M Lien Credit Bid Stipulation, the "Credit Bid Stipulations"). Again, the Panache Credit Bid Stipulation

essentially resolves a credit bid challenge through Romspen submitting a dedicated cash bid for the sole benefit of Panache.

25.     Together, the M&M Lien Plaintiffs and Panache hold approximately $15.6 million of the estimated $17.3 million of the prepetition Non-Romspen claims against the Estate - *over ninety percent (90%) of the Non-Romspen creditor pool*.  Thus, the Credit Bid Stipulations, if approved by the Court, result in the impact of any Romspen credit bid falling entirely on the remaining prepetition unpaid claims held by creditors that are not a party to a Credit Bid Stipulation. None of the Credit Bid Stipulations account for or protect the remaining creditors.

**The Threat of Romspen's Credit Bid**

26.     The Credit Bid Stipulations and the Creditor Challenge Adversary acknowledge (i) serious allegations against Romspen, (ii) the need for the Court to adjudicate these allegations, including the alleged harm Romspen inflicted on the Estate and creditors, and (iii) the resulting urgency to protect the creditors with proper deposits or similar limits on any Romspen credit bid to ensure available cash to compensate the Estate's non-Romspen creditors upon adjudication of the pending disputes.

27.     In fact, the Trustee's own investigation confirms facts supporting serious allegations against Romspen, as detailed below. As the Court-appointed representative of the Estate and fiduciary for all creditors with allowable claims, the Trustee owns the Estate's and Debtor's causes of action against Romspen and must protect the Estate's and all its creditors' options to recover on these claims from the Estate's assets, including the sale of the Campus, in the face of a Romspen credit bid that could total over $96 million and otherwise leave no cash proceeds to fund this recovery.

28.     In an effort to avoid this Motion, the Trustee and Romspen negotiated extensions of the Trustee's Challenge Period and the Trustee's Credit Bid Challenge deadlines to September 21, 2020 and October 1, 2020, respectively. *See* Second Notice and Stipulation Extending Challenge Period (the "Second Stipulation", ECF No. 178). The Financing Order also included Romspen's consent "to adjudication of all Credit Bid Challenges through a contested motion practice on such expedited schedule a[s] necessary to effectuate compliance with this provision." Financing Order at p.14, ¶ 11(c).

29.     To date, the Trustee has been unable to resolve this Motion with Romspen. Accordingly, the Trustee files this Motion timely and pursuant to the Financing Order's procedures. Further, Romspen previously consented to the Court's expedited consideration of this Motion. Financing Order at p.14, ¶ 11(c).

**The Trustee's Investigation**

30.     Since appointment, the Trustee and his professionals advanced a detailed investigation into Romspen's prepetition actions, liens, and claims, including obtaining thousands of pages of documents, interviewing witnesses, and serving subpoenas and turnover orders. This investigation culminated in the preparation of an adversary complaint against Romspen which seeks:

    a. Disallowance of the Romspen Claim;

    b. Equitable subordination of the Romspen Claim and assignment of Romspen's lien to the Estate pursuant to Bankruptcy Code § 510 (c); and

    c. Actual damages, punitive damages, and exemplary damages for numerous state law causes of action.

31.     In justifying this relief, the Trustee's investigation supports the accusations against Romspen summarized below, among many other similar accusations.

**Romspen's Inequitable Conduct**

32.     Romspen's conduct with respect to the Loan strongly suggests Romspen never intended to perform its funding obligations to the Debtor.

33.     Instead, Romspen delayed funding the Debtor's draws under the Loan beginning with the second draw, refused to consent to an already authorized PACE Loan required to fund critical environmental components of the Project, and manufacture a series of pretextual allegations of default against the Debtor. Romspen ignored its own professionals' warnings and pleas, improperly starved the Debtor of the funding needed to successfully redevelop the Project, and forced defaults that lead the Debtor into foreclosure, litigation, receivership, and involuntary bankruptcy, leaving millions of dollars in creditor claims unpaid.

**Romspen's Improper Control of the Project**

34.     To advance this scheme, Romspen imposed itself upon the Debtor acting as a co-developer exercising direct control over the Project – not to protect its security interest and the repayment of the Loan, but instead to wrest ownership of the Campus. Specifically,

  a.   Romspen itself negotiated the construction contract with Panache, the Debtor's general contractor, dictating the Debtor's principal business relation in developing the Project.

  b.   Romspen conditioned funding the Debtor's draw requests upon Panache and the Debtor complying with unpredictable, invasive, extraordinary, and impractical record access and production demands.

    c.   Romspen placed its own separate general contractor on-site at the Project on nearly a full-time basis to police the Project hour by hour.

    d.   Romspen and its agents directly coopted the Debtor's decision making at critical points - negotiating with the Debtor's suppliers and subcontractors, attempting to dictate leasing efforts, and influencing detailed zoning and regulatory matters.

35.    Romspen's assertion of such control deviates significantly from the lender/borrower relationship, providing Romspen improper influence of the Debtor's pre-bankruptcy decision making and operations. These facts suggest Romspen acted as a non-statutory insider of the Debtor, warranting heightened insider scrutiny of Romspen's transactions, dealings and claims. Further, this relationship imposes potential fiduciary duties on Romspen in its dealings with the Debtor. Romspen's aggressive interference extended well beyond day to day control of the Project, culminating in blocking the Debtors' third-party funding required to advance the Project.

**Romspen Deprives the Debtor of Critical PACE Funding**

36.    The Trustee's investigation developed compelling evidence of Romspen intentionally depriving the Debtor of necessary third-party funding in violation of Romspen's own loan documents. This third-party funding made up a significant portion of the Project's planned budget, knocking an unexpected hole in the Debtor's promised funding during construction. No redevelopment with the complexity of the Project could reasonably survive such a shock. Predictably, neither did the Debtor.

37.    Specifically, the Debtor obtained a commitment for a $25,000,000 principal PACE Loan. Romspen not only violated its obligation under the Loan Documents by systematically

refusing to deliver its consent to the PACE Loan, but actively interfered the Debtor's relationship with the PACE Lender.

38.     Romspen knew from before extending the Loan and executing the loan documents that the Debtor required additional financing through the PACE program to complete the Project as planned. In fact, Romspen specifically consented to PACE funding as part of the Debtor's overall funding plan. Romspen even knew the Debtor had chosen CleanFund as PACE lender.

39.     In a term sheet dated February 1, 2018, Romspen agreed to consent to a PACE funder taking a priority lien position ahead of Romspen. The final loan documents (the "Loan Agreement") incorporated this agreement as well. Section 5.13(c) of the Loan Agreement states:

> The *Lender agrees that the PACE Loan shall be a Permitted Encumbrance to title*, provided: (i) Lender shall not have issued a Declaration of Default hereunder; (ii) all proceeds from the PACE Loan either are utilized in the Work of the Project (and so offset against Budget items) or paid to Lender to be applied against the Debt; and (iii) the proceeds from the PACE Loan are to be collaterally assigned to Lender in connection with the Loan. (emphasis added)[2]

40.     Notably, this provision deprived Romspen of any right to select the PACE lender or second-guess the Debtor's choice. Nevertheless, even before Romspen executed the Loan Agreement in February 2018, the Debtor presented CleanFund to Romspen as the selected PACE lender.

41.     In October 2018, the Debtor secured CleanFund's commitment to provide PACE financing on the Project in the principal sum of $25 million, contingent on written consent from

---

[2] As set forth in the Trustee's adversary complaint, at the time the Debtor sought Romspen's formal consent to the PACE lender, (1) Romspen had not issued a Declaration of Default under the Loan Agreement, (2) all proceeds from the PACE Loan were to be utilized for the Project, and (3) the proceeds from the PACE Loan were to be collaterally assigned to Romspen in connection with the Loan. In other words, Romspen had no basis under the Loan Agreement to withhold its consent to the PACE Loan.

Romspen. In September and again in early November, 2018, the Debtor sent authorization documents for Romspen's execution to advance closing on the CleanFund loan.

42.     By mid-November, given the Debtor's failure to obtain Romspen's expected signature, CleanFund's representatives contacted Romspen making themselves available to answer any of Romspen's questions to advance approval.  Yet from mid-November 2018 to late January 2019, Romspen ceased communicating with CleanFund – despite multiple follow-ups from the Debtor and CleanFund.

43.     Meanwhile, the delay of the PACE financing caused by Romspen's refusal crippled the Project. In a progress report covering November 2018, the general contractor reported to Romspen that, with respect to the PACE financing, **"If we do not close in the early part of January, we will have fund deficiencies in completing the construction project."**

44.     In December 2018, Romspen's own project monitoring company, BTY, sounded the alarm about the lack of PACE funding disrupting the Project. The BTY report dated December 6, 2018 stated:

> has not yet requested funds for any PACE scope items. Although BTY is not providing funding recommendations on the PACE scopes of work, the completion of the scopes materially affect the ongoing success of the project. If the PACE agreement does not close, or if the funding is delayed, the project may not be completed with current loan funds. In this case, the Borrower would be required to contribute additional equity and the project would stop until such time as this occurs. Once PACE funding starts, we will include the tracking of such in our draw

BTY included this same warning in *every* monthly report to Romspen from that time forward, including reports for January, March, April, May, June, July, and August of 2019. Romspen ignored its own professionals' repeated warnings.

45.     Beginning in January 2019, Romspen's own general contractor on the ground, Dan Richardson, also underscored the lack of PACE funding's negative impact on the Project, in a series of increasingly urgent emails about the status of the PACE funding:

> Good morning
>
>  Hey skipper just following up with you about the letter from PACE that gives a deadline of 1/24/2019 to get things completed
>
>   Dan
> Sent from Dan's I Phone
>

> On Apr 8, 2019, at 3:59 PM, Dan Richardson <mitadan335@gmail.com> wrote:
>
> Just wanted to follow up with you both about PACE money, has anything changed since our conversation Friday.
>
>   Dan
>
> Sent from Dan's I Phone

› On Jun 4, 2019, at 10:44 AM, dan richardson <projectcontrol335@gmail.com> wrote:
›
› Have you had a chance to review and or speak with the PACE Lender Adam has chosen to fund the Project
›
›   Dan
›
› Sent from Dan's I Phone

From: Dan Richardson [mailto:mitadan335@gmail.com]
Sent: July 8, 2019 3:33 PM
To: Richard Weldon; Adam Zarafshani
Subject: PACE

Where are we with PACE FUNDING

46.     On March 1, 2019 – more than a year after the Debtor first notified Romspen of CleanFund's role as PACE lender – Romspen for the first time pushed the Debtor to consider a different PACE lender.

47.     Then, beginning in mid-March 2019, Romspen notified the Debtor that it would not consent to the PACE lending unless the Debtor signed a modification of the Loan Agreement adding numerous new conditions to Romspen's consent to the PACE financing, including a release of all claims against Romspen. Even though Romspen already agreed in the original Loan Agreement to consent to the PACE financing, Romspen refused to sign the PACE consent document until the Debtor signed the new loan modification document. The Debtor correctly refused to materially modify the terms of the Loan Agreement in this way.

48.     In May and June 2019, at Romspen's insistence, the Debtor considered other PACE lenders to appease Romspen, eventually selecting GreenWorks Lending ("GreenWorks"). Romspen continued to withhold its approval. By September 2019, more than a year after the Debtor first requested Romspen's consent, Romspen steadfastly refused any PACE lender.

49.     The Debtor formulated its development plans, budgets and entire funding model on PACE funding. Romspen's refusal to consent to the PACE financing – in violation of the Loan Agreement – knocked a sixteen percent deficiency hole in the Debtor's promised funding. Here, Romspen's blocking of this financing had predictable catastrophic effects on the Project. Without this funding, the Debtor could not complete the Project's critical components tied to PACE financing, rendering competition of the Project itself impossible. Romspen starved the Debtor of PACE funding with full knowledge of the resulting negative impact on the Project and over the Debtor's and Romspen's own agents' repeated pleas and warning, revealing Romspen's intent to stall and impede the Debtor into default.

**Romspen Reduces and Revokes Funding Under the Loan**

50.     At the same time Romspen blocked the Debtor's PACE funding, Romspen tightened its stranglehold on the Debtor further by reducing the Debtor's access to draws under

the Loan. On or about August 16, 2019, Romspen informed the Debtor, in writing, that Romspen would only disburse a maximum of approximately $102 million under the Loan's promised $125 million face amount.

51.     Romspen admitted that its "routine practice" is to overstate such promissory notes in its loans. The Debtor and various third parties, including contractors and venders, reasonably relied upon Romspen's promise to loan $125 million to develop the Project. In fact, combining Romspen's denial of PACE funding with this surprise denial of Loan funding **deprived the Debtor of one-third of its budgeted financing for the Project**, further sealing the Debtor's predicable fate.

52.     The Debtor's loss of tens of millions in planned funding predictably prevented payment of creditor claims, resulting in primary suppliers and contractors suspending their performance, stalling construction, and undermining relationships critical to the Project's successful completion.

53.     Having backed the Debtor into a desperate corner, Romspen withheld funding of long-pending draw requests to pressure the Debtor to execute a forbearance agreement providing Romspen expansive rights and further control and demanding the Debtor's execution of deed in lieu to assign the Campus to Romspen. Romspen's demand for a deed to the Campus is telling of Romspen's "loan to own" intentions.

54.     Meanwhile, subcontractors abandoned the Project due to non-payment. Construction crews walked off the job.

55.     By letter dated October 9, 2019, in desperate need of funds, the Debtor provided Romspen formal notice of Romspen's defaults under the Loan Documents.

56. Not coincidentally, after the Debtor substantially advanced the Campus redevelopment and just as the Debtor neared successful completion of critical rezoning and resolution of a condemnation dispute, Romspen refused to continue funding the Loan and formally declared an event of default.

57. Romspen's wrongful actions choked the Project of needed construction, reducing the Campus's value, damaged the Debtor's image, brand, and reputation; and ultimately forced the Debtor to foreclosure, culminating in a receivership and then this involuntary bankruptcy.

**The Trustee's Remedies**

58. As explained above and further detailed in the Trustee's complaint against Romspen, Romspen's improper control, systematic constrain of funding and breaches of the Loan Agreement establish the Trustee's claims for, among other relief, disallowance of and equitable subordination of the Romspen Claim and liens. As the Trustee asserts the Estate's claims against Romspen on behalf of the Debtor and all its creditors harmed by Romspen's actions, Bankruptcy Code § 510(c) authorize the Court to "(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of [Romspen's] claim to all or part of another allowed claim . . .or (2) order that any lien securing such a subordinated claim be transferred to the estate."

59. In the face of Romspen's inequitable and damaging acts against the Debtor and its creditors, the Trustee must oppose, and the Court should deny, Romspen's credit bid in the Auction. Holding an asserted claim totaling over $96 million, an unfettered Romspen credit bid risks Romspen acquiring the Campus at the Auction, with no cash proceeds to distribute to the creditors left unpaid by Romspen's actions, rewarding Romspen's inequitable behavior with ownership of the Project, free and clear. Preventing such injustice is the express goal of the Court's power to limit a credit bid "for cause" under Bankruptcy Code § 363(k).

60.     In fact, the Credit Bid Stipulations filed to date already establish the precedent and underscore the need to require Romspen to bid cash in the Auction. As noted above, the Credit Bid Stipulations provide for Romspen to fund cash escrows for the benefit of creditors holding over ninety percent (90%) of the dollar value of claims in Non-Romspen creditor pool; however, they provide no protection to the Estate itself or the remaining prepetition claims. At a minimum, the Court should condition Romspen's credit bid on its funding sufficient cash escrows to ensure the payment of these claims in the likely event the Trustee succeeds in subordination or disallowance of Romspen's secured claim. Absent such protections (already afforded to other creditors) the Court should deny Romspen's credit bid and permit only cash bids on the Project at the Auction.

## IV. RELIEF REQUESTED

61.     By this Motion, pursuant to Bankruptcy Code §§ 363(k), 510(c), 1129(b)(2)(A)(ii)[3] and 105(a), the Trustee requests the Court to limit or condition any credit bid by Romspen at the Auction. Specifically, the Trustee requests, at a minimum, the Court condition any Romspen credit bid on Romspen's deposit a total of $7.7 million cash (including $1.7 million for asserted Non-Romspen claims not covered by the Credit Bid Stipulation and $6 million for an estimated allowed amount for Panache's unsecured claim[4] not subject to the Panache Credit Bid Stipulation) pending the Court's adjudication of the Trustee's adversary proceeding against Romspen seeking to disallow and equitably subordinate the Romspen Claim (among other relief). Alternatively, the Court should deny Romspen's credit bid, permitting only cash bids at the Auction, with all liens,

---

[3] Section 1129 relates to plan sales, as the proposed sale in the case at hand is outside of the plan, the Trustee will not discuss this provision; however, to the extent applicable, the Trustee seeks relief under this provision as well.

[4] Panache filed Proof of Claim Number 22 (the "Panache Claim") asserting the total amount of $11,826,795.53, including $5,024,150.00 as a secured claim. The Trustee's estimate reduces the Panache Claim amount to account for (i) the $1,387,100.46 cash escrow the Panache Credit Bid Stipulation already provides, and (ii) $4.5 million in asserted fees which the Trustee estimates may not be allowable.

including Romspen's putative liens attaching to the proceeds for disbursement in accordance with the Court's rulings on the Trustee's adversary and similar priority, lien and claim disputes.

## V. BASIS FOR RELIEF

### A.  The Court's Power to Limit Credit Bids

62.  Pursuant to section 363(k), the Court has the power to limit a creditor's right to credit bid for cause. Section 363(k) states that:

> (k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, *unless the court for cause orders otherwise* the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11. U.S.C. § 363(k) (emphasis added).

63.  "[O]nly an allowed claim under § 502 is entitled to "credit bid" at § 363(b) sale." *In re RML Dev., Inc.*, 528 B.R. 150, 154 (Bankr. W.D. Tenn. 2014). While a secured creditor has the right to credit bid, the "law is equally clear, as Section 363(k) provides, that the Court may for cause order otherwise." *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014) (quotations and citations omitted). Further, section 105(a) states that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

64.  "The term 'cause' is not defined in the Bankruptcy Code and is left to the courts to determine on a case-by-case basis." *In re Old Prairie Block Owner, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011). Courts limit credit bid rights where (1) a creditor's allowed secured claim is in dispute, (2) the creditor engaged in inequitable conduct, and (3) where limiting a creditor's right to credit bid fosters competitive bidding.

65.     Courts routinely deny credit bidding of claims and liens subject in pending

objections and bona fide disputes. *See In re: Aéropostale, Inc.*, 555 B.R. at 415 (Bankr. S.D.N.Y.

2016) ("Courts have ... limited the right to credit bid when the validity of a creditor's lien is in

dispute.") (citations omitted)); *In re RML Development, Inc.*, 528 B.R. 150, 154–56 (Bankr. W.D.

Tenn. 2014) (a claim subject to an objection is no longer allowed and a court may estimate the

claim and deem it to be allowed in the estimated amount or disallowed for purposes of the right to

credit bid); *Securities and Exchange Commission v. Capital Cove Bancorp LLC*, 2015 WL

9701154 (C.D. Cal. 2015) (denying credit bidding rights to holders of liens in bone fide dispute

pursuant to § 363(f)(4)); *In re 160 Royal Palm, LLC*, 2019 WL 989829, *1, *8–12 (Bankr. S.D.

Fla. 2019), aff'd, 600 B.R. 119 (S.D. Fla. 2019) and stay pending appeal denied, 2019 WL 4419236

(Bankr. S.D. Fla. 2019) (the court estimated the secured creditor's claim at zero for credit bidding

purposes in the face of likely avoidance of the lien).

66.     For example, *In re RML Dev., Inc.*, a lender asserted a priority secured claim, and

an individual creditor asserted a secured claim under a constructive trust theory that arose prior to

the lender's lien. 528 B.R. 150, 152 (Bankr. W.D. Tenn. 2014). The lender sought to credit bid to

which the debtor objected seeking to limit any credit bid to the undisputed portion of the lender's

claim, objecting to the lender's interest calculation and payment ledger. *Id*. at 153 and 156. The

court limited the lender's right to credit bid to the undisputed amount of its claim. *Id.*

67.     Similarly, evidence of the secured creditor's misconduct, such as conduct to

specifically harm other creditors, constitutes "cause" to limit the secured creditor credit bid. *In re

Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr. D. Haw. 2009) (finding credit bidding party's

misconduct sufficient to deny the right to credit bid); *In re Antaeus Technical Services, Inc.*, 345

B.R. 556 (Bankr. W.D. Va. 2005) (denying secured creditor's right to credit bid upon evidence of

creditor improper actions to enhance its positions); *In re The Free Lance-Star Publishing Co. of Fredericksburg, VA*, 512 B.R. 798 (Bankr. E.D. Va. 2014) (finding cause to limit a secured creditor's credit bid due to creditor's inequitable conduct in a loan-to-own scheme and improperly recording financing, among other negative conduct).

68. Courts also limit a creditor's right to credit bid to foster a competitive bidding environment. *See In re The Free Lance-Star Publ'g Co. of Fredericksburg, VA*, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014) (stating that "limiting the amount of the credit bid in this case will restore enthusiasm for the sale and foster a robust bidding process" and "[m]aximizing the value debtors might be able to realize from the sale of their assets is an important policy advanced by the Bankruptcy Code."); *see also In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010), as amended (May 7, 2010) (stating that a "court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.").

69. In sum, courts routinely employ Section 363(k) to limit credit bidding at least (i) when an objection or dispute arises as to the amount, priority, and validity of a secured creditor's lien, including an objection to the claim through an adversary proceeding; (ii) when the creditor engaged in inequitable conduct, and (iii) where limiting a creditor's right to credit bid fosters competitive bidding.

70. As discussed below, each of these factors independently justify limiting Romspen's credit bid in the case at hand.

## VI. THE COURT SHOULD DENY OR LIMIT ROMSPEN'S CREDIT BID

71. The facts of this case warrant the Court's denial and limitation of Romspen's credit bid "for cause" under each of the key justifications: (i) Romspen's claims and liens remain subject

to numerous bona fide disputes and pending claim objection adversary proceedings; (ii) facts demonstrate Romspen's egregious inequitable conduct and infliction of harm on the Debtor and its creditors; and (iii) removing the threat of a Romspen credit bid protects and encourages competitive cash bidding at the upcoming Auction.

72.     <u>First</u>, Romspen currently lacks an allowed or estimated claim on which to base any credit bid - this alone defeats a Romspen credit bid. *See In re CS Mining, LLC*, 574 B.R. 259, 283– 84 (Bankr. D. Utah 2017) (determining that a pending adversary proceeding including an objection to the secured creditor's claim can prevent the creditor's credit bid in absence of an "allowed claim"). The Trustee's adversary, the Creditor Challenge Adversary, and the White Adversary all object to Romspen's asserted claims and liens – each raising colorable accusations to support, at a minimum, the disallowance or subordination of Romspen's liens and claims. Neither Romspen, nor any other creditor, should be permitted to use such embattled and putative claims and liens as its sole currency to purchase the Estate's primary asset.

73.     <u>Second</u>, as detailed above and chronicled in the Trustee's upcoming adversary proceeding (as well as the Creditor Challenge Adversary and the White Adversary ), the Trustee's investigation establishes a compelling record of Romspen's inequitable conduct including, among other schemes, depriving the Debtor of funding (both third-party PACE funding as well as advances under the Loan), leaving the Debtor undercapitalized and the Project underfunded, and forcing the Debtor's default with vendors, contractors, creditors, and ultimately Romspen.

74.     In addition, the investigation strongly suggests Romspen wielded extraordinary control over the Project and the Debtor, acting not as a third-party, arm's length lender, but as the Debtor's non-statutory insider with the fiduciary duties and heightened scrutiny required by such a relationship. In finding cause to limit credit bidding rights, the *in re CS Mining, LLC* court also

relied on the secured creditor's close relationship to the debtor (the equivalent of an insider). *Id*. at 283–84.

75.     Such significant inequitable conduct constitutes textbook cause under Bankruptcy Code § 363(k) and the case law to block Romspen's credit bid and prevent Romspen from profiting from and being rewarded for its improper conduct.  The Bankruptcy Code provides the Court the express means to block and condition a credit bid on these facts.

76.     In determining cause to limit a credit bid,  courts "balance the interests of the debtor, its creditors, and the other parties of interests in order to achieve the maximization of the estate and an equitable distribution to all creditors" *See In re: Aéropostale, Inc*., 555 B.R. at 415 (Bankr. S.D.N.Y. 2016) (citing cases discussing "cause") (citations and internal quotations omitted). To this point, the Credit Bid Stipulations set the precedent and demonstrate the fairness of requiring Romspen to escrow (or bid) cash to protect creditors in the Auction.

77.     The Credit Bid Stipulations already provide for Romspen to fund cash escrows for the benefit of creditors holding over ninety percent of the dollar value of Non-Romspen claims, leaving approximately $7.7 million in prepetition claims unprotected.  Granting such inequitable preference and credit bid protections to only some, but not all creditors, undermines the fairness of the sales process and this bankruptcy case.

78.     To restore balance, requiring Romspen to fund a similar escrow for the Estate's remaining unpaid creditors' benefit is fundamentally fair to Romspen. A $7.7 million **cash deposit totals less than eight percent (8%) of Romspen's asserted $96.5 million secured claim**. This limited relief, consistent with Romspen's voluntary agreements in the Credit Bid Stipulations, leaves Romspen's credit bid rights well in tack, to the tune of almost $90 million in available non-cash consideration. Thus, the equities balance in favor of granting this Motion.

79. Such a condition is limited in scope and consistent with those imposed by courts when the amount and validity of a lien is in dispute. *See In re Diebart Bancroft*, 1993 WL 21423 (E.D. La. 1993) (requiring the secured creditor fund a cash escrow or pay a portion of its bid in cash pending adjudication of a line priority dispute); *In re RML Development, Inc.*, 528 B.R. 150, 157 (Bankr. W.D. Tenn. 2014) (requiring the lender to provide a letter of credit, surety bond, or other deposit to backstop credit bid).

80. Finally, restricting Romspen's right to credit bid also facilitates the Trustee's ability to sell the Project through the proposed Auction and administer the Estate's assets for the benefit of all legitimate creditors. Permitting Romspen's unfettered credit bid, on the other hand, provides Romspen a no-cash $96 million check to purchase the Project and risks leaving no cash proceeds to the Estate and creditor (other than those Romspen already hand-picked for protection in the Credit Bid Stipulations).

81. At a minimum, the Court should condition Romspen's credit bid on its funding sufficient cash escrows to ensure the payment of all remaining claims in the likely event the Trustee succeeds in subordination or disallowance of Romspen's secured claim. Absent such protections, already afforded to other creditors, the Court should deny Romspen's credit bid and permit only cash bids at the Auction.

### VII. REQUEST FOR EMERGENCY RELIEF

82. The Trustee requests that the Court conduct an emergency hearing on this Motion in advance of the Auction scheduled for September 29, 2020. Romspen expressly consented "to adjudication of all Credit Bid Challenges through a contested motion practice on such expedited schedule a[s] necessary . . ." Final Financing Order at p. 14, ¶ 11(c). The Trustee is in immediate need of a ruling on Romspen's ability to credit bid prior to convening the Auction. The Trustee,

therefore, seeks immediate adjudication of this Motion to prevent immediate and irreparable harm to the Estate.

## VIII.RESERVATION OF RIGHTS

83.     In addition to the allegations contained and the relief requested in this Motion, the Trustee will file an adversary proceeding asserting further claims, causes of action and requests for relief against Romspen, in part based on some of the same alleged facts. Accordingly, nothing contained in this Motion is intended or should be construed as a waiver of the Trustee's, Debtor's, Estate's, or any other party's rights to further relief against Romspen or any other party. The relief requested in this Motion is neither exclusive nor an election of remedies.

WHEREFORE, PREMISES CONSIDERED, the Trustee requests that the Court (i) condition any Romspen credit bid on Romspen's funding of a $7.7 million escrow for the Estate's and its creditors' benefit; (ii) in the alternative, deny Romspen's credit bid, requiring only cash bids; and (iii) granting such other and further relief as the Court may deem just and proper.

Dated: September 15, 2020,

*/s/ Scott D. Lawrence*
Jason M. Rudd
State Bar No. 24028786
Scott D. Lawrence
State Bar No. 24087896
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Facsimile: (214) 692-6255

**COUNSEL FOR GREGORY MILLIGAN,
CH. 11 TRUSTEE FOR 3443 ZEN GARDEN, L.P.**

## **CERTIFICATE OF SERVICE**

I certify that on September 15, 2020, a true and correct copy of the forgoing was served on the parties listed in the attached service list, via ECF and/or email service where available, and otherwise via First Class United States Postal service on September 16, 2020.

*/s/ Scott D. Lawrence*