IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 1:20-10410-HCM |
| 3443 ZEN GARDEN, L.P. | § | |
| | § | Chapter 11 |
| DEBTOR. | § | |
| | § | |

DISCLOSURE STATEMENT FOR
CHAPTER 11 TRUSTEE'S AMENDED LIQUIDATING PLAN

WICK PHILLIPS GOULD & MARTIN, LLP

/s/ Scott D. Lawrence
Jason M. Rudd
State Bar No. 24028786
Scott D. Lawrence
State Bar No. 24087896
Lauren K. Drawhorn
State Bar No. 24074528
Daniella G. Heringer
State Bar No. 24103460
Emails:    jason.rudd@wickphillips.com
           scott.lawrence@wickphillips.com
           lauren.drawhorn@wickphillips.com
           daniella.heringer@wickphillips.com

COUNSEL FOR GREGORY S. MILLIGAN,
CH. 11 TRUSTEE FOR 3443 ZEN GARDEN, L.P.

Dated: November 25, 2020

<div style="border:1px solid black;">

**IMPORTANT INFORMATION FOR YOU TO READ**

</div>

     All holders of Claims or Equity Interests are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. Plan summaries and statements made in this Disclosure Statement, including the following summary, are qualified in their entirety by reference to the Plan and other exhibits annexed to the Plan. The statements contained in this Disclosure Statement are made only as of the date hereof, and there can be no assurance that the statements contained herein will be correct at any time after the date hereof.

     This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with federal or state securities laws or other applicable law.

     As to contested matters, adversary proceedings, and other actions or threatened actions, this Disclosure Statement shall not constitute or be construed as an admission of any fact or liability, a stipulation, or a waiver.

     This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor, the Chapter 11 Trustee, or any other party, nor shall it be construed to be advice on the tax or other legal effects of the Plan on holders of Claims or Equity Interests.

     The Chapter 11 Trustee is providing this Disclosure Statement to holders of Claims or Equity Interests, for their information only. Nothing in this Disclosure Statement may be used or relied upon by any person or entity for any other purpose.

## EXHIBITS TO DISCLOSURE STATEMENT

EXHIBIT A.    Chapter 11 Trustee's Amended Liquidating Plan

EXHIBIT B.    Summary of Scheduled and Filed Claims against the Estate

EXHIBIT C.    Retained Causes of Action

EXHIBIT D.    Disclosure Statement Solicitation Order

EXHIBIT E.    Trust Agreement

# TABLE OF CONTENTS

AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 25, 2020 ............................ 1
I. GENERAL INFORMATION ......................................................................................... 7
    A.       PURPOSES OF THIS DISCLOSURE STATEMENT ........................................ 7
    B.       GENERAL INFORMATION CONCERNING CHAPTER 11 ........................... 7
    C.       GENERAL INFORMATION CONCERNING TREATMENT OF
            CLAIMS AND INTERESTS .............................................................................. 8
    D.       CLASSES IMPAIRED UNDER THE PLAN ...................................................... 8
    E.       VOTING ............................................................................................................... 9
    F.       CONFIRMATION ............................................................................................... 9
          1.       Acceptance of the Plan ............................................................................ 9
          2.       Confirmation without Acceptance by all Impaired Classes ..................... 10
          3.       Best Interests Test .................................................................................. 11
II. BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11 ............................ 12
    A.       ORGANIZATIONAL INFORMATION .......................................................... 12
    B.       THE DEBTOR'S BUSINESS AND OPERATIONS ....................................... 12
    C.       EVENTS LEADING TO THE CHAPTER 11 FILING .................................. 13
III. THE BANKRUPTCY CASE ..................................................................................... 14
    A.       POST-FILING ACTIVITIES ........................................................................... 14
          1.       Employment of Professionals ................................................................ 14
          2.       Employment of Special Counsel ............................................................ 15
          3.       Financing Motion .................................................................................. 15
          4.       Romspen Settlements and Stipulations ................................................... 16
          5.       Sale Process ........................................................................................... 28
    B.       BAR DATES ...................................................................................................... 30
    C.       CLAIMS AGAINST THE DEBTOR ............................................................... 30
          1.       In General .............................................................................................. 30
          2.       Ad Valorem Tax Claims ........................................................................ 30
          3.       Administrative Expense Claims .............................................................. 31
IV. THE PLAN ............................................................................................................... 31
    A.       CLASSIFICATION AND TREATMENT OF CLAIMS AND
            EQUITY INTERESTS UNDER THE PLAN .................................................. 32
          1.       Class 1: Priority Non-Tax Claims .......................................................... 32
          2.       Class 2: Lender's Secured Claim ............................................................ 32
          3.       Class 3: M&M Plaintiff Secured Claims ................................................ 32
          4.       Class 4: Panache Secured Claims ........................................................... 33
          5.       Class 5: Other Secured Claims ............................................................... 33
          6.       Class 6: General Unsecured Claims ....................................................... 33
          7.       Class 7: Lender's Deficiency and Unsecured Claims ............................. 33
          8.       Class 8: Panache and M&M Plaintiffs' Deficiency and
                Unsecured Claims .................................................................................. 33
          9.       Class 9: Subordinated Claims ................................................................ 34
          10.     Class 10: Equity Interests ...................................................................... 34
    B.       ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX
            CLAIMS ............................................................................................................ 34

C.     IMPLEMENTATION OF THE PLAN...............................................................35
      1.    Plan Settlement...............................................................................35
      2.    The Creditor Trust..........................................................................35

V. RETENTION OF CAUSES OF ACTION .........................................................36

VI. ADDITIONAL PROVISIONS AND EFFECT OF THE PLAN ..........................38
    A.    LEGAL EFFECT OF THE PLAN...............................................................38
      1.    Exculpations.....................................................................................38
      2.    Injunction and Stay.........................................................................38
      3.    Vesting of Assets.............................................................................39
      4.    Debtor and Estate Releases.............................................................39
      5.    Releases by Holders of Claims and Interests.................................39
    B.    MODIFICATION OR REVOCATION OF THE PLAN;
       SEVERABILITY ..............................................................................................41
    C.    RETENTION OF BANKRUPTCY COURT JURISDICTION....................41
    D.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.....................41
      1.    Rejection of Executory Contracts and Unexpired Leases ........................41
      2.    Claims based on Rejection of Executory Contracts or
         Unexpired Leases .................................................................41
    E.    DISTRIBUTIONS UNDER THE PLAN.........................................................42
    F.    OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS .................................42
    G.    MANAGEMENT AND WINDDOWN OF THE REORGANZIED
       DEBTOR .........................................................................................................42

VII. CERTAIN RISK FACTORS AND BEST INTERESTS TEST ........................42
    A.    RISKS TO CONFIRMATION AND EFFECTIVENESS...................................42
    B.    ALTERNATIVES TO CONFIRMATION.....................................................43

VIII. LIQUIDATION ANALYSIS AND FEASIBILITY ........................................44
    A.    LIQUIDATION ANALYSIS ........................................................................44
    B.    FEASIBILITY ................................................................................................45

IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........45
    A.    IN GENERAL.................................................................................................45
    B.    FEDERAL INCOME TAX CONSEQUENCES TO THE
       DEBTOR .........................................................................................................46
    C.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS
       OF CLAIMS ...................................................................................................46
    D.    INFORMATION REPORTING AND BACKUP WITHHOLDING..................48
    E.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX
       ASSISTANCE ................................................................................................48

X. RECOMMENDATION AND CLOSING...........................................................48

## AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 25, 2020

THE PLAN IS PROPOSED BY THE CHAPTER 11 TRUSTEE FOR 3443 ZEN GARDEN, L.P. WHO STRONGLY URGES YOU TO VOTE TO ACCEPT IT

This Amended Disclosure Statement (this "Disclosure Statement") solicits acceptance of the Chapter 11 Trustee's Liquidating Plan, dated November 25, 2020 (the "Plan") of 3443 Zen Garden, L.P., (the "Debtor"), as debtor in the above-captioned chapter 11 case. The Plan is proposed by Gregory S. Milligan, Chapter 11 Trustee ("Chapter 11 Trustee") of the Debtor's bankruptcy estate (the "Estate").

The purpose of this Disclosure Statement is to enable holders of Claims[1] or Equity Interests impaired under the Plan and who may receive a distribution under the Plan to make an informed decision in exercising their right to vote to accept or reject the Plan.

The Plan, which is attached hereto as **Exhibit A**, provides a recovery to Allowed General Unsecured Claims principally through the settlement of all the Debtor's, the Reorganized Debtor's, the Chapter 11 Trustee's, the Estate's and any of their respective successors' and assigns' potential claims and causes of action against the Debtor's largest creditor, Romspen Mortgage Limited Partnership ("Romspen" or the "Lender"), in exchange for:

1. $600,000.00 to provide **at least a forty percent (40%) recovery to non-priority Allowed General Unsecured Claims** (the "Settlement Carve-Out") through a trust (the "Creditor Trust") with the possibility that additional asset recoveries and adjudication of claims objections may increase this distribution;
2. Romspen's subordination of its $56 million unsecured deficiency claim to prevent dilution of and to maximize the recovery to general unsecured creditors;
3. Romspen's successfully obtaining the subordination of the Panache deficiency and other General Unsecured Claims to prevent dilution of and to maximize the recovery to Non-Insider general unsecured creditors; and
4. Romspen's agreement to the Chapter 11 Trustee's continued use of cash collateral on hand to fund the Estate's, the Plan's and the Creditor Trust's administrative expenses; provided that any excess funds that remain on hand for unused surplus will be returned to Romspen upon termination of the Creditor Trust.

The Plan places the Settlement Carve-Out, Romspen's remaining cash collateral and all the Debtor's remaining assets into the Creditor Trust which will liquidate the assets and distribute the proceeds to holders of allowed claims in the priority governed by the Bankruptcy Code, subject to the voluntary subordinations set forth in the Plan, however, the Settlement Carve-Out is reserved for non-priority, Non-Insider, General Unsecured Claims. The Chapter 11 Trustee estimates less than $1.5 million in Allowed General Unsecured Claims will share in the $600,000.00 Settlement Carve-Out, providing these creditors at least a forty percent (40%) recovery on their claims, which the Creditor Trustee can distribute quickly upon confirmation of the Plan. The Chapter 11 Trustee submits this is a compelling recovery to unsecured creditors in a case that otherwise faces a $56

---

[1] Capitalized terms not otherwise defined herein are used as defined in the Plan.

million unsecured deficiency claim with risky, unliquidated, and hotly contested litigation claims providing the only potential means to achieve substantial creditor recoveries.

For the settlement consideration, the Plan provides Romspen and its affiliates a full release of liability, including a release on behalf of the Debtor's creditors, parties in interest and all third parties that do not opt out, and also provides for the return of $6.4 million of Romspen's $7 million deposit, after funding of the Settlement Carveout, that the Trustee holds in escrow pursuant to a stipulation with the Trustee. *See* ECF No. 238. Section III(A)(4)(d) of this Disclosure Statement details the Estate's potential claims against Romspen, and the Trustee's assessment of these claims, that the settlement resolves.

The Chapter 11 Trustee presents that the Plan's proposed settlement and the resulting over forty percent (40%) recovery to general unsecured creditors represents a remarkably successful proposed conclusion of the Debtor's chapter 11 case. Especially since the Debtor and its unsecured creditors faced over $96 million in asserted secured claims on the Petition Date and real estate assets now valued at $45 million to satisfy them, leaving little room for meaningful unsecured recoveries.

**How to opt-out**: If you are a holder of a Claim or Interest you will receive an Opt-Out Form with this Disclosure Statement to permit you to elect to be an Opt-Out Party and affirmatively opt out of the Third-Party Releases the Plan provides Romspen. You must return the completed Opt-Out Form to the Tabulation Agent (defined below) on or before [●] per the detailed instructions on the Opt-Out Form. **The Chapter 11 Trustee encourages all creditors to support and vote in favor of the Plan. The Chapter 11 Trustee also encourages all creditors to support the settlement by not opting out.**

A summary of the classification and treatment of Claims and Equity Interests under the Plan is as follows:[2]

| Class | Description | Entitled to Vote | Estimated Claims | Approx. Recovery | Treatment |
|-------|-------------|------------------|------------------|------------------|-----------|
| **Class 1** | Priority Non-Tax Claims | No (deemed to accept) | $0.00 | 100% | Payment in full in Cash. |
| **Class 2** | Lender's Secured Claim | Yes | $45,000,000 | 100% | Transfer of the Property pursuant to prior Bankruptcy Court order and credit bid. |
| **Class 3** | M&M Plaintiff Secured Claims | Yes | $2,922,558.68 | 100% | As provided for in the M&M Plaintiff Agreed Judgement, the stipulated amount of the M&M Plaintiff Secured Claims will be paid in full by $2,922,558.68 from the funds deposited in the Court's registry under the M&M Plaintiff Stipulation. |

---

[2] The estimated claim amounts set forth herein are based on the Chapter 11 Trustee's best estimates, as well as the proofs of claim that have been filed. The Plan contemplates empowering the Creditor Trust to object to claims against the Estate. The estimates stated in this Disclosure Statement, including all attachments hereto, are (1) not final, (2) subject to revision without notice, and (3) not binding on the Chapter 11 Trustee or the Creditor Trustee as to the amount or allowability of any Claims or Interests.

| Class | Description | Entitled to Vote | Estimated Claims | Approx. Recovery | Treatment |
|-------|-------------|------------------|------------------|------------------|-----------|
| **Class 4** | Panache Secured Claims | Yes | $1,387,100.46 | 28% | As provided for in the Panache Stipulation, with all the Liens associated with the Panache Secured Claims, to the extent Allowed, attaching to the $1,387,100.46 in funds deposited in the Court's registry. |
| **Class 5** | Other Secured Claims | Yes | $0.00[3] | 100% | At the Chapter 11 Trustee's option, receive one of the following treatments: (i) return of the Collateral securing such Allowed Secured Claim; or (ii) other treatment in accordance with section 1124 of the Bankruptcy Code. |
| **Class 6** | General Unsecured Claims | Yes | Up to $1,466,313.65[4] | >40% | Class A Interest in the Creditor Trust and thereafter receive Cash distributions from the assets of the Creditor Trust, including the $600,000 Settlement Carve-Out and the proceeds of the Creditor Trust Assets. |
| **Class 7** | Lender's Deficiency and Unsecured Claims | Yes | $56,511,950.72 | 0% | Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest of all Class A Interests; however, Class 7 shall not receive any portion of the Settlement Carve-Out. |
| **Class 8** | Panache and M&M Plaintiffs Deficiency and Unsecured Claims | Yes | $7,153,622.84 to $8,540,723.30 | 0% | Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest of all Class A Interests; however, Class 8 shall not receive any portion of the Settlement Carve-Out. |

[3] The Chapter 11 Trustee reviewed the Claims asserted as potential Class 5 Claims and estimates that none of these Claims are likely to be secured by Liens on assets with meaningful value. Accordingly, after adjudication of such Claims, the Chapter 11 Trustee estimates it is unlikely that any Claim in Class 5 will be Allowed in any meaningful amount. The Trustee has already begun the process of objecting to alleged secured claims. *See* ECF Nos. 307, 308, 309, 310, & 311. To the extent any Other Secured Claim is Allowed in Class 5, the Chapter 11 Trustee anticipates returning the collateral securing such Allowed Claim to the holder of such Allowed Claim on the Effective Date.

[4] The M&M Plaintiffs, Panache and Romspen have all agreed to subordinate any unsecured deficiency or other unsecured claims asserted them to the Allowed General Unsecured Claims held by Non-Insiders in Class 6. The estimated Allowed amounts for Claims in Class 6 thus excludes any potential unsecured deficiency or other unsecured claims asserted by Panache in the amount of up to $11,826,795.53 based on the anticipated treatment of Panache's unsecured claims as Class 8 Claims pursuant to the terms of the Chapter 11 Trustee's settlement with Romspen. Should Panache's unsecured claims be treated as Class 6 Claims the estimated Allowed amount of Class 6 Claims increases and the resulting Pro Rata distribution to Class 6 will drop significantly.

| Class | Description | Entitled to Vote | Estimated Claims | Approx. Recovery | Treatment |
|-------|-------------|------------------|------------------|------------------|-----------|
| **Class 9** | Subordinated Claims | Yes | $204,412.31[5] | 0% | Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest of all Class A Interests. Class 9 shall share in the Settlement Carve-Out, but only if and after all Class 6 Claims are paid in full with interest. |
| **Class 10** | Equity Interests | Yes | N/A | 0% | Class C Interest in the Creditor Trust and ownership of the Reorganized Debtor. Distributions to holders of Allowed Equity Interests who receive a Class C Interest shall be on a Pro Rata basis with all other Class C Interest holders, after payment in full with interest of all Class B Interests. |

The Chapter 11 Trustee believes that the Plan is in the best interests of holders of Claims and Equity Interests. Accordingly, holders of Claims and Equity Interests who are entitled to vote are urged to vote in favor of the Plan. **To be counted, your ballot must be fully completed, executed and actually received by Wick Phillips Gould & Martin, LLP c/o Scott Lawrence (the "Tabulation Agent") at the following physical address or via electronic mail no later than 5:00 p.m. (prevailing Central Time) on [●] (the "Voting Deadline):**

> **Wick Phillips Gould & Martin, LLP**
> **Attn: Scott Lawrence, Tabulation Agent**
> **3131 McKinney Ave., Suite 100**
> **Dallas, Texas 75204**
> **Email: scott.lawrence@wickphillips.com**

Holders of Claims and Equity Interests who are entitled to vote should carefully read this Disclosure Statement and the Plan in their entirety prior to voting on the Plan. Each holder of a Claim or Equity Interest should consult its individual attorney, accountant, and/or financial advisor as to the effect of the Plan on such holder.

Holders of Claims and Equity Interests will also receive an Opt-Out Form to elect to be excluded from the Third-Party Release detailed in Section 11.6 of the Plan. The Settlement Carve-Out and the Lender's subordination of its $56 million claim are the primary source of recoveries to creditors in the Plan. If you agree to provide the Third-Party Release, there is nothing you need to do other than support the Plan. If you nonetheless chose to opt-out of the Third-Party Release, you must return the completed Opt-Out Form to the Tabulation Agent on or before the Voting Deadline per the detailed instructions on the Opt-Out Form. The Chapter 11 Trustee encourages

---

[5] As of the date of this Disclosure Statement, the Subordinated Claims consist of Claims that were listed in the Debtor's schedules as contingent, unliquidated or disputed, and as to which no proof of claim was timely filed.

all creditors to support and vote in favor of the Plan. The Chapter 11 Trustee also encourages all creditors to support the settlement by not opting out.

Pursuant to section 1125(b) of the Bankruptcy Code, a hearing to approve this Disclosure Statement on a final basis (the "Disclosure Statement Hearing") has been scheduled to commence on December 1, 2020 at 1:00 p.m. Central Time, before the Honorable H. Christopher Mott, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court"), 903 San Jacinto Boulevard, Suite 326, Austin, Texas 78701. **The Bankruptcy Court will conduct the Disclosure Statement Hearing remotely through Cisco WebEx video conferencing at us-courts.webex.com/meet/mott and telephone at 650-479-3207, access code 160-357-6609#.** At the Disclosure Statement Hearing, the Court may set a date for a hearing a hearing to consider confirmation of the Plan (the "Confirmation Hearing").

Objections to the Disclosure Statement were due to be filed and served so as to be actually received by the Court, the Trustee, the Trustee's counsel, and the U.S. Trustee, on or before November 23, 2020 at 12:00 p.m. (the "DS Objection Deadline"). Objections to the Disclosure Statement are governed by Bankruptcy Rule 9014. If an objection to the Disclosure Statement was not timely filed and served, the Bankruptcy Court may not consider it. Daniel White and Lincoln 1861, Inc. filed the only objection to the Disclosure Statement (ECF No. 306, the "White Parties Objection").

Pursuant to section 1128(a) of the Bankruptcy Code, a hearing to consider confirmation of the Plan (the "Confirmation Hearing") has been scheduled to commence on [●] at __:__ _.m. Central Time, before the Honorable H. Christopher Mott, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court"), 903 San Jacinto Boulevard, Suite 326, Austin, Texas 78701. **Yhe Bankruptcy Court will conduct the Confirmation Hearing through Cisco WebEx video conferencing at us-courts.webex.com/meet/mott and telephone at 650-479-3207, access code 160-357-6609#.** At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed no later than [●] (the "Confirmation Objection Deadline") and simultaneously served on the following parties:

COUNSEL TO THE CHAPTER 11 TRUSTEE
Jason Rudd
Scott D. Lawrence
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Ave., Suite 100
Dallas, Texas 75204
Email: jason.rudd@wickphillips.com
        scott.lawrence@wickphillips.com

COUNSEL TO THE LENDER
Thomas Scannell
FOLEY & LARDNER LLP
2021 McKinney Ave., Suite 1600
Dallas, Texas 75201
Email: tscannell@foley.com

COUNSEL TO THE UNITED STATES TRUSTEE
Shane P. Tobin
OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto, Suite 230
Austin, Texas 78701
Email: shane.p.tobin@usdoj.gov

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. If an objection to confirmation is not timely filed and served, the Bankruptcy Court may not consider it.

For the convenience of Claim and Equity Interest holders, this Disclosure Statement summarizes the terms of the Plan. However, the Plan and any Exhibits and Schedules thereto are the operative documents and govern.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN AS A DESCRIPTION OF THE PLAN IN THE CHAPTER 11 CASE, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR, THE CHAPTER 11 TRUSTEE, OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE LEGAL EFFECT OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING, AND CONTAINS ESTIMATES, FORECASTS AND ASSUMPTIONS WHICH MAY PROVE TO BE MATERIALLY DIFFERENT FROM ACTUAL RESULTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR THE DATE ON WHICH THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT OR INDEPENDENT VERIFICATION. THE INFORMATION CONTAINED HEREIN AND THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT INACCURACY.

THE SECURITIES AND EXCHANGE COMMISSION HAS NEITHER APPROVED NOR DISAPPROVED THIS DISCLOSURE STATEMENT, NOR HAS IT PASSED UPON THE ADEQUACY OR ACCURACY OF THE STATEMENTS CONTAINED HEREIN.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to those terms in the Plan.

## I. GENERAL INFORMATION

### A.    PURPOSES OF THIS DISCLOSURE STATEMENT

This Disclosure Statement has been prepared by the Chapter 11 Trustee to provide information that the Bankruptcy Court has determined to be material and necessary to enable holders of Claims and Equity Interests, who are entitled to vote on the Plan, to make an informed judgment about the Plan. Confirmation of a plan pursuant to chapter 11 of the Bankruptcy Code depends, in part, upon the receipt of a sufficient number of votes in favor of the Plan. However, holders of Claims and Equity Interests whose claims are unimpaired are deemed to have conclusively accepted the Plan and are not entitled to vote thereon. As set forth in this Disclosure Statement, holders of Claims in Class 1 are unimpaired, conclusively deemed to have accepted the Plan and not entitled to vote to accept or reject the Plan. The holders of claims in Classes 2, 3, 4, 5, 6, 7, 8, 9 and 10 are impaired and entitled to vote to except or reject the Plan.

On December 1, 2020, at 1:00 p.m., the Bankruptcy Court will conduct a hearing to consider approving this Disclosure Statement as containing "adequate information." "Adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical investor typical of the holders of Claims and Equity Interests in the Chapter 11 Case that would enable such hypothetical investor to make an informed judgment about the Plan. A copy of the order approving the Disclosure Statement as containing adequate information is attached hereto as **Exhibit D**.

### B.    GENERAL INFORMATION CONCERNING CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor attempts to reorganize or liquidate its business for the benefit of itself, its creditors, and equity interest holders.

The commencement of a chapter 11 case creates an estate, comprised of all of a debtor's legal and equitable interests in property as of the date the petition is filed, wherever located and by whomever held. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. Section 1106 provides that a trustee shall, among other things, investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant tot eh case or to the formulation of a plan.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362(a) of the Bankruptcy Code provides for, among other things, an automatic stay of all attempts to collect prepetition debts against the debtor or to otherwise interfere with the debtor's property or business. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the time a plan of reorganization is confirmed.

The formulation of a plan of reorganization or liquidation is the principal purpose of a chapter 11 case. A plan sets forth the means for satisfying the claims against and equity interests in the debtor.

## C.  GENERAL INFORMATION CONCERNING TREATMENT OF CLAIMS AND INTERESTS

A chapter 11 plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. After a chapter 11 plan has been filed, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides claims and equity interests into classes and sets forth the treatment for each class. In accordance with section 1123(a) of the Bankruptcy Code, Administrative Expense Claims have not been classified in the Plan. A plan is also required, under section 1122 of the Bankruptcy Code, to classify claims and equity interests into classes that contain claims and equity interests that are substantially similar to the other claims and equity interests in such class. The Chapter 11 Trustee believes that the Plan has classified all Claims and Equity Interests in compliance with the provisions of Bankruptcy Code section 1122.

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Claims against and Equity Interests in the Debtor are classified as set forth previously at the beginning of this Disclosure Statement.

## D.  CLASSES IMPAIRED UNDER THE PLAN

Only classes of impaired claims or equity interests may vote to accept or reject a plan. A class is "impaired" if the legal, equitable, or contractual rights relating to the claims or equity interests in that class are modified by the plan. Modification for purposes of determining impairment, however, does not include curing defaults or reinstating maturity. Classes of claims or equity interests that are not "impaired" under a plan of reorganization, and each member of such class, are conclusively deemed to have accepted the plan and thus are not entitled to vote. Similarly, classes of claims or equity interests that will neither receive nor retain any property under a plan are deemed to not have accepted the plan and are thus not entitled to vote. Accordingly, acceptances of a plan will only be solicited from holders of claims and/or equity interests in impaired classes that may receive distributions under the plan.

The holders of Claims in Class 1 are unimpaired and are not entitled to vote to accept or reject the Plan. The Chapter 11 Trustee is seeking the votes of holders of claims classified as:

- Lender's Secured Claim in Class 2
- M&M Plaintiff Secured Claims in Class 3
- Panache Secured Claims in Class 4
- Other Secured Claims in Class 5
- General Unsecured Claims in Class 6
- Lender's Deficiency and Unsecured Claims in Class 7
- Panache and M&M Plaintiffs Deficiency and Unsecured Claims in Class 8
- Subordinated Claims in Class 9
- Equity Interests in Class 10

**E.     VOTING**

Holders of Claims in Classes 2, 3, 4, 5, 6, 7, 8, 9 and 10 are impaired under the Plan and are entitled to vote to accept or reject the Plan. A Ballot casting a vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such Ballot was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

All proofs of claim by creditors of the Debtor (not including Governmental Units), were required to be filed with the Clerk of the Bankruptcy Court by August 10, 2020 and proofs of claim by Governmental Units were required to be filed with the Clerk of the Bankruptcy Court by October 5, 2020 (the last date to file a claim is referred to as the "Bar Date"). If a claimant already filed a proof of claim with the Bankruptcy Court, or if the claim in question was scheduled by the Debtor as not being contingent, unliquidated, or disputed, a proof of claim need not have been filed. The schedules for the Debtor were filed with the Bankruptcy Court on May 6, 2020 and are available for inspection on the Bankruptcy Court's website at www.txwb.uscourts.gov or upon written request to the Chapter 11 Trustee's counsel. Any references in the Plan or this Disclosure Statement to any Claims or Equity Interests shall not constitute an admission of the allowability, existence, nature, extent, or enforceability thereof.

**F.     CONFIRMATION**

There are two methods by which a plan may be confirmed: (i) the "acceptance" method, pursuant to which all impaired classes of claims and interests have voted in the requisite amounts to accept the plan and the plan otherwise complies with section 1129(a) of the Bankruptcy Code; and (ii) the "cram-down" method under section 1129(b) of the Bankruptcy Code, which is available even if classes of claims vote against the Plan.

**1.     Acceptance of the Plan**

A plan is accepted by an impaired class of claims if the holders of at least two-thirds (⅔) in amount and more than one-half (½) in number of the allowed claims in such class actually voting, vote to accept the plan. A plan is accepted by an impaired class of equity interests if holders

of at least two-thirds (⅔) in amount of allowed equity interests in such class actually voting, vote to accept the plan.

BALLOTS THAT ARE SIGNED BUT THAT DO NOT EXPRESSLY INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATE BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL BE DISREGARDED.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or equity interest in an impaired class entitled to vote or that the plan otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or equity interest in such class (*see* discussion of "Best Interests Test" below).

## 2.     Confirmation without Acceptance by all Impaired Classes

Under section 1129 of the Bankruptcy Code, the Chapter 11 Trustee has the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by a class of Equity Interests.

A plan may be confirmed notwithstanding its rejection by one or more classes of claims or equity interests if, in addition to satisfying the applicable requirements of section 1129(a) of the Bankruptcy Code, the plan (1) is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan and (2) does not "discriminate unfairly."

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of secured claims if either (a)(i) the holders of such secured claims retain the liens securing such claims and (ii) each holder of a claim in such class receives deferred cash payments equal to the present value of such claim; (b) the property subject to the holders' liens is sold, subject to the creditors' right to credit bid, with the creditors' liens to attach to the proceeds of sale; or (c) the holders receive the "indubitable equivalent" of their claims.

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of unsecured claims if, with respect to such dissenting class either (a) the plan provides that each holder of a claim of such class receive or retain property of a value equal to the allowed amount of such claim, or (b) no holders of junior claims or equity interests receive or retain any property under the plan on account of such junior claims or interests.

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of equity interests if, with respect to such dissenting class, either (a) each holder of an interest of such class shall receive or retain on account of such interest property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (b) the holder of any interest that is junior to the interest of such class shall not receive or retain any property on account of such junior interest.

This fair and equitable standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or equity interests receives full

compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property under the plan on account of such claims or interests. The Chapter 11 Trustee believes that if a non-consensual confirmation is necessary, the requirements for non-consensual confirmation will be met and the Plan will be confirmed despite its rejection by any impaired dissenting Class of Equity Interests.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank. The Chapter 11 Trustee believes that the Plan meets this requirement with respect to any class of Equity Interests that might reject the Plan, because all Classes of Equity Interests are being treated the same.

### 3. Best Interests Test

Notwithstanding acceptance of the Plan by each impaired Class, in order for the Plan to be confirmed the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Equity Interest in an impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides for each holder of a Claim or Equity Interest in such Class to receive or retain on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount each such holder would receive if the Estate was liquidated under chapter 7 of the Bankruptcy Code on such date.

The Bankruptcy Court previously approved the Chapter 11 Trustee's sale of the Estate's principal asset, the Property, to Romspen for a $45 million credit bid (the "Sale"). In tandem with the Sale, the Chapter 11 Trustee negotiated a settlement with Romspen to fund the Plan and guaranty a recovery to general unsecured creditors. In exchange for receiving the Plan's proposed releases, Romspen has agreed to subordinate its $56 million unsecured deficiency claim resulting from the Sale and provide the $600,000 Settlement Carve-Out for distribution to non-priority general unsecured creditors through the Creditor Trust as well as to fund the administration of the Estate and the Creditor Trust with the remaining Romspen cash collateral in the Estate. In addition, the Plan permits the Estate's other assets to be liquidated for the primary benefit of the general unsecured creditors. The Chapter 11 Trustee estimates the Settlement Carve-Out will provide at least a forty percent (40%) immediate distribution to general unsecured creditors, with the possibility that additional asset recoveries and adjudication of claims objections may increase this distribution.

As the Chapter 11 Trustee's settlement with Romspen is conditioned on confirmation of the Plan, in any liquidation outside of the Plan, including a chapter 7 liquidation, there would be no Settlement Carve-Out or agreed subordination of the Romspen unsecured deficiency claim. Further, there would be no agreement to permit use of Romspen's cash collateral to fund administrative expenses. As a result of each of these facts, any chapter 7 case will necessarily present the significant risk of a much lower recovery, if any, to unsecured creditors. Further, the administrative expenses of a chapter 7 trustee would be paid from the Estate before chapter 11 administrative creditors or holders of General Unsecured Claims receive any distribution. As a result, and by implication, constituents will receive more under the Plan than what they would

otherwise receive if the Chapter 11 Case would be converted and the Debtor was liquidated in chapter 7. In addition, the Plan provides an immediate distribution of the Settlement Carve-Out to general unsecured creditors; however, in a chapter 7, a recovery to general unsecured creditors, if any, will be significantly delayed by uncertain litigation possibly lasting years.

## II. BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11

### A.    ORGANIZATIONAL INFORMATION

The Debtor is a privately owned Texas limited partnership. Adam Zarafshani ("Zarafshani"), Fara Ranjbaran, and 1468527 Alberta Ltd., an affiliate of Dan White ("White"), are the ultimate members of the Debtor. The organizational structure of the Debtor is as follows:



### B.    THE DEBTOR'S BUSINESS AND OPERATIONS

In the early 1970s, Motorola built its first semiconductor plant in Austin, Texas, within six miles of Austin's downtown and now the Austin Bergstrom International Airport. The site became known as the Motorola Campus. The Motorola Campus was a catalyst to the growth of the City of Austin, including the creation of thousands of jobs. Following financial difficulties and a spinoff of Motorola's semiconductor business, the Motorola Campus was largely abandoned and, in 2009, the owners sold a significant portion located at 3443 Ed Bluestein Boulevard, Austin, TX 78721 (the "Property") to a Texas real estate developer.

In 2012, a consortium of local investors purchased the Property for nominal value. The investors went to market, claiming that they would redevelop the Property, but no meaningful development took place. The buildings deteriorated, and assets were removed and sold. On September 15, 2015, an entity called MOS8 purchased the Property. MOS8 was affiliated with Romspen and affiliates of Dan White. Chris Milam, a local developer, largely spearheaded the effort. At that time, the plan was to redevelop the Property as a data center; however, disputes lead to Milam exiting MOS8.

The Debtor was formed to purchase and develop the Property as a 109-acre mixed use campus with offices, hotels, and retail spaces and utilize state of the art "green" technology, renewable energy resources and sustainable design. In November 2016, MOS8 transferred its interests in the Property to the Debtor. At this time, the Lender established a new loan for the Property.

In 2017, White teamed with Zarafshani, a real estate developer, and his company Panache Development & Construction, Inc. ("Panache") to advance a redevelopment plan. The Debtor formulated and initiated the redevelopment of a visionary mixed-use project to consist of offices, hotels, and retail spaces using renewable energy resources, energy-efficient technologies, and sustainable design (the "Project"). In early 2018, Romspen provided a $125 million construction loan (the "Loan") to the Debtor to fund the Project.

## C.    EVENTS LEADING TO THE CHAPTER 11 FILING

Romspen and the Debtor closed the Loan on April 27, 2018. The Project budget also included the Debtor obtaining a separate, supplemental loan under the Property Assessed Clean Energy Act[6] from another lender (the "PACE Loan") to fund key environmental and energy saving components of the Project. With funding from the Loan, the Debtor advanced the Project's development and construction.

In late 2018 and throughout 2019, disputes arose between the Debtor and Romspen regarding, among other issues, (i) approval of the PACE Loan, (ii) the support required for and timing of draws under the Loan, and (iii) the Loan's interest reserve account and related interest payments. These conflicts escalated over time, preventing closing on the PACE Loan and depleting available funding of the Project. Meanwhile, vendor payables grew, suppliers withheld delivery of needed materials, workers reduced and stopped work and construction progress stalled. Further, Zarafshani and White increasingly disagreed regarding the Debtor's management and means to advance the Project to completion.

By October 4, 2019, Romspen threatened the Debtor with default on the Loan and presented the Debtor with forbearance terms, which the Debtor rejected. On October 9, 2019, the Debtor served notice alleging Romspen defaults under the Loan. By letter dated October 11, 2019, Romspen notified the Debtor of the Debtor's alleged defaults under the Loan.

---

[6] The Property Assessed Clean Energy (PACE) program provides financing for efficiency and conservation improvements to commercial properties under Chapter 399 of the Texas Local Government Code. Additional PACE information is available at: https://comptroller.texas.gov/programs/seco/funding/pace.php

On October 17, 2019, the Debtor, Eightfold Development, LLC, White, and Zarafshani filed their Original Petition against Romspen, styled *3443 Zen Garden Limited Partnership, a Texas limited partnership, Eightfold Development LLC, a Texas limited liability company, Daniel White, an individual, and Adam Zarafshani, an individual v. Romspen Mortgage Limited Partnership, an Ontario limited partnership*, Cause No. D-1-GN-19-007269 in the 261st Judicial District Court of Travis County, Texas (the "Lender Litigation"). Among their developing disputes, Zarafshani and White also disagreed on how to proceed with the Lender Litigation, resulting in a deadlock. On November 26, 2019, the 261st Judicial District Court of Travis County, Texas entered an Agreed Order Appointing Receiver, appointing Rob Roy Parnell as Receiver (the "Receiver") for the Property. Mr. Parnell served as receiver until the Debtor entered bankruptcy.

### III. THE BANKRUPTCY CASE

On March 22, 2020 (the "Petition Date"), Lyle America, Inc. d/b/a Glass.com of Illinois, Austin Glass & Mirror, Inc., and ACM Services, LLC (collectively, the "Petitioning Creditors") initiated this Chapter 11 Case by filing an involuntary chapter 11 petition in the United States Bankruptcy Court for the Western District of Texas, Austin Division ("Bankruptcy Court").

The Bankruptcy Court entered its *Consent Order for Entry of Relief* [ECF No. 11] on April 8, 2020. The Chapter 11 Case is currently pending under Case No. 20-10410-HCM before the Honorable H. Christopher Mott. On April 9, 2020, the Petitioning Creditors filed an *Expedited Motion for Order Requiring Appointment of a Chapter 11 Trustee* [ECF No. 14], which the Court granted on April 15, 2020 [ECF No. 27]. The Court appointed Gregory S. Milligan as Chapter 11 Trustee for the Debtor on April 22, 2020. [ECF No. 36]. No official committee of unsecured creditors, or any other official committees, have been appointed or designated.

Upon appointment, the Chapter 11 Trustee performed an assessment of the status and condition of the Property and Project consulting with all key stakeholders and brokers and professionals familiar with the Property and the Austin commercial real estate market. The Chapter 11 Trustee determined that an orderly sale process will maximize the value and minimize the risk to the Estate. Consistent with this assessment, the Chapter 11 Trustee commenced a marketing process.

The Chapter 11 Trustee continues to manage the Debtor in this Chapter 11 Case, including presenting the Plan. A summary of the key events in the Chapter 11 Case follows.

### A. POST-FILING ACTIVITIES

#### 1. Employment of Professionals

The Chapter 11 Trustee engaged the following professionals in the Chapter 11 Case:

- Wick Phillips Gould & Martin, LLP ("Wick Phillips") as counsel;

- HMP Advisory Holdings, LLC d/b/a Harney Partners ("Harney") as financial advisors; and

- Cushman & Wakefield U.S., Inc. ("C&W") as real estate brokers.

The Bankruptcy Court entered Orders approving the employment of Wick Phillips and Harney on June 8, 2020 [ECF Nos. 86, 87] and C&W on July 27, 2020 [ECF No. 160].

**2.      Employment of Special Counsel**

The Chapter 11 Trustee also engaged the following special counsel in connection with certain Planned Development Agreement ("PDA") and Texas Department of Transportation ("TxDOT") matters:

- Sprouse Shrader Smith PLLC ("Sprouse"); and

- Foran, O'Toole & Burke LLC ("FOB").

The Bankruptcy Court entered Orders approving the employment of FOB on June 11, 2020 [ECF No. 96] and of Sprouse on June 19, 2020 [ECF No. 124].

The Chapter 11 Trustee retained Sprouse to act as special counsel in connection with the Project's City of Austin zoning and other development regulations. Specifically, before the Petition Date, the Debtor advanced a PDA to maximize the Property's permissible use by reducing the parking requirement, increasing permissible building height, and decreasing the impervious cover restriction. The Debtor spent over two years in pursuit of the PDA, which the Austin City Council approved in November 2020. Accordingly, the Chapter 11 Trustee employed Sprouse to advance the PDA and its expected positive impact on the Project's value.

The Chapter 11 Trustee retained FOB to act as special counsel in connection with a TxDOT condemnation proceeding relating to a portion of the Property. The Property includes substantial road frontage along Ed Bluestein Boulevard, also designated as U.S. Route 183 which TxDOT is widening. TxDOT initiated a condemnation proceeding seeking an easement of a portion of the Property for drainage retention (the "Condemnation Proceeding"). Prior to the Petition Date, the Debtor engaged in negotiating a consensual resolution of the Condemnation Proceeding. The Chapter 11 Trustee employed FOB to continue the negotiation and resolution of the Condemnation Proceeding in the best interest of the Estate.

**3.      Financing Motion**

As the Property and related Project remained incomplete on the Petition Date, the Estate generated no cash flow to fund maintenance of the Property and its improvements, administration of the Estate, or otherwise to preserve value to permit the sales process to advance. Accordingly, the Chapter 11 Trustee required access to cash to avoid immediate and irreparable harm to the Estate that would result if the Chapter 11 Trustee is unable to fund the chapter 11 process or maintain the Property. As an active construction site, the Property required unique additional

expenditures to preserve the value of the improvements and avoid deterioration. Accordingly, the Chapter 11 Trustee negotiated and filed a motion seeking approval of postpetition financing from Romspen to fund these critical efforts and the administration of the Estate.

The Bankruptcy Court entered an interim financing order on May 21, 2020 [ECF No. 73], a final order on June 19, 2020 [ECF No. 125], and an Amended Final Order on June 30, 2020 [ECF No. 144] (the "Financing Order").

As of September 30, 2020, Romspen had advanced $4,085,470 to the Estate in postpetition financing under the Financing Order. Romspen bid its advances as part of its credit bid to purchase the Property. As such, the Estate's liability for the advances has been satisfied.

The Financing Order further provides the Chapter 11 Trustee, Debtor and Estate a deadline by which parties in interest must initiate any challenge to Romspen's claims and otherwise assert certain potential causes of action (the "Challenge Period"). Pursuant to that certain Fifth Notice and Stipulation Extending Challenge Period under Final Financing Order (ECF No. 286), the current Challenge Period expires on December 18, 2020.

### 4.     Romspen Settlements and Stipulations

### a.     The Chapter 11 Trustee Investigates Romspen

The Debtor's prepetition Lender Litigation raised challenges to Romspen's claims and liens against the Estate and sought to recover damages from Romspen under various legal theories. Specifically, the Lender Litigation alleges Romspen engaged in a "loan to own" scheme and asserts claims of fraud, breach of duty of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, and breach of contract. The Debtor non-suited the Lender Litigation prior to the Petition Date.

Specifically, on September 15, 2020, the Trustee filed an "Emergency Motion to Limit Romspen Mortgage Limited Partnership's Credit Bid" (ECF No. 209) (the "Credit Bid Limitation Motion") and requested an expedited hearing to hear the Credit Bid Limitation Motion (ECF No. 210), which request was granted. The allegations raised by the Trustee were similar in scope and nature to those alleged by Daniel White and Lincoln 1861, Inc. and their affiliated and related entities (collectively, "White Parties", defined further herein) in an adversary proceeding filed by the White Parties in an action titled *White, et al v. Romspen Mortgage Limited Partnership, et al.*, Docket No. 20-01047 (the "White Adversary") and an adversary proceeding filed by certain secured creditors in an action titled *Austin Glass & Mirror, Inc., et al. v. Romspen Mortgage Limited Partnership, et al.*, Docket No. 20-01048 (the "M&M Plaintiff Adversary").

The Credit Bid Limitation Motion filed by the Trustee, the White Adversary and the M&M Plaintiff Adversary all made similar allegations of fraud, self-dealing, breach of fiduciary duties against Romspen. While the Credit Bid Limitation Motion and the M&M Plaintiff Adversary have been resolved by stipulation, the White Parties are pursuing their claims against Romspen raised in the Adversary. To this end, the White Parties have retained Deloitte Forensics, Inc. ("Deloitte"),

an international investigative firm. Deloitte has at its disposal investigators with extensive experience conducting forensic investigations.

The White Parties Disclosure Statement Objection requested the Trustee include language in the Disclosure Statement regarding Deloitte's investigation. The Chapter 11 Trustee analyzed Deloitte's Report referenced below and it is the Trustee's position that this Report principally restates and summarizes the Trustee's own allegations in the Credit Bid Limitation Motion and the White Parties' allegations in the White Adversary, providing no meaningful new information or analysis. Thus, the Trustee believes the Deloitte Report only confirmed the Trustee's business judgment in settling the Estate's claims and causes of action against Romspen for the Settlement Carve-Out, the subordination of Romspen's $56 million deficiency claim and related consideration that guarantees a forty percent (40%) recover to general unsecured creditors as being in the best interest of the Estate and its creditors. However, to resolve the White Parties Objection on this point, the Trustee includes the following language requested by the White Parties.

**The statements set out in the outlined area below were drafted by the White Parties and are included at their request. The following does not constitute the Chapter 11 Trustee's position.**

---

*The White Parties state the following, the Chapter 11 Trustee does not endorse these statements. The following statements are opinions provided by a third party hired by the White Parties. The following statements are NOT findings of fact, evidence or conclusions of the Court, and are not intended to be, deemed to be, or construed to be wrongdoing of any kind on behalf of the Lender.*

Deloitte has issued a preliminary report ("Report"), pursuant to which Deloitte made preliminary findings and conclusions which impact directly on the Trustee's proposed plan and the distribution to the creditors. Deloitte found that

Based on a preliminary review of documents received, in particular the September 15, 2020 Emergency Order by the Trustee, we have relied on the assumptions and facts uncovered with respect to the allegations of misconduct on the part of Romspen and through association Adam Zarafshani. It is our view that the aforementioned information and assumptions, are consistent with indicators of fraud being present. The final conclusion of fraud is a legal determination by the trier of fact.

Deloitte Report, page 11.

Deloitte further stated in the Report that they were unable to conduct the own analysis and quantification of the alleged fraud we have not been granted access to the Trustees investigation report, underlying documents nor did they have access to these documents that would be of particular importance in this matter (e.g. Zen Garden bank records, financial records, Zen Garden corporate and parties acting on behalf of Zen Garden communications). In order for Deloitte to conduct a thorough forensic investigation to independently corroborate the significant findings in the Emergency Motion by the Trustee, the Creditor Motion filed, the Commitment Letter Dated

---

February 1, 2018 and the BTY Monitoring Report from April 2018, they require additional information including that listed in Appendix A.

The White Parties anticipate presenting to the Trustee and Court any result or report of the findings from Deloitte. The White Parties also intend to vigorously question the Trustee concerning his business judgment in entering into the Stipulation with Romspen, including, but not limited to, in a 2004 examination.[7]

**The statements set out in the outlined area below were drafted by the Lender in rebuttal to the comments of the White Parties, above, and are included at its request. The Chapter 11 Trustee does not endorse these statements.**

The above contents of the Deloitte Report obtained by the White Parties are NOT findings of fact, evidence or conclusions of the Trustee or the Court. The above contents of the Deloitte Report obtained by the White Parties are one-sided opinions based on allegations raised by the White Parties against the Lender arising from ongoing, unresolved litigation. The above contents of the Deloitte Report should not be interpreted as facts, conclusions, evidence or admissions against the Lender in any way. The Lender has advised the Chapter 11 Trustee and the White Parties that the Lender VEHEMENTLY OPPOSES the opinions expressed in the Deloitte Report, and the Lender intends to rebut and neutralize the contents of the Deloitte Report in due course of the litigation between the White Parties and the Lender. The above contents of the Deloitte Report are presented herein to advise you of the extent of the Chapter 11 Trustee's investigation against the Lender and the analysis conducted by the Chapter 11 Trustee in his evaluation of the proposed settlement with the Lender. The Chapter 11 Trustee evaluated the contents of the Deloitte Report and included his analysis of the contents of the Deloitte Report (including the excerpts above) in exercising his sound business judgment to proceed with the Lender Settlement.

As the Court-appointed representative of the Estate and fiduciary for all creditors with allowable claims, the Chapter 11 Trustee owns the Estate's and Debtor's potential causes of action against Romspen. Since appointment, the Chapter 11 Trustee and his professionals advanced a detailed investigation into Romspen's prepetition actions, liens, and claims, including obtaining thousands of pages of documents, interviewing witnesses, and serving subpoenas.

Specifically, the Trustee and his professionals conducted multiple extensive interviews with the following witnesses:

- Dan Richardson, the contractor Romspen hired to oversee the Project and the Debtor's operations on Romspen's behalf;
- Adam Zarafshani, the Debtor's and Panache's principal and the person with the most personal knowledge of the Debtor's prepetition operations and negotiations with Romspen; and

---

[7] The Trustee responds that the White Parties first requested "documents and witness interviews that are referenced within the September 15, 2020 Emergency Motion along with the byproduct of the Investigation that was undertaken by the Trustee" on Friday, November 20, 2020.

- Hinshaw & Culbertson LLP ("Hinshaw"), the Debtor's prepetition law firm that conducted the prior investigation of causes of action against Romspen, drafting and representing the Debtor in the Lender Litigation.

The Chapter 11 Trustee also collected and analyzed extensive documents. The Chapter 11 Trustee collected documents from the Debtor, Panache and Zarafshani regarding the Loan, Pace Loan, related negotiations and communications as well as the amounts Romspen asserts against the Estate. Further, the Chapter 11 Trustee filed and prosecuted a motion to compel Hinshaw & Culbertson to turn over their legal files and related documents [ECF No. 198], obtaining all the following:

- Hinshaw's files regarding administration of the Loan following closing;
- Hinshaw's files regarding Debtor's attempts to obtain and close on the PACE Loan;
- Hinshaw's files regarding the preparation, filing and dismissal of the Lender Litigation; and
- Extensive correspondence related to these files.

In addition, the Chapter 11 Trustee subpoenaed documents and communications from Dan Richardson regarding his work with Romspen in overseeing the Project and the Debtor. The Chapter 11 Trustee also obtained documentation from Romspen regarding the allegations in the Lender Litigation, the PACE Loan and support for and calculation of Romspen's asserted claims.

The Chapter 11 Trustee obtained updated title lien reports on the Property and related UCC lien searches and instructed the Chapter 11 Trustee's counsel to assess the perfection and enforceability of Romspen's asserted liens on the Property

Harney, the Chapter 11 Trustee's financial advisors performed a line by line reconciliation of Romspen's asserted $96 million in prepetition claims against the Estate and the documentation supporting each amount. As a result of this analysis, Harney initially identified approximately $2.5 million in questionable amounts, totaling less than a three percent variance. In response to this analysis, Romspen provided supplemental support for these amounts. Regardless, the Harney reconciliation confirmed the advances and calculations that constitute substantially all Romspen's claims. Harney was able to reconcile 99.4% of the $96,495,021.72 that Romspen asserted in its proof of claim. Further, the Lender Settlement subordinates the entire unpaid balance of the Romspen Claim. Accordingly, any remaining objectionable portion is resolved many times over in the subordination.

This investigation culminated in the preparation of a draft adversary complaint against Romspen seeking equitable subordination of and challenging the Romspen claims and liens plus recovery of potential damages for alleged state law causes of action.

**b.      The Chapter 11 Trustee's Stipulation with Romspen**

The Chapter 11 Trustee's investigation formed the basis of the Chapter 11 Trustee's Emergency Motion to Limit Romspen Mortgage Limited Partnership's Credit Bid (ECF No. 209,

the "Credit Bid Motion"), which details the Chapter 11 Trustee's assessment of potential claims against Romspen. The Chapter 11 Trustee and Romspen successfully resolved the Credit Bid Motion through Romspen's funding of a $7,000,000 cash escrow to the Chapter 11 Trustee (the "Trustee Escrow") to adequately protect the Estate and creditors pursuant to the Stipulation and Order to Deposit Funds Between Gregory S. Milligan, Chapter 11 Trustee and Romspen Mortgage Limited Partnership Resolving Credit Bid Challenge (ECF No. 238, the "Credit Bid Stipulation").

### c. The Chapter 11 Trustee's Proposed Settlement with Romspen

As announced on the record during the Bankruptcy Court's October 7, 2020 hearing in this Chapter 11 Case and detailed in this Disclosure Statement and the Plan, the Chapter 11 Trustee negotiated the settlement of all the Debtor's, the Reorganized Debtor's, the Chapter 11 Trustee's, the Estate's and any of their respective successors' and assigns' potential claims and causes of action against Romspen, in exchange for (the "Lender Settlement"):

1. The Settlement Carve-Out of $600,000.00 from the Trustee Escrow to provide a recovery to non-priority Allowed General Unsecured Claims, estimated as providing at least a forty percent (40%) recovery, with the possibility that additional asset recoveries and adjudication of claims objections may increase this distribution;

2. Romspen's subordination of its $56 million unsecured deficiency claim to prevent dilution of and to maximize the recovery to General Unsecured Claims;

3. Romspen's successfully obtaining the subordination of the Panache deficiency and other General Unsecured Claims to prevent dilution of and to maximize the recovery to Non-Insider general unsecured creditors; and

4. Romspen's agreement to the Chapter 11 Trustee's continued use of cash collateral on hand to fund the Estate's, the Plan's, and the Creditor Trust's administrative expenses; provided that any excess funds that remain on hand for unused surplus will be returned to Romspen upon the termination of the Creditor Trust.

For the settlement consideration, the Plan provides Romspen and its affiliates a full release of liability, including a release on behalf of the Debtor's creditors, parties in interest and all third parties that do not opt out. Further, the Chapter 11 Trustee's proposed settlement with Romspen is conditioned on Romspen obtaining an agreement with Panache that includes Panache's agreement to subordinate its potential unsecured claims as provided by the Plan. The Lender Settlement also provides for the return of the Trustee Escrow, net of the Settlement Carveout, which Romspen placed in escrow with the Chapter 11 Trustee pursuant to the Credit Bid Stipulation. *See* ECF No. 238.

### d. Justification of the Lender Settlement under Fed. R. Bankr. P. 9019 and Applicable Standards

Since his appointment, the Chapter 11 Trustee worked diligently to understand and form an opinion about the Estate's claims against Romspen. The Chapter 11 Trustee's and his professionals' investigation is detailed above in this Disclosure Statement and supported an extensive evaluation of all of the claims and causes of action brought against Romspen by the

Debtor prior to the Petition Date in the Lender Litigation, as well as additional potential causes of action held by the Estate under the Bankruptcy Code and other legal theories. The Chapter 11 Trustee and his professionals have conferred with key witnesses and the Debtor's pre-bankruptcy attorneys at length to understand the nature of those claims and the cost-benefit viability of pursuing those claims and others against Romspen. This analysis was based on the best interests of the creditors of the Estate and maximizing the return to the creditors in this Chapter 11 Case. The Chapter 11 Trustee and his professionals have spent months analyzing the evidence and evaluating the viability of the causes of action the Estate has against Romspen. The Chapter 11 Trustee has relied on his expertise as an experienced bankruptcy fiduciary and litigant as well as his professionals' informed advice and recommendations. The Chapter 11 Trustee has decided to settle with Romspen pursuant to the terms and conditions described in the Lender Settlement. The Chapter 11 Trustee strongly believes that the terms of the Romspen settlement are fair and equitable and in the best interests of the Estate. As a result, the Chapter 11 Trustee believes that the Romspen settlement and compromise should be approved pursuant to Rule 9019(b) of the Federal Rules of Bankruptcy Procedure in this Plan.

The Chapter 11 Trustee has asserted against Romspen certain claims, including, without limitation, the following causes of action:

1. Claim Objection – including subordination, lien avoidance, claim disallowance
2. Breach of Fiduciary Duty
3. Fraud in the Inducement
4. Fraud
5. Constructive Fraud
6. Real Estate Fraud under the Texas Business and Commerce Code
7. Negligent Misrepresentation
8. Negligence
9. Gross Negligence / Recklessness
10. Breach of Good Faith and Fair Dealing
11. Economic Duress
12. Civil Conspiracy
13. Accounting
14. Constructive Trust
15. Fraudulent Transfer under Bankruptcy Code Sec. 548 and state law theories
16. Related Injunctive Relief

A portion of the factual allegation supporting these causes of action are set forth in the Credit Bid Motion. *See* ECF No. 209.

Romspen vehemently disputes the allegations asserted by the Chapter 11 Trustee. Romspen has communicated to the Chapter 11 Trustee the extent to which Romspen will oppose any lawsuit brought by the Chapter 11 Trustee on these claims. Specifically, Romspen has communicated to the Chapter 11 Trustee that Romspen would force the Estate to file a lawsuit, engage in extensive discovery, expert disclosures, numerous depositions, dispositive motion practice, and ultimately trial of the disputed allegations supporting the Chapter 11 Trustee's articulated causes of action. Given the extent and nature of the allegations supporting the Estate's causes of action, the litigation

required to adjudicate these claims would be extremely fact intensive and take a considerable amount of time with great risk posed to both sides, given the unknown nature of claims and defenses asserted by the Chapter 11 Trustee and Romspen, respectively. Just as Romspen disputes the Chapter 11 Trustee's allegations, the Chapter 11 Trustee likewise disputes Romspen's responses to the Chapter 11 Trustee's position and allegations on the above-cited claims.

The Chapter 11 Trustee and Romspen have engaged in months-long good-faith, arms-length settlement negotiations to avoid the costs, expenses, risks, uncertainties, and burdens of litigation over the claims, including attending a full day mediation and follow up sessions with former Bankruptcy Judge Leif M. Clark. Subject to the Bankruptcy Court's approval, as a result of those negotiations, and to avoid the expense, inconvenience, delay, risks, and uncertainty of further litigation, the Chapter 11 Trustee and Romspen have agreed to fully and completely resolve their disputes under the proposed Lender Settlement outlined above and detailed in the Plan.

This Court has the right and the power to approve the Lender Settlement. *See* 11 U.S.C. § 105; FED. R. BANKR. P. 9019. Bankruptcy Rule 9019(a) provides, in pertinent part, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a).

The Chapter 11 Trustee strongly believes that the Lender Settlement is in the best interests of the Estate and the creditors thereof; thus, it should be approved. Settlements and compromises are a "normal part of the process of reorganization." *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939). The Supreme Court of the United States has further said: "In administering [Bankruptcy] Proceedings in an economical and practical manner, it will often be wise to arrange the settlement of claims as to which there are substantially and reasonable doubts." *Protective Comm. of Stockholders of TMT Trailer Ferry, Inc. v. Anderson (In re TMT Trailer Ferry, Inc.)*, 390 U.S. 414, 424 (1968), on remand, *TMT Trailer Ferry, Inc. v. Kirkland*, 471 F.2d 10 (5th Cir. 1972). Settlements are "desirable and wise methods of bringing [closure] to . . . proceedings otherwise lengthy, complicated and costly." *Matter of Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

Under Bankruptcy Rule 9019(a), this Court may approve a compromise or settlement "on motion by the trustee and after a hearing on notice to creditors, the debtor and indenture trustee . . . ." *TMT Trailer Ferry, Inc.* 390 U.S. at 424. "In conducting a hearing under Rule 9019(a), the bankruptcy court is to determine whether the proposed compromise is fair and equitable, and in the best interests of the bankruptcy estate." *Id.* In making this determination, a bankruptcy judge is required to apprise himself "of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Id.* To determine whether a settlement should be approved under 9019, the Court should:

> form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of the litigation.

*Id.* at 424-25.

The decision whether to approve a particular settlement is within the discretion of the bankruptcy court. "It must be remembered that the evaluation of any lawsuit is quite problematic and calls for a significant degree of speculation." *Texas Extrusion Corp. v Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142, 1159 (5th Cir. 1988). A reviewing court will uphold the approval of a settlement if it is the result of "an adequate and intelligent consideration of the merits of the claims, the difficulties of pursuing them, the potential harm to the debtor's estate caused by delay, and the fairness of the terms of the settlement." *TMT Trailer Ferry, Inc.*, 390 U.S. at 434.

The Fifth Circuit has adopted the following factors to consider in evaluating the propriety of a proposed settlement or compromise:

    A.   The probability of success in the litigation, with due consideration for the uncertainty in fact and law;

    B.   the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

    C.   all other factors bearing on the wisdom of the compromise.

*Matter of Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

The Chapter 11 Trustee submits that the Lender Settlement meets each of the *Jackson Brewing* factors.

<u>Probability of Success on the Merits</u>. The Chapter 11 Trustee recognizes that all litigation has risk and uncertainty. The claims and rights to be released or compromised under the Lender Settlement are no different. Litigation over the claims would require fact-intensive inquiries and substantial proof presentations at contested hearings and trial. As a result, both of the Chapter 11 Trustee and Romspen each bears risk as to the ultimate outcome. The Chapter 11 Trustee has taken this risk (and probability of success) into consideration in analyzing and evaluating the Lender Settlement.

To this point, the Chapter 11 Trustee and the Estate face specific hurdles to ultimate success against Romspen on the alleged claims, including:

- **Limitations on Liability** – The Debtor's Loan Agreement with Romspen contained a limitation-of-liability provision that may limit the type and amount of damages the Estate may recovery from Romspen. Texas law governs the Loan Agreement and the Texas Supreme Court recently held that limitations of liability provisions are enforceable and will prevent an award of punitive damages in a fraud case. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 231–32 (Tex. 2019).

- **The Debtor's Potential Defaults** – The Debtor's Interest Reserve Fund that funded the Debtor's interest payments under the Loan exhausted in September 2019, resulting in the Debtor lacking funds to make further interest payments under the Loan. Although the

implications of this fact are disputed, the cessation of interest payments under the Loan presents a meaningful potential default under the Loan, as Romspen noted in declaring a formal default under the Loan in October 2019. This and other potential defaults by the Debtor, and the Debtor's inability to cure the potential default, undermine the Debtor's causes of action and damage model against Romspen.

- **Inconsistent Stories** – The Chapter 11 Trustee has documented communications by the Debtor and related witness reports that present inconsistent stories regarding the reasons for delays in the Project, Romspen's cooperation and the Debtor's ability to fund the Project to completion. The Debtor's prior non-suit of the Lender Litigation reinforces this concern.

- **The Debtor's Ability to Refinance or Fund the Project** – Witnesses have questioned, and the Chapter 11 Trustee has been unable to establish, the Debtor's ability, independently or through any credible support from its existing equity holders, including the White Parties, to obtain financing or capital to replace the Loan at maturity.

- **Texas Law on Lender Liability** – Under Texas law, lenders like Romspen do not generally owe a duty of good faith and fair dealing to borrowers.[8] The Chapter 11 Trustee must establish "extraordinary circumstances" for Romspen to be found to owe fiduciary and other duties to the Debtor. While the Chapter 11 Trustee sites some evidence in the Credit Bid Motion, the Chapter 11 Trustee and Estate face an uphill battle on such claims in Texas.

To protect attorney client privilege, the Chapter 11 Trustee will not detail all of the concerns and challenges facing the Debtor's causes of action against Romspen; however, the above list provides some important examples. In sum, the Chapter 11 Trustee's investigation reveals meaningful factual and legal obstacles in succeeding in litigation against Romspen. The Lender Settlement provides the Estate a substantial recovery on these claims without these risks. The probability of success on the merits supports the Lender Settlement.

<u>Complexity, Expense, and Likely Duration of the Litigation</u>. The Chapter 11 Trustee investigated the Debtor's claims subject to the Lender Settlement over an eight-month period and incurred over $65,000 in profession fees on this investigation alone. The claims include causes of action subject to pre-bankruptcy Lender Litigation between the Debtor and Romspen initiated in October 2019 for which the Debtor incurred hundreds of thousands of dollars in legal fees. Accordingly, the claims subject to the Lender Settlement have already been the subject of litigation ongoing for more than a year with no pending suit on file. This history demonstrates the complexity, expense and likely duration of the litigation the Lender Settlement resolves.

---

[8] *Hagood v. Countrywide Home Loans, Inc.*, No. A-17-CA-00784-SS, 2017 U.S. Dist. LEXIS 165943 (W. D. Tex. October 6, 2017) ("Without providing details, Plaintiff contends Defendants breached their fiduciary duties to him. However, under Texas law, a mortgage lender or servicer generally does not owe a fiduciary duty to a borrower. Plaintiff has failed to allege extraordinary circumstances giving rise to a fiduciary duty owed to him in this case. To the extent Plaintiff relies on fiduciary duties between Defendants themselves, such claims also fail because Plaintiff himself was owed no duty.").

The Estate would bear substantial litigation expenses to proceed with litigating the claims, including, for example, extensive and document-heavy written discovery, numerous depositions, expert engagement and disclosures, pretrial motions, *Daubert* motions, dispositive motions, trial brief preparation, mediation and preparation for and participation in a lengthy trial, and potential appeal(s) by one or both parties. Given the Estate holds no funds on hand to support the litigation of the claims against Romspen, the Chapter 11 Trustee must locate and hire counsel on a full contingency fee basis to prosecute the claims. Further, such counsel or other funding sources must be willing to advance out of pocket expenses, such as expert fees, discovery and deposition costs and related expenses likely to exceed hundreds of thousands of dollars.

As to duration, given the novelty of the Debtor's claims against Romspen, the tens of millions of dollars at stake, and Romspen's demonstrated ability to litigate aggressively with skilled counsel, the Chapter 11 Trustee concludes that any recovery against Romspen will come only after years of litigation, including exhaustion of all available appeals. Romspen is a sophisticated and well-funded litigant. Accordingly, the Chapter 11 Trustee believes prosecuting the claims will be neither easy, nor quickly resolved, nor inexpensive. The amount of money available for creditor distributions depends on the Chapter 11 Trustee's success and recovery on the claims, less the amount required to prosecute and collect on any such success. Further, any resulting distribution to creditors, if any, is likely years away. The Lender Settlement will provide the Estate the certainty needed to (a) monetize the claims, (b) subordinate Romspen's Unsecured Claim against the Estate, (c) create value for the Estate, and (d) distribute that value to legitimate creditors as quickly as reasonably practicable.

The Chapter 11 Trustee is confident that he has appropriately accounted for the expense and likely duration of litigating the claims and disputes subject to the Lender Settlement. Given the (i) cost of contingency counsel and the contingency fee payable upon any settlement or success of prosecuting the claims against Romspen; (ii) the value of the claims; (iii) the viability of success on the Claim, including the risk and uncertainly naturally arising from litigating the fact-intensive nature of these specific claims; and (iv) the length of time involved in actually recovering any monetary value on the claims. The Chapter 11 Trustee is confident that approval of the Lender Settlement is a sound exercise of the Chapter 11 Trustee's business judgment after an extensive, diligent investigation and analysis of the claims against Romspen.

<u>Other Facts and Circumstances Bearing on the Wisdom of the Lender Settlement</u>. The Lender Settlement benefits the Estate and the creditors because it provides Allowed General Unsecured Creditors at least an immediate forty percent (40%) recovery on their Claims, with the possibility that additional asset recoveries and adjudication of claims objections may increase this distribution. Such a result mirrors success in litigation with Romspen while saving the Estate from incurring substantial risk, additional expense, and remarkable delay in prosecuting the claims. Balancing (i) the contingency fee payable to contingency counsel against (ii) even a liberal estimated recovery on the claims would likely net a lower amount to creditors of the Estate and would take much longer to monetize, which would result in a substantial delay in distributions to creditors.

Importantly, the Lender Settlement provides the Estate with needed certainty on the subordination of Romspen's $56 million unsecured Claim against the Estate. Without the

subordination, even if successful on some of the monetary value of the claims, if the equitable subordination claim is not proved against Romspen, then Romspen (holding by far the largest unsecured claim) would take the "lion's share" of the monetary value of the claims. Romspen also negotiated and obtained the subordination of Panache's unsecured Claims, further maximizing the recovery to Non-Insider General Unsecured Claims. Romspen's and Panache's agreements to fully subordinate their unsecured Claims represent substantial value to the Estate and its General Unsecured Creditors.

Further, the Lender Settlement also separately funds the Estate's and the Creditor Trust's administrative expenses, adding hundreds of thousands of dollars in additional cash value to ensure the feasibility of the Plan and the preservation of the Settlement Carve-Out and other Estate assets for General Unsecured Creditors.

Accordingly, the Chapter 11 Trustee is confident that the Lender Settlement is in the best interests of the Estates and serves the "paramount interests" of the creditors by maximizing the ultimate net return to creditors in this case. Put simply, the Lender Settlement is a good deal for the Estate and its creditors. A settlement should be approved when the settlement is fair and equitable and in the best interest of the estate. *See In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015); *see also In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). A plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate and the Bankruptcy Court should approve the Lender Settlement as an integral part of the Plan. 11 U.S.C. § 1123(b)(3)(A).

Apart from the Chapter 11 Trustee's resolution of the Estate's disputes with Romspen, certain potential secured creditors have asserted their own potential claims and challenges against Romspen and negotiated separate stipulations providing for the adjudication of these disputes and funding of a recovery on any resulting Allowed Secured Claims. These stipulations are discussed below.

### e.     M&M Plaintiff Secured Claim / Removables Challenge

The M&M Plaintiffs alleged their Claims are superior in priority to the Lender's with respect to pre-petition collateral consisting of "removables." On June 25, 2020, the Bankruptcy Court entered a Removables Challenge Scheduling Order, setting forth a process and procedure for the adjudication of any Removables Challenge (as defined in the Financing Order) (ECF No. 138). The M&M Plaintiffs, together with Panache, filed their Complaint and Objection to Romspen's Proof of Claim on August 20, 2020 (ECF No. 192, Adv. Proc. No. 20-1048), which initiated the M&M Lien Claimant Adversary. Romspen agreed to escrow funds sufficient to satisfy the M&M Plaintiff Secured Claims pursuant to the Stipulation and Order to Deposit Funds in the Registry of the Court Between the M&M Plaintiffs and Romspen Mortgage Limited Partnership Resolving Credit Bid Challenge (ECF No. 221, the "M&M Plaintiff Stipulation").

On November 18, 2020, the Bankruptcy Court entered the Agreed Judgement in the M&M Lien Claimant Adversary [ECF No. 29 in Adversary 20-01048-hcm] (the "M&M Plaintiff Judgment"). The M&M Plaintiff Judgment allowed the M&M Plaintiff Secured Claims in the amount of $2,922,558.68 and paid this amount in full from the $3,787,597.80 in cash Romspen

funded to the registry of the Court to serve as an escrow under the M&M Plaintiff Stipulation. The M&M Plaintiffs have agreed with the Chapter 11 Trustee to subordinate their remaining unsecured deficiency claims in the amount of $865,039.12 to the Class 6 General Unsecured Claims. Accordingly, the Plan provides for the M&M Plaintiff's Unsecured Claims to be Allowed and treated as Class 8 Panache and M&M Plaintiff Deficiency and Unsecured Claims.

### f.    Panache Secured Claim and Stipulation

Panache alleges that it has a secured claim that is superior in priority to the Lender with respect to pre-petition collateral. Panache is a party to the M&M Lien Claimant Adversary. The Lender has agreed to escrow funds sufficient to satisfy the M&M Plaintiff Secured Claims to the extent they are allowed pursuant to Stipulation and Order to Deposit Funds in the Registry of the Court Between Adam Zarafshani, Panache Development & Construction, Inc., and Romspen Mortgage Limited Partnership Resolving Credit Bid Challenge (ECF No. 222, the "Panache Stipulation"). The Panache Stipulation includes Romspen's provision of $1,387,100.46 to the Bankruptcy Court, to be held in escrow pending resolution of Panache's claims under the M&M Lien Claimant Adversary. To the extent Panache's claims are determined not to be secured, it may assert deficiency claims against the Estate, which claims, if allowed, will be entitled to treatment as Class 8 Panache Deficiency and Unsecured Claims.

Panache's claims in the M&M Lien Claimant Adversary are expressly preserved and unaffected by the Plan, which reserves and preserves all parties' rights, claims, liabilities, defenses, affirmative defenses, causes of action and other interests asserted in the M&M Lien Claimant Adversary, as described in the Section 11.8(c) of the Plan. For the avoidance of doubt, to the extent the White Parties' claims in the White Adversary are derivative of the Debtor's rights or the Estate's rights, those claims will be released under the Plan; however, the White Parties' claims that are not derivative of the Debtor or Estate are expressly preserved and unaffected by the Plan.

### g.    The White Parties' Adversary

On August 8, 2020, Daniel White, the Dan White Family Trust, a Canadian Trust, Absolute Environmental Waste Management, Inc., Absolute Energy Resources, Inc., Lot 11 GP, Ltd., Lot 11 Limited Partnership, Eco Industrial Business Park, Inc., Symmetry Asset Management Inc., and Lincoln 1861, Inc. (together, the "White Parties") filed the White Adversary. The White Adversary complaint alleges twenty-six counts, including seeking the disallowance of Romspen's claims and liens and recovery of damages against all defendants.

The Plan addresses the White Parties' claims in the White Adversary in Section 11.8(b) as follows:

> Reservation of White Parties' Litigation. The releases and injunctions in favor of Lender contained in this Plan do not extend to or otherwise apply to any valid, viable, ripe, live / non-moot, and currently existing claims and causes of action to which the White Parties have standing to assert against Lender in Adversary Case Number 20-1047, currently pending before the Bankruptcy Court ("White Adversary"). All parties' rights, claims, liabilities, defenses, affirmative defenses, causes of action and other interests asserted in the White Adversary,

including without limitation, all dispositive motions and other forms of relief requested, are expressly reserved and preserved by this Plan. For the sake of clarity, Lender is expressly released under the Plan by all Releasing Parties and Third Party Releasing Parties on any and all Claims, causes of action, disputes and challenges (specifically including any claims objections, lien challenges and requests for subordination), except the causes of action held by the White Parties based on any timely and properly asserted claims in the White Adversary that are valid, viable, live / not moot and to which the White Parties have standing to assert against Romspen, subject to any motions to dismiss and/or other dispositive motions filed by Romspen to be adjudicated in the White Adversary in due course. Any moot claims and claims to which the White Parties lack standing (including any potential overlap with the Claims already settled by the Chapter 11 Trustee under the Lender Settlement) would be disposed of by the Lender Settlement because only the Chapter 11 Trustee has standing to assert and settle the Claim. Those "overlapping" claims will be likewise disposed of in the White Adversary pursuant to Romspen's pending motion to dismiss, such that the any claims asserted by the White Parties in the White Adversary that qualify as the Claims settled by the Chapter 11 Trustee under the Lender Settlement will be dismissed with prejudice. To the extent the White Parties have asserted any claims in the White Adversary that the White Parties do not have standing to assert (including, without limitation, the Claims settled by the Chapter 11 Trustee under the Lender Settlement) will NOT be preserved under this Plan and will be completely and finally disposed of by the Lender Settlement under this Plan. Only those valid, viable, live / non-moot claims that the White Parties have standing to assert against Romspen in the pending White Adversary are hereby preserved to be prosecuted only by the White Parties and only through the White Adversary. To the extent the White Parties have standing to bring any ripe / non-moot, valid causes of action against Romspen in the White Adversary, then only those timely filed, viable causes of action will survive the Lender Settlement and be preserved under this Plan. The White Parties' rights to continue prosecuting only those ripe / non-moot, valid causes of action and challenges asserted against Romspen in the White Adversary to which the White Parties have standing ("Viable Claims") will continue. Romspen's and the White Parties' respective rights and defenses as to those Viable Claims are expressly preserved and reserved to be determined in due course of the White Adversary without substantive determination through the Plan.

## 5. Sale Process

As explained above, the Property and related Project constituted the Debtor's principal asset on the Petition Date. Upon appointment, the Chapter 11 Trustee performed an extensive inspection of the Property and assessment of its condition and redevelopment. As well documented in the Chapter 11 Case, the Chapter 11 Trustee determined in his business judgment, the best and most efficient path forward for the Estate and its creditors included a sale process designed to generate the highest and best bid for the Property while preserving, maintaining and enhancing the Property's value during the marketing process.

To maximize the value of the Property and thus the benefits to the Estate's creditors, the Chapter 11 Trustee sought proposals from multiple potential brokers for the Property and extensively interviewed three primary candidates. All three brokers confirmed an approximately ninety-day marketing process provided sufficient time to locate all likely buyers and enable potential bidders to complete due diligence and submit an informed bid. Upon completion of broker interviews and negotiations, the Bankruptcy Court approved the Chapter 11 Trustee's retention and employment of C&W to serve as the Estate's real property broker to conduct a three-month marketing and sale process (the "Marketing Process"). *See* ECF Nos. 137 & 160. C&W and the Chapter 11 Trustee prepared and organized the Marketing Process in late June and opened the virtual data room to potential bidders on July 6, 2020.

After actively marketing the Property for forty-five days, the Chapter 11 Trustee filed his Motion for Orders (I) Authorizing and Approving (A) Bid Procedures, and (B) Form and Manner of Notices for the Bid Procedures and Resulting Sale, (II) Scheduling an Auction to Determine the Highest and Best Offer, (III) Scheduling a Hearing to: (a) Approve the Sale of Assets to the Successful Bidder Free and Clear of Liens, Claims and Encumbrances, and (b) Authorize the Debtor to Assume and Assign Executory Contracts and Unexpired Leases in Connection with the Sale, and (IV) Granting Related Relief (ECF No. 175, the "Sale Motion").

In addition to seeking authorization to sell the Property, the Sale Motion requested, and the Bankruptcy Court granted, approval of procedures (ECF No. 194, the "Bid Procedures") to govern the solicitation, submission, and selection of bids for the sale of the Property. The Bankruptcy Court approved Bid Procedures and set September 25, 2020 (the "Bid Deadline") as the deadline for submission of bids. The Bid Procedures scheduled an auction among any competing bidders for September 29, 2020 (the "Auction"). The Marketing Process culminated in two qualified bids for the Property, one all-cash bid from an affiliate of Dan White in the total amount of $13 million and another from Romspen. The Chapter 11 Trustee conducted the Auction and selected Romspen's $45 million credit bid as the highest and best offer for the Property. The White Parties contend the Chapter 11 Trustee should have accepted the White Parties' $13 million cash bid over the Romspen $45 million credit bid; however, the White Parties ignore the fact that Romspen's liens would attach to the $13 million cash and, absent the full subordination or disallowance of Romspen's claims, none of the $13 million cash would provide a recovery to any creditor except Romspen, and still leave Romspen with an $88 million deficiency claim. The Bankruptcy Court approved the Chapter 11 Trustee's acceptance of the Romspen Credit Bid as the "highest and best" consideration for the Property.

On October 7, 2020, the Bankruptcy Court entered its Order Authorizing and Approving the Sale of Certain of Debtor's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and Granting Related Relief entered by the Bankruptcy Court (ECF No. 278, the "Sale Order") which approved the sale of the Property to Romspen. The Chapter 11 Trustee closed on the Sale of the Property to Romspen on October 15, 2020 (the "Sale"), which satisfied $45 million of Romspen's claims, including all the Postpetition Indebtedness (as defined in the Financing Order). The White Parties still state their $13 million cash offer is open; however, the Sale Order is a Final Order, the Sale has closed, and the Bankruptcy Court approved the Chapter 11 Trustee's rejection of this offer.

Pursuant to the Sale, the Estate no longer holds the Property, leaving potential claims and causes of action as the Estate's remaining primary assets which the Plan places in the Creditor Trust to be liquated for the benefit of creditors.

## B.    BAR DATES

The deadline for creditors, except Governmental Units, to file proofs of claim in these cases was August 10, 2020. The deadline for Governmental Units to file proofs of claim in these cases was October 5, 2020.

Under Section 2.1 of the Plan, requests for payment of administrative expense claims arising prior to the Effective Date must be filed within thirty (30) days after the Effective Date. Professional Persons holding Fee Claims must also file such claims within thirty (30) days after the Effective Date.

## C.    CLAIMS AGAINST THE DEBTOR

### 1.    In General

A summary of Claims against the Debtor as set forth in (i) the Debtor's schedules and (ii) proofs of claim filed against the Estate, is included as **Exhibit B** to this Disclosure Statement.

To date, the Chapter 11 Trustee has performed a reconciliation of the claims from the Debtor's bankruptcy schedules versus the actual proofs of claim filed, in addition to claims allowed pursuant to order(s) of the Bankruptcy Court. After accounting for objectionable and duplicative claims, the Chapter 11 Trustee believes the pool of General Unsecured Claims is at most $1.4 million and possibly much less depending upon claim objection resolutions and settlement payments creditors may receive from third parties to resume work at the Property.

In addition to filed proofs of claim, the Debtor scheduled approximately $200,000 in potential unsecured claims as either contingent, unliquidated or disputed, for which the scheduled creditors filed no proof of claim. The Plan proposes, and the Chapter 11 Trustee will file a motion to Allow these contingent, unliquidated and disputed scheduled Claims as Class 9 Subordinated Claims, to share in Creditor Trust distributions only if and after payment in full of Allowed Class 6 General Unsecured Claims.

The Chapter 11 Trustee reserves any and all rights, claims, objections, or other defenses to all claims. Objections to claims will be pursued by the Chapter 11 Trustee before the Plan's Effective Date and after the Creditor Trust after the Effective Date.

### 2.    Ad Valorem Tax Claims

Travis County and relate taxing authorities asserted $177,796.18 in estimated 2020 ad valorem tax Claims secured by the Property. Pursuant to the Sale Order, Romspen assumed and will pay all ad valorem tax Claims.

### 3. Administrative Expense Claims

The Chapter 11 Trustee believes that, as of the date of entry of the Confirmation Order, there will be approximately $20,000, in unpaid administrative claims not already covered by carve-outs provided in the Financing Order. The Chapter 11 Trustee has satisfied the Receiver's Allowed Administrative Expense Claims.

Under the Plan, Allowed Administrative Expense Claims will be paid in full on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after entry of an order by the Bankruptcy Court allowing such Administrative Expense Claim. Request for payment of Administrative Expense Claims must be filed no later than thirty (30) days following the Effective Date unless an earlier date is set by separate Bankruptcy Court order. Since the Chapter 11 Case commenced as an involuntary bankruptcy case under Bankruptcy Code section 303, to the extent the Bankruptcy Court Allows any Claim as a "gap period" Claim under Bankruptcy Code section 502(f), the Plan treats these Allowed "gap claims" as Allowed Administrative Expenses Claims under Bankruptcy Code section 507(a)(3) and proposes to pay them in full with all other Allowed Administrative Expense Claims from the Lender's Contribution.

A summary of the Plan and its treatment of all Claims follows.

### IV. THE PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION AND TREATMENT OF CLAIMS, AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>. THE PLAN ITSELF AND THE DOCUMENTS REFERENCED THEREIN WILL CONTROL THE TREATMENT OF CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR.**

The Chapter 11 Trustee's Plan provides for the settlement of all the Debtor's the Reorganized Debtor's, the Chapter 11 Trustee's, the Bankruptcy Estate's and any of their respective successors' and assigns' potential claims and causes of action Romspen, in exchange for:

1. The Settlement Carve-Out of $600,000.00 from the Trustee Escrow to provide a recovery to non-priority Allowed General Unsecured Claims, estimated as providing at least a forty percent (40%) recovery, with the possibility that additional asset recoveries and adjudication of claims objections may increase this distribution;

2. Romspen's subordination of its $56 million unsecured deficiency claim to prevent dilution of and to maximize the recovery to holders of non-priority Allowed General Unsecured Claims;

3.     Romspen's successfully obtaining the subordination of the Panache deficiency and other General Unsecured Claims to prevent dilution of and to maximize the recovery to Non-Insider general unsecured creditors; and

4.     Romspen's agreement to the Chapter 11 Trustee's continued use of cash collateral on hand to fund the Estate's, the Plan's, and the Creditor Trust's administrative expenses (defined in the Plan as the "Lender's Contribution"); provided that any excess funds that remain on hand for unused surplus will be returned to Romspen upon the termination of the Creditor Trust.

The Plan places the Settlement Carve-Out, the Lender's Contribution and all the Debtor's remaining assets into the Creditor Trust which will liquidate the assets and distribute the proceeds to holders of allowed claims in the priority governed by the Bankruptcy Code, subject to the voluntary subordinations set forth in the Plan. The Creditor Trust will distribute the Settlement Carve-Out to holders of non-priority Allowed Non-Insider General Unsecured Claims.

Pursuant to the settlement terms, the Plan provides Romspen and its affiliates a full release of liability, including a release on behalf of the Debtor's creditors, parties in interest and all third parties that do not opt out.

**A.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

**1.    Class 1: Priority Non-Tax Claims**

Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Estate agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, payment in full in Cash from the Lender's Contribution by the Chapter 11 Trustee or the Creditor Trustee, as applicable, on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after such Priority Non-Tax Claim becomes Allowed. Holders of Priority Non-Tax Claims are unimpaired, deemed to accept the Plan, and not entitled to vote thereon. The Chapter 11 Trustee believes that, as of the Effective Date, there will be no claims in Class 1.

**2.    Class 2: Lender's Secured Claim**

Pursuant to the Sale Order the Chapter 11 Trustee transferred title for the Property to the Lender in full and final satisfaction of the Lender's Secured Claim, including the Postpetition Indebtedness under the Financing Order. The Lender is impaired under the Plan and entitled to vote thereon.

**3.    Class 3: M&M Plaintiff Secured Claims**

Each holder of an Allowed M&M Plaintiff Secured Claim shall receive the recovery and treatment provided for in the M&M Plaintiff Judgment and receive $2,922,558.68 of the funds deposited in the Court's registry pursuant to the M&M Plaintiff Stipulation in full satisfaction of their Allowed Secured Claims. The M&M Plaintiffs are impaired under the Plan and entitled to vote thereon.

4.      **Class 4: Panache Secured Claims**

Each holder of an Allowed Panache Secured Claim shall receive the recovery and treatment provided for in the Panache Stipulation, with all the Liens associated with the Panache Secured Claims, to the extent Allowed, attaching to the funds deposited in the Court's registry pursuant to the Panache Stipulation. Panache is impaired under the Plan and entitled to vote thereon.

5.      **Class 5: Other Secured Claims**

Each holder of an Allowed Other Secured Claim shall, at the Chapter 11 Trustee's option, receive one of the following treatments: (i) the Collateral securing such Allowed Secured Claim; or (ii) other treatment in accordance with section 1124 of the Bankruptcy Code. Holders of other secured claims are impaired under the Plan and entitled to vote thereon. The Chapter 11 Trustee believes that, as of the Effective Date, there will be no Claims Allowed in Class 5.

6.      **Class 6: General Unsecured Claims**

Each holder of an Allowed General Unsecured Claim shall receive a Class A Interest in the Creditor Trust and thereafter receive Cash distributions from the Creditor Trust, including the Settlement Carve-Out and the proceeds of Creditor Trust Assets. Distributions to holders of Allowed General Unsecured Claims who receive a Class A Interest shall be on a Pro Rata basis with all other Class A Interest holders, until the Allowed amount of General Unsecured Claims are paid in full with interest at the Plan Interest Rate. General Unsecured Claims shall not receive any proceeds of the Lender's Contribution, unless otherwise agreed by Romspen. General unsecured claimants are impaired under the Plan and entitled to vote thereon.

7.      **Class 7: Lender's Deficiency and Unsecured Claims**

The Lender shall receive on account of the Lender's Deficiency Claims and any other Allowed General Unsecured Claim held or acquired by the Lender, a Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest at the Plan Interest Rate of all Class A Interests; however, the holders of Claims in Class 7 shall not receive any portion of the Settlement Carve-Out. The Lender is impaired under the Plan and entitled to vote thereon.

8.      **Class 8: Panache and M&M Plaintiffs' Deficiency and Unsecured Claims**

Panache and the M&M Plaintiffs shall receive on account of any Allowed General Unsecured Claim they held, hold, or acquire, including any Allowed Claim constituting an unsecured deficiency portion of the Panache Secured Claims or the M&M Plaintiff Secured Claims, a Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest at the Plan Interest Rate of all Class A Interests; however, the holders of Claims in Class 8 shall not receive any portion of the Settlement Carve-Out. Class 8 is impaired under the Plan and entitled to vote thereon.

### 9. Class 9: Subordinated Claims

Subordinated Claims may be Allowed by Order of the Bankruptcy Court or stipulation with the Chapter 11 Trustee or the Creditor Trustee. Further, the Plan provides that any Claim which appears in the Debtor's Schedules as contingent, liquidated or disputed for which the holder of the Claim failed to timely file a proof of claim by the Bar Date is a Subordinated Claim and entitled to treatment as a Class 9 Claim. On the Effective Date, the holder of any Allowed Subordinated Claims shall receive a Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest at the Plan Interest Rate of all Class A Interests. Class 9 shall also receive distributions from the Settlement Carve-Out, after payment in full with interest at the Plan Interest Rate of all Class A Interests. Subordinated claimants are impaired under the Plan and entitled to vote thereon.

### 10. Class 10: Equity Interests

Except to the extent that a holder of an Allowed Equity Interest in the Debtor agrees to a different treatment, each holder of an Allowed Equity Interest shall receive a Class C Interest in the Creditor Trust and thereafter receive Cash distributions from the Creditor Trust Assets. The holders of Claims in Class 10 shall be revested with ownership interests in the Reorganized Debtor, in the same proportion as each held in the Debtor on the day before the Petition Date. Distributions to holders of Allowed Equity Interests who receive a Class C Interest shall be on a Pro Rata basis with all other Class C Interest holders, after payment in full with interest at the Plan Interest Rate of all Class B Interests. Holders of Equity Interests are impaired under the Plan and entitled to vote thereon.

## B. ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

The Bankruptcy Code requires that all Administrative Expense Claims against the Estate be paid in full in cash on the Effective Date of the Plan unless the holder of such a Claim agrees to a different treatment. Administrative Expense Claims and Priority Tax Claims are not classified under the Plan. Except to the extent the holder of an Administrative Expense Claim has agreed to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive, on account of and in full satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Administrative Expense Claim on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after entry of an order by the Bankruptcy Court allowing such Administrative Expense Claim.

Except to the extent that a holder of an Allowed Priority Tax Claim has agreed or agrees to a different treatment of such Claim, each holder of an Allowed Priority Tax Claim shall receive on (or as soon as reasonably practicable after) the Effective Date, at the Chapter 11 Trustee's option: (i) Cash in an amount equal to the Allowed amount of such Claim, or (ii) regular installment payments of Cash (a) having a total value, as of the Effective Date, equal to the Allowed amount of the Claim, (b) over a period ending not later than five (5) years after the Petition Date and (c) in a manner not less favorable than the most favored nonpriority Allowed General Unsecured Claims provided for by the Plan (other than Cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code).

To the extent interest is required to be paid on any Priority Tax Claim, the rate of such interest shall be the rate determined under applicable non-bankruptcy law, as set forth in section 511 of the Bankruptcy Code. To the extent the holder of an Allowed Priority Tax Claim has a Lien on the Debtor's property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full. On and after the Effective Date, all ad valorem property taxes (if any) will be paid as they become due, in the ordinary course.

Pursuant to Section 2.1 of the Plan, holders of Administrative Expense Claims arising from the Petition Date through the Effective Date, other than Professional Persons holding Fee Claims, must file with the Bankruptcy Court a request for payment of such Claims within thirty (30) days after the Effective Date. Pursuant to Section 2.2 of the Plan, Professional Persons holding Fee Claims that have not been the subject of a final fee application and accompanying Bankruptcy Court order shall similarly file a final application for payment of fees and reimbursement of expenses no later than the date that is thirty (30) days after the Effective Date.

## C.     IMPLEMENTATION OF THE PLAN

### 1.     Plan Settlement

As discussed above, the Plan constitutes a compromise and settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code between the Chapter 11 Trustee, the Estate and the Debtor on one hand and Romspen on the other hand in complete and final resolution of all claims the Estate may have against Romspen. Alleged claims that are being settled include, without limitation, all claims and causes of action asserted or that could have been asserted in the Lender Litigation, the Credit Bid Motion or otherwise. In exchange for the release of such claims and causes of action, Romspen agrees to (i) contribute $600,000 from the Trustee Escrow to the Creditor Trust for the benefit of the General Unsecured Creditors; (ii) subordinate its unsecured claims, including the Lender's Deficiency Claim to the General Unsecured Creditors; and (iii) permit the Chapter 11 Trustee and the Creditor Trustee to use the Lender's Contribution to fund Allowed Administrative Expenses Claims the reasonable and necessary expenses for the Creditor Trust.

### 2.     The Creditor Trust

The Plan contemplates the establishment of a Creditor Trust on the Effective Date. A copy of the proposed Trust Agreement to govern the Creditor Trust is attached hereto as **Exhibit E**. Gregory S. Milligan will serve as the Creditor Trustee to manage the assets, administration, and distribution of the Creditor Trust. The Creditor Trust shall receive and hold the remainder of the Lender's Contribution, the Settlement Carve-Out, both to be segregated from other funds, and the Creditor Trust Assets, which include but are not limited to the Estate's Causes of Action against third parties. A non-exclusive list of the Causes of Action to be assigned to the Creditor Trust is attached hereto as **Exhibit C**. The Creditor Trustee will be entitled to hire professionals to assist in the administration of the Trust and pursue recoveries on the Causes of Action for the benefit of the Trust beneficiaries, primarily the General Unsecured Creditors, but possibly also the subordinated claimants.

The Creditor Trustee shall be entitled to reasonable compensation at the Creditor Trustee's reasonable and ordinary hourly rate paid from the Lender's Contribution and the Creditor Trust Assets, plus a commission on specific distributions as detailed below and provided for in prior Bankruptcy Court orders. Pursuant to the Panache Stipulation and the M&M Plaintiff Stipulation, respectively, the Creditor Trustee shall also be entitled to a fee of three percent (3%) of all disbursements made on account of any Allowed Claims held by Panache and the M&M Plaintiffs from the registry of the Court or by the Lender. Pursuant to the Sale Order, the Creditor Trustee shall also be entitled to a fee of three percent (3%) of all disbursements made on account of any 2020 ad valorem taxes secured by the Property. For avoidance of doubt, the Creditor Trustee shall be entitled to a fee of three percent (3%) of any payment made by the Lender, Panache or any other party on account of or to reduce or satisfy any Claim against the Estate. Any portion of funds returned to the Lender (but not then distributed to any other holder of a Claim or on account of a Claim against the Estate) from the Lender's Contribution, the Credit Bid Escrow, the funds deposited in the Court's registry pursuant to the M&M Plaintiff Stipulation or the funds deposited in the Court's registry pursuant to the Panache Stipulation shall not qualify the Creditor Trustee to an additional fee of three percent (3%) on such funds refunded to the Lender, provided the Lender does not otherwise satisfy Claims against the Estate on account of such refunds.

## V. RETENTION OF CAUSES OF ACTION

The Chapter 11 Trustee, through the Creditor Trust, as applicable, shall retain all rights, claims, defenses and causes of action including, but not limited to the Causes of Action, including but not limited to, causes of action against Daniel White and affiliated entities, Adam Zarafshani and affiliated entities, the Debtor's current and former partners or interest holders, and various third-party unsecured goods and service providers, including those parties listed on the Debtor's Schedules and Statement of Financial Affairs [ECF No. 48]. The Creditor Trustee and Creditor Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or any action, order, or approval of the Bankruptcy Court. The Chapter 11 Trustee shall have the right to disclose any additional Causes of Action prior to the Effective Date of the Plan.

Except as otherwise provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights or setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of the Estate or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, but not limited to, causes of action against Daniel White and affiliated entities, Adam Zarafshani and affiliated entities, the Debtor's current and former officers and directors, and various third-party unsecured goods and service providers, including those parties listed on the Debtor's Schedules and Statement of Financial Affairs [ECF No. 48]. The Creditor Trustee, through the Creditor Trust, as applicable, shall have retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced and all of the Debtor's legal and equitable rights in respect of any Unimpaired

Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.

For avoidance of doubt, the Creditor Trust shall have the right to pursue and collect any amounts Dan White and any of his affiliates may owe the Debtor, including accounts receivable reflected on the Debtor's books and records in the amount of $2,303,215.36, and another other amounts owed. Further, the Creditor Trust shall have the right to pursue avoidance, recharacterization and collection of any payments the Debtor made to Symmetry Asset Management, Inc., including any payments on alleged loans.

Similarly, the Creditor Trust shall have the right to recover tenant deposits in the amount of $411,833.33 and $1,000,000.00 collected by Eightfold Development LLC, from Eightfold Development LLC, Dan White, Adam Zarafshani and any of their affiliates and transferees.

The failure to list or describe any Causes of Action in this Disclosure Statement or in Section 11.8 of the Plan is not intended to limit the rights of the Creditor Trust to pursue any known or unknown Cause of Action. Unless a Cause of Action against a Person is expressly waived, relinquished, released, compromised, or settled herein or in any Final Order, the Chapter 11 Trustee expressly reserves all Causes of Action (including unknown Causes of Action) for later adjudication through the Creditor Trust and therefore, no preclusion doctrine of res judicata, collateral estoppel, issue preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon, after, or as a result of the confirmation or Effective Date of the Plan, or the Confirmation Order. No Person may rely on the absences of a specific reference in the Plan, the Creditor Trust Agreement, or this Disclosure Statement to any Cause of Action against them as any indication that the Chapter 11 Trustee or Creditor Trustee, on behalf of the Debtor or its Estate, will not pursue any and all available Causes of Action against them. The Chapter 11 Trustee expressly reserves all rights to prosecute, through the Creditor Trust, all Causes of Action other than those settled, resolved, or released pursuant to the Plan.

For the avoidance of doubt, the Debtor and its Estate, through the Creditor Trust, reserve and shall retain all Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease and will continue to review payments made by and transactions involving the Debtor prior to the Petition Date to determine whether preference and other actions to avoid such payments and transactions should be brought.

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTOR WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION, AND THAT THE PLAN AUTHORIZES THE CREDITOR TRUST TO PROSECUTE THE SAME.

## VI. ADDITIONAL PROVISIONS AND EFFECT OF THE PLAN

**A.**     **LEGAL EFFECT OF THE PLAN**

    **1.**     **Exculpations**

       The Plan provides and exculpation to the Chapter 11 Trustee, the Creditor Trustee, HMP Advisory Holdings, LLC d/b/a Harney Partners, and Wick Phillips Gould & Martin, LLP as the "Exculpated Parties." As provided by the Plan, neither the Exculpated Parties nor any of their respective present or former members, managers, officers, directors, employees, equity holders, partners, affiliates, funds, advisors, attorneys or agents, or any of their predecessors, successors or assigns, shall have or incur any liability to any holder of a Claim or an Equity Interest, or any other party-in-interest, or any of their respective agents, employees, equity holders, partners, members, affiliates, funds, advisors, attorneys or agents, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the administration of the Chapter 11 Case, the negotiation and pursuit of approval of this Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the funding of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and shall be deemed to have acted in good faith in connection therewith and entitled to the protections of section 1125(e) of the Bankruptcy Code. Notwithstanding anything to the contrary, the Plan shall not exculpate any party from any liability based upon gross negligence or willful misconduct.

    **2.**     **Injunction and Stay**

       Except as otherwise expressly provided in the Plan, all Persons or entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against the Estate, the Chapter 11 Trustee, the Creditor Trustee, the Creditor Trust, or other entity released, discharged, or exculpated hereunder, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Estate, the Chapter 11 Trustee, the Creditor Trustee or the Creditor Trust with respect to any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Estate, the Chapter 11 Trustee, the Creditor Trustee, the Creditor Trust, or against the property or interests in property of any Estate, the Chapter 11 Trustee, the Creditor Trustee or the Creditor Trust, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Estate, the Chapter 11 Trustee, the Creditor Trustee or the Creditor Trust, or against the property or interests in property of the Estate, the Chapter 11 Trustee, the Creditor Trustee or the Creditor Trust with respect to any such Claim or Equity Interest, or (v) pursuing any Claim released under the Plan.

       Unless otherwise provided, all injunctions or stays arising under or entered during the Debtor's Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 3. Vesting of Assets

Upon the Confirmation Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Creditor Trust Assets shall vest in the Creditor Trust, free and clear of all Claims, Liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. The Chapter 11 Trustee or the Creditor Trustee may abandon any asset to the Reorganized Debtor.

### 4. Debtor and Estate Releases

As explained above, as consideration of the Chapter 11 Trustee's settlement with Romspen, and the value Romspen is providing the Estate and Creditor Trust to fund the Plan and related creditor recoveries, the Plan provides release to Romspen and its affiliates and related parties included in the Plan's definition of "Released Parties".

As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtor, the Reorganized Debtor, the Chapter 11 Trustee, the Creditor Trust, and the Estate on behalf of themselves and their successors, assigns, and representatives and any and all other entities that may purport to assert any cause of action derivatively, by or through the foregoing entities (together, the "Releasing Parties"), from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, remedies, or liabilities, whatsoever, including any derivative claims, asserted or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Releasing Parties would have been legally entitled to assert in its own right, or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Estate, the Chapter 11 Case, the Lender Settlement, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest (including without limitation any collateral pledged to the Lender in connection with any such transactions or loans), the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the restructuring transactions, the negotiation, formulation, or preparation of this Disclosure Statement and the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence, other than claims or causes of action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, and willful misconduct.

### 5. Releases by Holders of Claims and Interests

As explained above, as part of the consideration of the Chapter 11 Trustee's settlement with Romspen, and the value Romspen is providing the Estate and Creditor Trust to fund the Plan and related creditor recoveries, the Plan provides Romspen and the Released Parties releases on behalf of third parties that do not opt out of the release.

As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the holders of all Claims and Interests and the successors and assigns (other than the Opt-Out Parties, the "**Third-Party Releasing Parties**") from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the holder of the Claim or Interest, or the Debtor or Estate, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale, or recission of the purchase or sale of any security of or investment or interest in the Debtor, the Lender Settlement, the subject matter or, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan (including, without limitation, any collateral pledged to the Lender in connection with any such transactions or loans with the Debtor), the business or contractual arrangements between any holder of a Claim or Interest, and the Debtor or any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the negotiation, formulation, or preparation of this Disclosure Statement, the Plan, related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, or any other act or omission (the "**Third-Party Releases**"), other than the claims or causes of action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

With regard to holders of Claims or Interests that are Unimpaired under the Plan and holders of Claims or Interests whose vote to accept or reject the Plan was solicited or who were deemed to reject the Plan but who did not return a ballot or Opt-Out Form (and thus did not opt-out of this release), if such holder of Claims or Interests wishes to pursue a claim or cause of action against any Released Party, such holder must first petition the Bankruptcy Court for a determination of whether this release applies to such holder. If the Bankruptcy Court determines that such holder's claim is not released by this provision, such holder must bring any claim or cause of action in the United States Bankruptcy Court for the Western District of Texas or must obtain leave of this Bankruptcy

Court to bring such claim or cause of action before a court of another jurisdiction.

**B.    MODIFICATION OR REVOCATION OF THE PLAN; SEVERABILITY**

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Chapter 11 Trustee at any time prior to or after the Confirmation Date. Holders of Claims and Equity Interests that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified; provided, however, that any holders of Claims and Equity Interests who were deemed to accept the Plan because such Claims and Equity Interests were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims and Equity Interests continue to be unimpaired.

If the Bankruptcy Court determines that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest, the Chapter 11 Trustee may modify the Plan in accordance with section 13.4 of the Plan so that such provision shall not be applicable to the holder of any Claim or Equity Interest. Any determination of unenforceability shall not (i) limit or affect the enforceability and operative effect of any other provisions of the Plan; or (ii) require the re- solicitation of any acceptance or rejection of the Plan unless otherwise ordered by the Bankruptcy Court.

**C.    RETENTION OF BANKRUPTCY COURT JURISDICTION**

Following the Confirmation Date, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code.

**D.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**1.    Rejection of Executory Contracts and Unexpired Leases**

The Plan contemplates that the Chapter 11 Trustee shall reject each executory contract and unexpired lease to which the Estate is a party with certain potential exceptions. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the contract and lease assumptions or rejections described above, as of the Effective Date. The rejections set forth in this section shall include rejecting any obligations of the Chapter 11 Trustee pursuant to the Debtor's by-laws, limited partnership agreements, or other organizational documents and agreements to indemnify any officers or directors of the Debtor for any prepetition actions or failures to act.

**2.    Claims based on Rejection of Executory Contracts or Unexpired Leases**

All Claims arising out of the rejection of executory contracts and unexpired leases (if any) must be served upon the Chapter 11 Trustee and his counsel within thirty (30) days after the earlier of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the

Effective Date. Any Claims not filed within such time shall be forever barred from assertion against the Debtor, the Estate, its property, the Reorganized Debtor and the Creditor Trust.

## E.    DISTRIBUTIONS UNDER THE PLAN

In general, distributions and deliveries to be made under the Plan will be made either on the Effective Date or as soon as practicable thereafter in accordance with the Creditor Trust Agreement. All distributions made by the Chapter 11 Trustee pursuant to the Plan shall be obtained from the Lender's Contribution, except as otherwise funding under the Financing Order. All distributions made by the Creditor Trustee to beneficiaries of the Creditor Trust shall be obtained from the Settlement Carve-Out and Creditor Trust Assets. All payments made by the Creditor Trustee to fund the Creditor Trust's fees and expenses shall be obtained first, from the Lender's Contribution, second, from the Creditor Trust Assets, and third, only to the extent needed, from the Settlement Carve-Out. All distributions made pursuant to the Plan shall be in Cash.

## F.    OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

The Creditor Trustee, the Chapter 11 Trustee or any other party in interest with standing, shall be entitled to object to Claims and Equity Interests, including objections seeking reclassification or subordination of Claims. If a timely objection is made with respect to any Claim or Equity Interest, no payment or distribution under the Plan shall be made on account of such Claim or Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes Allowed. Any Claim for which a proof of claim is filed after the applicable Bar Date shall be deemed disallowed. The Plan authorizes the Creditor Trust to object to any Claim paid in whole or in part by Panache, the Lender or any other person, and seek a reduction of such Claim by the amount so paid. The Plan requires Panache and the Lender to report all such payments.

## G.    MANAGEMENT AND WINDDOWN OF THE REORGANZIED DEBTOR

As provided by the treatment of Class 10 Allowed Equity Interests, the Debtor's existing equity owners will own, manage and control the Reorganized Debtor after the Effective Date and may proceed to operate, winddown or dissolve the Reorganized Debtor subject to their business judgment. The Chapter 11 Trustee and the Creditor Trustee shall have no obligation to manage, winddown or dissolve the Reorganized Debtor.

## VII. CERTAIN RISK FACTORS AND BEST INTERESTS TEST

## A.    RISKS TO CONFIRMATION AND EFFECTIVENESS

ALL HOLDERS OF IMPAIRED CLAIMS AND IMPAIRED INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE EXHIBITS HERETO) PRIOR TO DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN.

BEFORE DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN, YOU SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION SET FORTH IN THIS

DISCLOSURE STATEMENT AND, IN PARTICULAR, THE RISKS DESCRIBED BELOW. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCURS, THE DEBTOR'S BUSINESS, FINANCIAL CONDITION, OR RESULTS OF OPERATIONS COULD BE HARMED. THE RISKS AND UNCERTAINTIES BELOW ARE NOT THE ONLY ONES THE CHAPTER 11 TRUSTEE FACES BUT REPRESENT THE RISKS THE CHAPTER 11 TRUSTEE BELIEVES ARE MATERIAL. HOWEVER, THERE MAY BE ADDITIONAL RISKS THAT THE CHAPTER 11 TRUSTEE CURRENTLY CONSIDERS NOT TO BE MATERIAL OR OF WHICH THE CHAPTER 11 TRUSTEE IS NOT CURRENTLY AWARE, AND ANY OF THESE RISKS COULD HAVE THE EFFECTS SET FORTH ABOVE.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. The requirements for confirmation are set forth in Section 1129 of the Bankruptcy Code, which requires, among other things, a finding by the Bankruptcy Court that confirmation of the Plan is not likely to be followed by a liquidation or need for further financial reorganization, and that the value of the distributions to non-accepting holders of Claims and Interest holders would not be less than the value that such creditors or interest holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Although the Chapter 11 Trustee believes that these requirements will be satisfied, there can be no assurance that the Court will concur.

The Chapter 11 Trustee has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Chapter 11 Trustee is required to do so pursuant to an order of the Bankruptcy Court. Delivery of this Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

Various factors will impact the amount of recoveries that are received from the Creditor Trust (other than the Settlement Carve-Out) and, at this time, the Chapter 11 Trustee cannot estimate the amount of such recoveries with any degree of certainty. The Creditor Trust Assets, other than the Settlement Carve-Out, will consist primarily of Causes of Action. Accordingly, due to the uncertainty of litigation, it is difficult to predict how much the Creditor Trust will recover on account of such claims.

## B.    ALTERNATIVES TO CONFIRMATION

Although this Disclosure Statement is intended to provide information to assist the holder of a Claim or Interest in determining whether to vote for or against the Plan, a summary of the alternatives to confirmation of the Plan may be helpful.

If the Plan is not confirmed, the following alternatives are available: (a) confirmation of another chapter 11 plan; (b) conversion of the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code; or (c) dismissal of the Chapter 11 Case leaving holders of Claims and Equity Interests to pursue available non-bankruptcy remedies. These alternatives to the Plan are very limited and not likely to benefit creditors. Although the Chapter 11 Trustee could theoretically file a new plan, because the Debtor's main asset is the Property and the Chapter 11 Trustee has already

sold it, any plan is likely to contain terms similar to the Plan. Although any party in interest could theoretically file a new plan, the most likely result if the Plan is not confirmed is that the Chapter 11 Case will be converted to one under chapter 7 of the Bankruptcy Code.

The Chapter 11 Trustee believes that conversion of the Chapter 11 Case to a chapter 7 case would result in (i) significant delay in distributions to all creditors who would have received a distribution under the Plan; and (ii) diminished recoveries for certain classes of creditors due to, among other things, an increase in administrative expenses. If the Chapter 11 Case is dismissed, creditors would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against the Debtor. However, in that event, creditors would be faced with the costs and difficulties of attempting, each on its own, to collect claims from the Debtor.

## VIII. LIQUIDATION ANALYSIS AND FEASIBILITY

### A. LIQUIDATION ANALYSIS

The Chapter 11 Trustee believes that any liquidation analysis is speculative, as such an analysis is necessarily premised on assumptions and estimates, which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Chapter 11 Trustee. Thus, there can be no assurances as to the values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Chapter 11 Trustee's conclusions or concur with such assumptions in making its determination under Section 1129(a)(7). However, the Chapter 11 Trustee believes that, under the proposed terms of the Plan, all holders of Impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a chapter 7 liquidation of the Debtor's assets.

The Chapter 11 Trustee's belief is based primarily on consideration of the effect that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Claims, including (i) increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee and professional advisors to the trustee; (ii) substantial increases in claims, and (iii) substantial delay in distributions to holders of Claims and Interests that would likely ensue in a chapter 7 liquidation. In addition, the Chapter 11 Trustee believes that creditors will receive more under the Plan than they would in a chapter 7 liquidation due to the following factors:

- The Chapter 11 Trustee's settlement with Romspen will not close, and Romspen will not provide the Settlement Carve-Out, the Lender's Contribution, voluntarily subordinate the Lender's Deficiency Claim or be required to obtain the subordination of the Panache Deficiency and Unsecured Claim in a chapter 7 liquidation, which would make it difficult for a chapter 7 trustee to recover and distribute as much as the Plan provides to creditors – specifically general unsecured creditors.

- The amount of claims in a chapter 7 liquidation will be more than the amount of claims that are paid under the Plan, because a chapter 7 trustee would hire new professionals with priority over existing creditors. These additional claims in a chapter 7 liquidation would cause creditor

recoveries to be diluted. Further, the chapter 7 trustee would lack the Lender's Contribution to pay professional claims and will be required to prosecute litigation claims with contingency fee counsel, eroding the net recovery to the Estate and creditors.

## B.     FEASIBILITY

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, the Chapter 11 Trustee must demonstrate that the Bankruptcy Court's confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the Plan. Because the Plan liquidates all the Debtor's assets, the Plan complies with this provision. Further, distributions from the Creditor Trust do not depend on future operations of the Debtor; thus, the Chapter 11 Trustee reasonably believes that the Creditor Trustee will be able to make all such distributions under the Plan. In any event, the Chapter 11 Trustee believes the Creditor Trust will be profitable and well capitalized, as a result of the funding that will be provided by the Lender's Contribution and the Plan. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation of the Debtor or the need for further reorganization.

## IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.     IN GENERAL

A summary description of certain U.S. federal income tax consequences of the Plan is provided below. The description of tax consequences below is for informational purposes only and is subject to significant uncertainties. Only the principal consequences of the Plan for the Debtor and for the holders of Claims who are entitled to vote to confirm or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of U.S. federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated and proposed thereunder, and judicial decisions and administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to holders of Claims or Equity Interests. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-

THROUGH ENTITIES, S CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED HEREIN.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

**B.      FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTOR**

Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of debt ("COD") income, which must be included in the debtor's income. The Debtor and Reorganized Debtor may have COD income as a result of the Plan, however, the Chapter 11 Trustee and Reorganized Debtor, as applicable, should be able to utilize a special tax provision which excludes from income debts discharged in a chapter 11 case. If debts are discharged in a chapter 11 case, however, certain tax attributes otherwise available must be reduced by the amount of COD income that is excludable from income. Tax attributes subject to reduction generally include net operating losses and net operating loss carryovers (collectively, "NOLs"). Any NOLs would be reduced (assuming the Reorganized Debtor does not make an election pursuant to section 108(b)(5) of the Tax Code to first reduce the tax basis of the depreciable property) to the extent of the COD income exclusion. The COD income generated by the debt cancellation occurring pursuant to the Plan may eliminate available NOLs generated prior to the Effective Date (although such NOLs, which may be subject to usage limitations under section 382 of the Tax Code, would first be permitted to offset any taxable income generated in the tax year that includes the Effective Date). The Debtor's and Reorganized Debtor's remaining NOLs may have a value, and that value is presently undergoing analysis.

U.S. federal income taxes generally must be satisfied before most other claims may be paid. To the extent the Debtor or Reorganized Debtor has taxable income after the Effective Date, the Debtor may have NOLs to offset such income.

**C.      FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS**

Holders of Claims should generally recognize a gain (or loss) to the extent the amount realized under the Plan (generally the amount of cash received) in respect of their Claims exceeds (or is exceeded by) their respective tax bases in their Claims. The tax treatment of holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (a) the nature and origin of the Claim, (b) the manner in which a holder acquired a Claim, (c) the length

of time a Claim has been held, (d) whether the Claim was acquired at a discount, (e) whether the holder has taken a bad debt deduction in the current or prior years, (f) whether the holder has previously included in income accrued but unpaid interest with respect to a Claim, (g) the method of tax accounting of a holder, and (h) whether a Claim is an installment obligation for U.S. federal income tax purposes. Therefore, holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to such holders as a result thereof.

The tax treatment of a holder of a Claim that receives distributions in different taxable years is uncertain. If such a holder treats the transaction as closed in the taxable year it first receives (or is deemed to have received) a distribution of cash and/or other property, it should recognize gain or loss for such tax year in an amount equal to the cash and the value of the other property actually (and deemed) received in such tax year (other than that received in respect of accrued interest) with respect to its Claim (other than any portion of the Claim that is attributable to accrued interest) plus the estimated value of future distributions (if any) less its tax basis in its claim (except to the extent its Claim is for accrued interest). A holder should then subsequently recognize additional income or loss when additional property distributions are actually received in an amount equal to the cash and/or value of such other property (other than that received in respect of accrued interest) less the holder's allocable tax basis in its Claim with respect to such subsequent distribution. A holder may have to treat a portion of any subsequent distribution as imputed interest recognizable as ordinary income in accordance with the holder's method of tax accounting. If instead the open transaction doctrine applies as a result of the value of the subsequent distributions that a holder may receive not being ascertainable on the closing date or the Effective Date, such holder should not recognize gain (except to the extent the value of the case and/or other property already received exceeds such holder's adjusted tax basis in its Claim (other than any Claim for accrued interest)) or loss with respect to its Claim until it receives the final distribution thereon. It is the position of the IRS that the open transaction doctrine only applies in rare and extraordinary cases. The Chapter 11 Trustee believes that the open transaction doctrine should not apply and that holders may be entitled to take the position that on the closing date and on the Effective Date no value should be assigned to the right to receive any subsequent distributions. Holders of Claims are urged to consult their own tax advisors regarding the application of the open transaction doctrine and how it may apply to their particular situations, whether any gain recognition may be deferred under the installment method, whether any loss may be disallowed or deferred under the related party rules and the tax treatment of amounts that certain holders of Claims may be treated as paying to other holders of Claims.

Holders of Allowed Claims will be treated as receiving a payment of interest (in addition to any imputed interest as discussed in the preceding paragraph) includible in income in accordance with the holder's method of accounting for tax purposes, to the extent that any cash and/or other property received pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash and/or other property should be attributable to an accrued but unpaid interest is unclear. The Plan provides, and the Chapter 11 Trustee intends to take the position, that such cash and/or other property distributed under the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each holder should consult its own tax advisor regarding the determination of the amount of consideration received under the Plan that is

attributable to interest (if any) and whether any such interest may be considered to be foreign source income. A holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## D.     INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including the payments of Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the backup withholding rules, a holder of a Claim may be subject to backup withholding at the applicable tax rate with respect to distributions or payments made pursuant to the Plan, unless the holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury as to the correctness of its taxpayer identification number and certain other tax matters. Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of U.S. federal income taxes, a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

## E.     IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINLY, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## X. RECOMMENDATION AND CLOSING

The Chapter 11 Trustee and his professional advisors have explored various alternative scenarios and they believe that the Plan enables the holders of Claims to realize the maximum recovery under the circumstances. The Chapter 11 Trustee believes that the Plan is in the best interest of the Estate, its creditors, equity interest holders, and other parties in interest and believes that the Plan will provide for a more valuable distribution to holders of Allowed Claims and Interests than all other alternatives.

The Plan has the Chapter 11 Trustee's support. Any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially diminished distributions to the holders of Claims. Accordingly, the Chapter 11 Trustee recommends the confirmation of the Plan and urges all holders of Claims and Equity Interests to vote to accept the Plan and to indicate such acceptance by returning the Ballots so as to be received no later than [●] at 5:00 p.m. (CST).

**Exhibit A**

**Chapter 11 Trustee's Amended Liquidating Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 1:20-10410-HCM** |
| **3443 ZEN GARDEN, L.P.** | § | |
| | § | **Chapter 11** |
| **DEBTOR.** | § | |

### CHAPTER 11 TRUSTEE'S AMENDED LIQUIDATING PLAN

WICK PHILLIPS GOULD & MARTIN, LLP

/s/ Scott D. Lawrence
Jason M. Rudd
State Bar No. 24028786
Scott D. Lawrence
State Bar No. 24087896
Lauren K. Drawhorn
State Bar No. 24074528
Daniella G. Heringer
State Bar No. 24103460
Emails:    jason.rudd@wickphillips.com
           scott.lawrence@wickphillips.com
           lauren.drawhorn@wickphillips.com
           daniella.heringer@wickphillips.com

COUNSEL FOR GREGORY S. MILLIGAN,
CH. 11 TRUSTEE FOR 3443 ZEN GARDEN, L.P.

Dated: November 25, 2020

# SUMMARY OF PLAN

The Chapter 11 Trustee's Plan provides for the settlement of all the Debtor's, the Reorganized Debtor's, the Chapter 11 Trustee's, the bankruptcy Estate's and any of their respective successors' and assigns' potential claims and causes of action against the Debtor's largest creditor, Romspen Mortgage Limited Partnership, in exchange for:

1.  $600,000.00 to provide at least a forty percent (40%) recovery to non-priority general unsecured creditors with allowed claims (the "***Settlement Carve-Out***") through a creditor trust, with the possibility that additional asset recoveries and adjudication of claims objections may increase this distribution;

2.  Romspen's subordination of its $56 million unsecured deficiency claim to prevent dilution of and to maximize the recovery to general unsecured creditors;

3.  Romspen's successfully obtaining the subordination of the Panache deficiency and other General Unsecured Claims to prevent dilution of and to maximize the recovery to Non-Insider general unsecured creditors; and

4.  Romspen's agreement to the Chapter 11 Trustee's continued use of cash collateral on hand to fund the Estate's, the Plan's, and the creditor trust's administrative expenses, provided that any excess funds that remain on hand for unused surplus will be returned to Romspen upon the termination of the creditor trust.

The Plan places the Settlement Carve-Out, Romspen's remaining cash collateral and all the Debtor's remaining assets into a creditor trust which will liquidate the assets and distribute the proceeds to holders of allowed claims in the priority governed by the Bankruptcy Code, subject to the voluntary subordinations set forth in the Plan. The creditor trust will distribute the Settlement Carve-Out to holders of allowed non-priority unsecured claims. For the settlement consideration, the Plan provides Romspen and its affiliates a full release of liability, including a release on behalf of the Debtor's creditors, parties in interest and all third parties that do not opt out and also provides for the return of Romspen's $7 million deposit, net of the Settlement Carveout, that Romspen placed in the registry of the Court pursuant to a stipulation with the Trustee. *See* ECF No. 238.

## TABLE OF CONTENTS

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ........................................................1
1.1   Definitions ..............................................................................................................1
1.2   Rules of Interpretation and Construction. .............................................................9

**ARTICLE II. TREATMENT OF UNCLASSIFIED CLAIMS** ...........................................9
2.1   Administrative Expense Claims. ...........................................................................9
2.2   Fee Claims. ...........................................................................................................10
2.3   Chapter 11 Trustee Fees and Expenses. ..............................................................11
2.4   U.S. Trustee Fees. ...............................................................................................11
2.5   Priority Tax Claims. ............................................................................................11

**ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ...............12

**ARTICLE IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS** .........................12
4.1   Class 1 – Priority Non-Tax Claims. ....................................................................12
4.2   Class 2 – Lender's Secured Claim. ......................................................................12
4.3   Class 3 – M&M Plaintiff Secured Claims. ..........................................................13
4.4   Class 4 – Panache Secured Claims. .....................................................................13
4.5   Class 5 – Other Secured Claims. .........................................................................13
4.6   Class 6 – General Unsecured Claims. ..................................................................13
4.7   Class 7 – Lender's Deficiency and Unsecured Claims. .......................................14
4.8   Class 8 – Panache and M&M Plaintiffs Deficiency and Unsecured Claims .......14
4.9   Class 9 – Subordinated Claims ............................................................................14
4.10    Class 10 – Equity Interests .............................................................................14

**ARTICLE V. IMPAIRMENT; ACCEPTANCE OR REJECTION OF THE PLAN;
EFFECT OF REJECTION BY ONE OR MORE CLASSES** ..............................................15
5.1   Classes Entitled to Vote. ......................................................................................15
5.2   Class Acceptance Requirement. ...........................................................................15
5.3   Cramdown. ...........................................................................................................15
5.4   Elimination of Classes. ........................................................................................15

**ARTICLE VI. MEANS OF IMPLEMENTATION** ............................................................15
6.1   The Lender Settlement. ........................................................................................15
6.2   The Creditor Trust. ..............................................................................................16
6.3   General Settlement of Claims. ..............................................................................22
6.4   Issuance of Creditor Trust Interests. ....................................................................22
6.5   Section 1145 Exemption. .....................................................................................22
6.6   Restructuring Transactions. .................................................................................23
6.7   Corporate Action. ................................................................................................23
6.8   Vesting of Assets. ...............................................................................................23
6.9   Preservation of Rights of Action; Settlement of Litigation Claims. ....................23
6.10    Effectuating Documents; Further Transactions. ............................................24
6.11    Exemption from Certain Transfer Taxes. .....................................................24
6.12    Management and Winddown of the Reorganized Debtor. ..............................24
6.13    Cooperation with the Creditor Trustee. ........................................................24

**ARTICLE VII. DISTRIBUTIONS** ...................................................................................25
7.1   Date of Distributions. ..........................................................................................25
7.2   Sources of Cash for Plan Distributions. ...............................................................25
7.3   Creditor Trustee. .................................................................................................25
7.4   Record Date for Distributions. .............................................................................25
7.5   Recipients of Distributions. .................................................................................26
7.6   Delivery of Distributions; Unclaimed Property. ..................................................26
7.7   Means of Payment. ..............................................................................................26
7.8   Setoffs and Recoupment. .....................................................................................26

7.9    Distributions After Effective Date..............................................................................26
7.10   Withholding and Reporting Requirements. .................................................................27
7.11   No Postpetition Interest..............................................................................................27
7.12   Time Bar to Payments. ...............................................................................................27
7.13   De Minimis Distributions. ...........................................................................................27

**ARTICLE VIII. PROCEDURES FOR RESOLVING AND  TREATING DISPUTED CLAIMS..........................................................................................28**
8.1    Objections to Claims. .................................................................................................28
8.2    Post-Sale Closing Date Reporting on Payments on Account of Claims. .....................28
8.3    No Distributions Pending Allowance. ..........................................................................28
8.4    Distributions After Allowance. ....................................................................................28
8.5    Disallowance of Late Filed Claims. ............................................................................29

**ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES...................................................................................................29**
9.1    Rejection of Contracts and Leases..............................................................................29
9.2    Inclusiveness. .............................................................................................................29
9.3    Claims Based on Rejection of Executory Contracts or Unexpired Leases...................29
9.4    No Effect on Insurance ...............................................................................................29

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN .......................................................................30**
10.1   Conditions to Confirmation of Plan. ...........................................................................30
10.2   Conditions to Effective Date of Plan...........................................................................30
10.3   Waiver of Conditions Precedent. ................................................................................31
10.4   Effect of Failure of Conditions. ..................................................................................31
10.5   Reservation of Rights..................................................................................................31

**ARTICLE XI. EFFECT OF CONSUMMATION ..............................................................31**
11.1   Vesting of Assets. .......................................................................................................31
11.2   Discharge of Claims and Interests in the Debtor. .......................................................31
11.3   Injunction against Interference with Plan....................................................................32
11.4   Exculpation. ...............................................................................................................32
11.5   Debtor and Estate Releases ........................................................................................32
11.6   Releases by Holders of Claims and Interests...............................................................33
11.7   Injunction and Stay. ...................................................................................................34
11.8   Preservation of Claims. ..............................................................................................35
11.9   Compromise of Controversies. ...................................................................................36

**ARTICLE XII. RETENTION OF JURISDICTION .........................................................37**

**ARTICLE XIII. MISCELLANEOUS ................................................................................38**
13.1   Payment of Statutory Fees. .........................................................................................38
13.2   Filing of Additional Documents. .................................................................................38
13.3   Schedules, Exhibits and Plan Supplement Incorporated. .............................................38
13.4   Amendment or Modification of the Plan. ....................................................................38
13.5   Inconsistency..............................................................................................................39
13.6   Exemption from Certain Transfer Taxes. .....................................................................39
13.7   Expedited Tax Determination. ....................................................................................39
13.8   Binding Effect. ...........................................................................................................39
13.9   Severability. ...............................................................................................................39
13.10  No Admissions. ..........................................................................................................40
13.11  No Payment of Attorneys' Fees. ................................................................................40
13.12  Notices. ......................................................................................................................40
13.13  Governing Law. ..........................................................................................................40

Gregory S. Milligan, Chapter 11 Trustee for the Bankruptcy Estate of 3443 Zen Garden, L.P., hereby proposes the following Liquidating Chapter 11 Plan pursuant to section 1121(a) of the Bankruptcy Code.

## ARTICLE I. DEFINITIONS AND INTERPRETATION

### 1.1    Definitions

For the purpose of this Plan, the following terms shall have the respective meanings set forth below:

*Action* means any claim, action, cause of action, demand, lawsuit, arbitration, notice of violation, proceeding, litigation, citation, or summons, whether civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

*Administrative Expense Claim* means any right to payment constituting a cost or expense of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b) or 507 of the Bankruptcy Code, including, without limitation, (i) any fees or charges assessed against the Estate under 28 U.S.C. § 1930, (ii) Fee Claims, (iii) any "gap period" claims under Bankruptcy Code section 502(f), and (iv) other Administrative Expense Claims as may be ordered and Allowed by the Bankruptcy Court.

*Allowed* means, with reference to any Claim or Equity Interest, any Claim or Equity Interest (i) for which a proof of claim or proof of interest has been filed and as to which no objection has been interposed on or before the Objection Deadline or such other applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (ii) which appears in the Debtor's Schedules and is not listed as contingent, liquidated or disputed, (iii) which is allowed by Final Order of the Bankruptcy Court, or (iv) which is expressly allowed under this Plan.

*Avoidance Actions* means Actions arising under sections 502, 510, 541, 542, 543, 544, 545, 547 through and including 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Actions, and which may be recovered pursuant to section 550 of the Bankruptcy Code.

*Ballot* means the ballot provided to holders of Claims to indicate their votes to accept or reject the Plan.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time.

*Bankruptcy Court* means the United States Bankruptcy Court for the Western District of Texas, Austin Division, or any other court of the United States having jurisdiction over the Chapter 11 Case.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended and in effect from time to time.

**Bar Date** means the last date to file proofs of claim against the Debtor, which was or will be (i) August 10, 2020 for all creditors except Governmental Units and (ii) October 5, 2020 for Governmental Units.

**Business Day** means any day other than a Saturday, Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a).

**Cash** means legal tender of the United States of America.

**Cash Collateral** means Cash in the Estate's possession on the Effective Date on which the Lender has a Lien, including amounts the Lender funded under the Postpetition Financing Order.

**Causes of Action** is defined in Section 11.8 hereof.

**Chapter 11 Case** means the above-captioned chapter 11 bankruptcy case.

**Chapter 11 Trustee** means Gregory S. Milligan, Chapter 11 Trustee of the Estate.

**Claim** means a claim against the Debtor or the Estate within the meaning of section 101(5) of the Bankruptcy Code.

**Class** means any group of Claims or Equity Interests classified by this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**Class A Interests** is defined in Section 6.2(g) hereof.

**Class B Interests** is defined in Section 6.2(g) hereof.

**Class C Interests** is defined in Section 6.2(g) hereof.

**Collateral** means any property or interest in property of the Estate subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state or federal law.

**Compensation Order** means that certain Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals (ECF No. 135).

**Confirmation Date** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

**Confirmation Hearing** means the hearing conducted by the Bankruptcy Court pursuant to sections 1128(a) and 1129 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

*Credit Agreement* means that certain superpriority secured Loan Agreement and Promissory Note dated as of April 27, 2018 by and among the Debtor and the Lender.

*Credit Bid Stipulation* means that certain Stipulation and Order to Deposit Funds Between Gregory S. Milligan, Chapter 11 Trustee and Romspen Mortgage Limited Partnership Resolving Credit Bid Challenge (ECF No. 238).

*Credit Bid Escrow* means the $7,000,000.00 the Lender placed in escrow with the Chapter 11 Trustee pursuant to the Credit Bid Stipulation.

*Creditor Trust* means that certain trust named the "ZG Creditor Trust" that will come into existence on the Effective Date of the Plan, which trust shall be formed pursuant to, and governed by, the provisions of the Plan and the Creditor Trust Agreement.

*Creditor Trust Agreement* means the ZG Creditor Trust Agreement governing the Creditor Trust dated as of the Effective Date, substantially in the form included as an exhibit to the Disclosure Statement.

*Creditor Trust Assets* means (i) all Causes of Action owned by the Debtor or the Estate, except as the same may be dismissed, settled or released pursuant to the Plan; (ii) all proceeds of any of the Debtor's insurance policies; and (iii) any other property of the Estate not otherwise distributed pursuant to the terms of this Plan. For the sake of clarity, the TxDOT Condemnation Proceeding and PDA Proceeding are transferred to Lender under the Sale Order and are NOT included in the Creditor Trust Assets and as of the Sale Closing Date are exclusively the Lender's property pursuant to the terms of the Sale Order, as confirmed by this Plan.

*Creditor Trust Interests* means the Class A Interests, Class B Interests, and the Class C Interests, together.

*Creditor Trustee* means the trustee of the Creditor Trust, Gregory S. Milligan, and any successor Creditor Trustee.

*Debtor* means 3443 Zen Garden, L.P. in its capacity as chapter 11 debtor.

*Disallowed Claim or Equity Interest* means any Claim or Equity Interest, or portion thereof that is not an Allowed Claim, an Allowed Equity Interest, or a Disputed Claim or Disputed Equity Interest.

*Disclosure Statement* means that certain disclosure statement relating to the Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

*Disputed Claim* means, with respect to a Claim, such Claim (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) with respect to which the Debtor or any party in interest has interposed a timely objection (as a contested matter, adversary proceeding, or otherwise) or request for estimation prior to the Objection Deadline in accordance with the Plan or the Bankruptcy Rules,

which objection or request for estimation has not been withdrawn or determined by a Final Order as of the Effective Date.

*Disputed Equity Interest* means, with respect to an Equity Interest, such Equity Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) for which a proof of interest for payment has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Chapter 11 Trustee or any party in interest has interposed a timely objection or request for estimation prior to the Objection Deadline in accordance with the Plan, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.

*Distribution Date* means the date, occurring on or as soon as practicable after the Effective Date, on which the Creditor Trustee first makes distributions to holders of Allowed Claims and Allowed Equity Interests as provided in the Plan.

*Distribution Record Date* means the record date for purposes of receiving distributions under the Plan on account of Allowed Claims and Allowed Equity Interests, which shall be the Confirmation Date.

*Effective Date* means the first Business Day on which all the conditions precedent to the effectiveness of the Plan specified in Section 10.2 hereof shall have been satisfied or waived as provided in Section 10.3 hereof; *provided*, *however*, that if a stay, injunction or similar prohibition of the Confirmation Order is in effect, the Effective Date shall be the first Business Day after such stay, injunction or similar prohibition is no longer in effect.

*Equity Interest* means any "equity security" of the Debtor, as that term is defined in section 101(16) of the Bankruptcy Code.

*Estate* means the estate of the Debtor as created under section 541 of the Bankruptcy Code.

*Exculpated Parties* means the Chapter 11 Trustee, the Creditor Trustee, HMP Advisory Holdings, LLC d/b/a Harney Partners, and Wick Phillips Gould & Martin, LLP.

*Fee Claim* means any Claim by a Professional Person under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and/or reimbursement of expenses in the Chapter 11 Case.

*Final Order* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a stay, new trial, reargument or rehearing shall have expired;

*provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

**General Unsecured Claim** means any Claim against the Debtor that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Lender Secured Claim, an M&M Plaintiff Secured Claim, a Panache Secured Claim, a Subordinated Claim, an Other Secured Claim, a Lender Deficiency Claim or an Equity Interest. General Unsecured Claim includes any unsecured claim held by the M&M Plaintiffs or an Other Secured Claim as a result of the operation of section 506(a)(1) of the Bankruptcy Code.

**Governmental Unit** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**Insider** means any Person who is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, or who may otherwise be determined to be an "insider" under section 101(31) of the Bankruptcy Code by a court of competent jurisdiction.

**Lender** means Romspen Mortgage Limited Partnership ("**Romspen**"), in its capacities as prepetition and postpetition lender to the Debtor. Romspen and Lender may be used interchangeably throughout this Plan to refer to Romspen Mortgage Limited Partnership.

**Lender's Contribution** means the Cash Collateral remaining in the Estate on the Effective Date to be used for the payment of Administrative Expense Claims that are Allowed but unpaid on the Effective Date, with the remaining Cash Collateral transferred to the Creditor Trust to be held separate from other Creditor Trust Assets and used for the specific and separate purpose of funding the Creditor Trust's reasonable and necessary costs and expenses and, upon the dissolution of the Creditor Trust and after payment of all the Creditor Trust's reasonable and necessary costs and expenses, to be returned to the Lender.

**Lender's Deficiency Claim** means the unsecured claim held by the Lender as a result of the operation of section 506(a)(1) of the Bankruptcy Code in the amount of $56,511,950.72, subject to a final calculation by the Lender satisfactory to the Chapter 11 Trustee.

**Lender's Secured Claim** means the Secured Claim held by the Lender secured by a Lien on the Property in the Allowed amount of $45,000,000.00, satisfied through the Sale Order.

**Lender Settlement** is defined in Section 6.1 hereof.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Local Rules** means the Bankruptcy Local Rules of the United States Bankruptcy Court for the Western District of Texas, as the same may be amended or modified from time to time.

**M&M Plaintiffs** means, together, ACM Services, LLC' Koetter Fire Protection of Austin, LLC, Capital Industries, LLC, Hill Country Electric Supply, LP, Lyle America, Inc. d/b/a

Glass.com of Illinois, Summer Legacy, LLC, Texas Air, LLC, Ferguson Enterprises, LLC, and American Builders and Contractors Supply Co., Inc. d/b/a ABC Supply.

*M&M Plaintiff Secured Claim* means a Secured Claim asserted by an M&M Plaintiff that is Allowed by the Bankruptcy Court pursuant to the M&M Plaintiff Stipulation.

*M&M Plaintiff Stipulation* means the Stipulation and Order to Deposit Funds in the Registry of the Court Between the M&M Plaintiffs and Romspen Mortgage Limited Partnership Resolving Credit Bid Challenge (ECF No. 221).

*Non-Insider* means a Person who is not an Insider.

*Objection Deadline* means the later of (a) one hundred twenty (120) days after the Effective Date and (b) such later as may be ordered by the Bankruptcy Court prior to the expiration of such one hundred twenty (120) day period, upon motion.

*Opt-Out Form* means the provision on the ballot or other applicable Bankruptcy Court-approved form providing notice of the Third-Party Releases and ability to opt-out of such Third-Party Releases.

*Opt-Out Parties* means any holder of a Claim or Interest that timely completes and returns an Opt-Out Form, affirmatively opting out of the Third-Party Releases in Section 11.6 hereof; however, the Debtor and the Estate, cannot be Opt-Out Parties.

*Other Secured Claim* means a Secured Claim that is not a Lender Secured Claim, an M&M Plaintiff Secured Claim or a Panache Secured Claim.

*Panache* means Panache Development and Construction, Inc., Adam Zarafshani, and any of their insiders, affiliates, subcontractors, successors or assigns.

*Panache Secured Claim* means a Secured Claim asserted by, through or related to Panache that is Allowed by the Bankruptcy Court pursuant to the Panache Stipulation.

*Panache Stipulation* means that certain Stipulation and Order to Deposit Funds in the Registry of the Court Between Adam Zarafshani, Panache Development & Construction, Inc., and Romspen Mortgage Limited Partnership Resolving Credit Bid Challenge (ECF No. 222).

*PDA Proceeding* means all the Debtor's and Estate's rights and interests in the Debtor's Planned Development Agreement ("*PDA*") pending before the Austin City Council seeking to maximize the Property's permissible use.

*Petition Date* means March 22, 2020, the date on which Lyle America, Inc. d/b/a Glass.com of Illinois, Austin Glass & Mirror, Inc, and ACM Services, LLC filed an involuntary petition for relief against the Debtor under chapter 11 of the Bankruptcy Code.

*Person* means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

*Plan* means this Liquidating Chapter 11 Plan, as the same may be amended, supplemented or otherwise modified from time to time, including any exhibits and schedules hereto.

*Plan Interest Rate* means simple interest at the rate of 3% per annum.

*Plan Supplement* means the compilation of documents and forms of documents, schedules and exhibits to be filed in one or more parts or volumes, no later ten (10) Business Days prior to the Confirmation Hearing, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, containing the form of Creditor Trust Agreement and any other documents necessary for the execution and implementation of the Plan.

*Postpetition Financing Order* means that certain Amended Final Order Granting Chapter 11 Trustee's Motion to Obtain Secured Credit on an Interim and Final Basis (ECF No. 144).

*Priority Non-Tax Claim* means any Claim that is entitled to priority in payment pursuant to sections 507(a)(4), (5), (6) or (7) of the Bankruptcy Code and that is not an Administrative Expense Claim or a Priority Tax Claim.

*Priority Tax Claim* means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Professional Person* means any Person retained or to be compensated by the Chapter 11 Trustee pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

*Property* means the real property located at 3443 Ed Bluestein Boulevard, Austin, TX 78721.

*Pro Rata* means the proportion that the amount of an Allowed Claim or Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such Class.

*Released Parties* means, collectively, the Lender and its predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees. For the avoidance of doubt, none of the Debtor's past or current officers, agents, employees, directors, insurers, or insiders shall constitute Released Parties or be deemed to be released by any provision of this Plan, Plan Document, or Confirmation Order.

*Releasing Parties* means the Debtor, the Reorganized Debtor, the Chapter 11 Trustee, the Creditor Trustee, the Creditor Trust and the Estate on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities that may purport to assert any cause of action derivatively, by or through the foregoing entities, as defined in Section 11.5.

*Relief Order Entry Date* means April 8, 2020, the date on which the Bankruptcy Court entered its *Consent Order for Entry of Relief* (ECF No. 11).

*Reorganized Debtor* means the 3443 Zen Garden Limited Partnership entity following the Effective Date of this Plan.

*Sale Order* means that certain Order Authorizing and Approving the Sale of Certain of Debtor's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and Granting Related Relief entered by the Bankruptcy Court on October 7, 2020 (ECF No. 278).

*Sale Closing Date* means October 15, 2020, the date the Chapter 11 Trustee closed on the sale of the Property to the Lender pursuant to the Sale Order.

*Schedules* means, collectively, Schedules A through J and the Statement of Financial Affairs, as filed by the Debtor in the Chapter 11 Case, as the same may have been or may be amended from time to time.

*Secured Claim* means a Claim, other than the Lender's Secured Claim, secured by a Lien that is valid, perfected and enforceable, and not avoidable, upon property in which a Debtor has an interest, to the extent of the value, as of the Effective Date, of such interest or Lien as determined by a Final Order of the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code, or as otherwise agreed to in writing by the Chapter 11 Trustee and the holder of such Claim.

*Settlement Carve-Out* means $600,000.00 the Chapter 11 Trustee will pay from the Credit Bid Escrow to the Creditor Trust on the Effective Date.

*Subordinated Claim* means any Claim that is subject to (a) subordination under section 510 of the Bankruptcy Code or any other statute, (b) contractual subordination, (c) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim (i) for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of the Debtor; (ii) for damages arising from the purchase or sale of such a Security; or (iii) for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, (d) a Claim that is subordinated by agreement of the holder , or (e) any Claim acquired by a holder of a Claim that is subordinated under this Plan. Subordinated Claim also means any Claim which appears in the Debtor's Schedules as contingent, unliquidated or disputed for with the holder of the Claim failed to timely file a proof of claim.

*Third-Party Releases* means the releases provided by the Lender Settlement.

*Third-Party Releasing Parties* means the holders of all Claims and Interests and their successors and assigns, other than the Opt-Out Parties, as defined in Section 11.6 hereof.

*Trustee and Professional Fee Escrow* means all funds the Lender paid to the Chapter 11 Trustee to fund the payment of the Chapter 11 Trustee's and his Professional Persons' fees and expenses pursuant to the terms of the Postpetition Financing Order.

*Trust Claims Reserve* is defined in Section 6.2(p)(iii) hereof.

*TxDOT Condemnation Proceeding* means all the Debtor's and Estate's rights, claims and interests in the Texas Department of Transportation ("*TxDOT*") initiated condemnation proceeding related to the Property and any settlement, disposition or resolution of the same.

*Voting Deadline* means [●] , the date set by the Bankruptcy Court by which Ballots for accepting or rejecting the Plan must be received.

*White Parties* means Daniel White and Lincoln 1861, Inc. and their affiliated and related entities.

## 1.2   Rules of Interpretation and Construction.

(a)   Interpretation. Unless otherwise specified herein, all section, article, and exhibit references in the Plan are to the respective section in, article of, and exhibit to, the Plan, as the same may be amended, waived or modified from time to time. All headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

(b)   Construction and Application of Bankruptcy Code Definitions. Unless otherwise defined herein, words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan. Words or terms used but not defined herein shall have the meanings ascribed to such terms or words, if any, in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

(c)   Other Terms. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan.

(d)   Time.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II. TREATMENT OF UNCLASSIFIED CLAIMS

## 2.1   Administrative Expense Claims.

All Administrative Expense Claims against the Estate, other than Fee Claims, shall be treated as follows:

(a)   Time for Filing. All holders of Administrative Expense Claims, other than Professional Persons holding Fee Claims, shall file with the Bankruptcy Court a request for payment of such Claims within thirty (30) days after the Effective Date. Any such request must be served on the Chapter 11 Trustee and his counsel, and must, at a minimum, set forth (i) the name of the holder of the Administrative Expense Claim; (ii) the amount of the Administrative Expense Claim; and (iii) the basis for the Administrative Expense Claim.  A failure to file any such request in a timely fashion will result in the Administrative Expense Claim in question being discharged and its holder forever barred from asserting such Administrative Expense Claim against the Estate or any other Person.

(b)   Allowance. An Administrative Expense Claim for which a request for payment has been properly filed shall become an Allowed Administrative Expense

Claim unless an objection is filed by the date that is thirty (30) days after a request for payment of such Administrative Expense Claim is filed. If an objection is timely filed, the Administrative Expense Claim in question shall become an Allowed Administrative Expense Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

(c)    Payment. Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment of such Claim, each holder of an Allowed Administrative Expense Claim shall receive, on account of and in full satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Administrative Expense Claim on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after entry of an order by the Bankruptcy Court allowing such Administrative Expense Claim. The Chapter 11 Trustee and the Creditor Trustee, as applicable, shall pay Allowed Administrative Expense Claims from the Lender's Contribution or as otherwise agreed by the holder of the Allowed Fee Claim and the Chapter 11 Trustee or the Creditor Trustee, as applicable.

(d)    Lender Exception. Lender is excepted from the obligations of this Section 2.1. The terms of this Section 2.1 shall not apply to Lender. Lender is not obligated to file an application for allowance of an Administrative Expense Claim. Lender is deemed to hold an Allowed Administrative Expense Claim pursuant to the terms of the Postpetition Financing Order. Lender's Allowed Administrative Expense Claim shall be satisfied in full by the Lender's credit bid approved by and pursuant to the terms of the Sale Order.

(e)    Gap Period Claims. Since the Chapter 11 Case commenced as an involuntary bankruptcy case under Bankruptcy Code section 303, to the extend the Bankruptcy Court Allows any Claim as a "gap period" claim under Bankruptcy Code section 502(f), the Plan treats these Allowed "gap claims" as Allowed Administrative Expenses Claims under Bankruptcy Code section 507(a)(3) and pays them in full with all other Allowed Administrative Expense Claims from the Lender's Contribution.

## 2.2    Fee Claims.

Every Professional Person holding a Fee Claim that has not previously been the subject of a final fee application and accompanying Bankruptcy Court order approving the same shall file a final application for payment of fees and reimbursement of expenses no later than the date that is thirty (30) days after the Effective Date. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. All final fee applications shall be set for hearing on the same day, as the Bankruptcy Court's calendar permits, after consultation with counsel to the Chapter 11 Trustee. Allowed Fee Claims subject to the Trustee and Professional Fee Escrow shall be paid by the Chapter 11 Trustee from the Trustee and Professional Fee Escrow pursuant to the terms of the Postpetition Financing Order. To the extent an Allowed Fee Claims is not covered by the Trustee and Professional Fee Escrow, then such Allowed Fee Claims shall be paid by the Chapter 11 Trustee or the Creditor

Trustee, as applicable, from the Lender's Contribution or as otherwise agreed by the holder of the Allowed Fee Claim and the Chapter 11 Trustee or the Creditor Trustee.

### 2.3 Chapter 11 Trustee Fees and Expenses.

The Chapter 11 Trustee shall file a final application for payment of fees and reimbursement of expenses under Bankruptcy Code section 330 no later than the date that is thirty (30) days after the Effective Date. Allowed Chapter 11 Trustee fees and expenses shall be paid by the Chapter 11 Trustee from the Trustee and Professional Fee Escrow pursuant to the terms of the Postpetition Financing Order. To the extent any Allowed Chapter 11 Trustee fees and expenses are not covered by the Trustee and Professional Fee Escrow, then such Allowed fees and expenses shall be paid by the Chapter 11 Trustee from the Lender's Contribution. As previously provided by the Postpetition Financing Order and the Sale Order the satisfaction of the Postpetition Indebtedness in the amount of $4,061,444.30[1] shall constitute "moneys disbursed or turned over in the case" by the Chapter 11 Trustee "to parties in interest" for purposes of Bankruptcy Code section 326(a) in determining the Allowed amount of the Chapter 11 Trustee's fees. As previously provided by the M&M Plaintiff Stipulation and the Panache Stipulation any funds distributed by the Court or the Lender on account of the M&M Plaintiff Secured Claims or the Panache Secured Claims shall constitute "moneys disbursed or turned over in the case" by the Chapter 11 Trustee "to parties in interest" for purposes of Bankruptcy Code section 326(a) in determining the Allowed amount of the Chapter 11 Trustee's fees. Pursuant to the Sale Order, all disbursements made by the Lender or any other party on account of 2020 ad valorem taxes secured by the Property shall constitute "moneys disbursed or turned over in the case" by the Chapter 11 Trustee "to parties in interest" for purposes of Bankruptcy Code section 326(a) in determining the Allowed amount of the Chapter 11 Trustee's fees.

### 2.4 U.S. Trustee Fees.

All fees payable under section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid by the Creditor Trust from the Lender's Contribution.

### 2.5 Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim has agreed or agrees to a different treatment of such Claim, each holder of an Allowed Priority Tax Claim shall receive on (or as soon as reasonably practicable after) the Effective Date, Cash in an amount equal to the Allowed amount of such Claim. To the extent the holder of an Allowed Priority Tax Claim has a Lien on Estate property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full. Pursuant to the Sale Order, Allowed Priority Tax Claims, including ad valorem taxes for 2020, shall be paid by the Lender, and will retain their Lien on the Property until paid in full.

---

[1] Subject to a final calculation by Lender.

## ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

All Claims against, and Equity Interests in, the Debtor are classified for all purposes, including voting, confirmation, and distribution, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | No | No (deemed to accept) |
| Class 2 | Lender's Secured Claim | Yes | Yes |
| Class 3 | M&M Plaintiff Secured Claims | Yes | Yes |
| Class 4 | Panache Secured Claims | Yes | Yes |
| Class 5 | Other Secured Claims | Yes | Yes |
| Class 6 | General Unsecured Claims | Yes | Yes |
| Class 7 | Lender's Deficiency and Unsecured Claims | Yes | Yes |
| Class 8 | Panache and M&M Plaintiffs Deficiency and Unsecured Claims | Yes | Yes |
| Class 9 | Subordinated Claims | Yes | Yes |
| Class 10 | Equity Interests | Yes | Yes |

Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code. Instead, all such Claims shall be treated separately as unclassified claims on the terms previously set forth in Article II of this Plan.

## ARTICLE IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1    Class 1 – Priority Non-Tax Claims.**

Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Estate agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, payment in full in Cash from the Lender's Contribution by the Chapter 11 Trustee or the Creditor Trustee, as applicable, on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after such Priority Non-Tax Claim becomes Allowed.

**4.2    Class 2 – Lender's Secured Claim.**

Pursuant to the Sale Order, in full and final satisfaction of the Lender's Secured Claim, the Chapter 11 Trustee transferred title for the Property to the Lender on the Sale Closing Date.

**4.3    Class 3 – M&M Plaintiff Secured Claims.**

On November 18, 2020, the Bankruptcy Court enter the Agreed Judgement in the M&M Lien Claimant Adversary [ECF No. 29 in Adversary 20-01048-hcm] (the "***M&M Plaintiff Judgment***"). On the Effective Date (or as soon as reasonably practicable), except to the extent that a holder of an Allowed M&M Plaintiff Secured Claim against the Estate agrees to less favorable treatment, each holder of an Allowed M&M Plaintiff Secured Claim shall receive the recovery and treatment provided for in the M&M Plaintiff Judgment from the funds deposited in the Court's registry pursuant to the M&M Plaintiff Stipulation. Nothing herein shall prevent Lender, any M&M Plaintiff or any other party from settling, resolving or otherwise agreeing to modified treatment on or after the Effective Date. The Bankruptcy Court may enter any appropriate order and/or judgment (whether agreed or otherwise) releasing to Lender, any M&M Plaintiff or any other party any portion of the funds deposited in the Court's registry pursuant to the M&M Plaintiff Stipulation and the M&M Plaintiff Judgment.

**4.4    Class 4 – Panache Secured Claims.**

On the Effective Date (or as soon as reasonably practicable thereafter), except to the extent that a holder of an Allowed Panache Secured Claim against the Estate agrees to less favorable treatment, the holder of an Allowed Panache Secured Claim shall receive the recovery and treatment provided for in the Panache Stipulation, with all the Liens associated with the Panache Secured Claims, to the extent Allowed, attaching to the funds deposited in the Court's registry pursuant to the Panache Stipulation. Nothing herein shall prevent Lender, Panache or any other party from settling, resolving or otherwise agreeing to modified treatment on or after the Effective Date. The Bankruptcy Court shall enter any appropriate order and/or judgment (whether agreed or otherwise) releasing to Lender, Panache or any other party any portion of the funds deposited in the Bankruptcy Court's registry pursuant to the Panache Stipulation.

**4.5    Class 5 – Other Secured Claims.**

On the Effective Date (or as soon as reasonably practicable thereafter), except to the extent that a holder of an Allowed Other Secured Claim against the Estate agrees to less favorable treatment, each holder of an Allowed Other Secured Claim shall, at the Chapter 11 Trustee's option, receive one of the following treatments: (i) the Collateral securing such Allowed Secured Claim; or (ii) other treatment that renders such Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

**4.6    Class 6 – General Unsecured Claims.**

Except to the extent that a holder of an Allowed General Unsecured Claim against the Estate agrees to a different treatment, each holder of an Allowed General Unsecured Claim shall receive a Class A Interest in the Creditor Trust and thereafter receive Cash distributions from the assets of the Creditor Trust, including the Settlement Carve-Out and the Creditor Trust Assets. Distributions to holders of Allowed General Unsecured Claims who receive a Class A Interest shall be on a Pro Rata basis with all other Class A Interest holders, until the Allowed amount of General Unsecured Claims are paid in full with interest at the Plan Interest Rate.

### 4.7    Class 7 – Lender's Deficiency and Unsecured Claims

On the Effective Date, the Lender shall receive on account of the Lender's Deficiency Claims and any other Allowed General Unsecured Claim held by the Lender, a Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest at the Plan Interest Rate of all Class A Interests; however, holders of claims in Class 7 shall not receive any portion of the Settlement Carve-Out.

### 4.8    Class 8 – Panache and M&M Plaintiffs Deficiency and Unsecured Claims

On the Effective Date, Panache and each M&M Plaintiff shall receive on account of any Allowed General Unsecured Claim it held, holds or acquires, including any Allowed Claim constituting an unsecured deficiency portion of the Panache Secured Claims, the M&M Plaintiff Secured Claims, and any Allowed Claim from the rejection of any executory contract or unexpired lease, a Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest at the Plan Interest Rate of all Class A Interests; however, holders of claims in Class 8 shall not receive any portion of the Settlement Carve-Out.

### 4.9    Class 9 – Subordinated Claims

Subordinated Claims may be Allowed by Order of the Bankruptcy Court or stipulation with the Chapter 11 Trustee or the Creditor Trustee. Further, this Plan provides that any Claim which appears in the Debtor's Schedules as contingent, unliquidated or disputed for which the holder of the Claim failed to timely file a proof of claim by the Bar Date is a Subordinated Claim and entitled to treatment as a Class 9 Claim. On the Effective Date, the holder of any Allowed Subordinated Claims shall receive a Class B Interest in the Creditor Trust. Distributions to holders of Class B Interests shall be on a Pro Rata basis, after payment in full with interest at the Plan Interest Rate of all Class A Interests. Class 9 shall also receive distributions from the Settlement Carve-Out, after payment in full with interest at the Plan Interest Rate of all Class A Interests.

### 4.10    Class 10 – Equity Interests

Except to the extent that a holder of an Allowed Equity Interest in the Debtor agrees to a different treatment, each holder of an Allowed Equity Interest shall receive a Class C Interest in the Creditor Trust and thereafter receive Cash distributions from the Creditor Trust Assets. Distributions to holders of Allowed Equity Interests who receive a Class C Interest shall be on a Pro Rata basis with all other Class C Interest holders, after payment in full with interest at the Plan Interest Rate of all Class B Interests. On the Effective Date, the holders of Allowed Equity Interest shall be revested with their ownership interests in the Reorganized Debtor, in the same proportion as each held in the Debtor on the day before the Petition Date, without further corporate action or Bankruptcy Court order.

## ARTICLE V. IMPAIRMENT; ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES

### 5.1 Classes Entitled to Vote.

The holders of Claims in Class 1 are unimpaired, conclusively deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. The holders of claims in Classes 2, 3, 4, 5, 6, 7, 8, 9 and 10 are impaired and entitled to vote to accept or reject the Plan.

### 5.2 Class Acceptance Requirement.

A Class of impaired Claims shall have accepted the Plan if the holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Claims in such Class who have voted on the Plan have voted to accept the Plan. A Class of impaired Equity Interests shall have accepted the Plan if at least two-thirds (2/3) in amount of Equity Interests in such Class who have voted on the Plan have voted to accept the Plan.

### 5.3 Cramdown.

To the extent that any Class is impaired under the Plan and such Class fails to accept the Plan in accordance with section 1126(c) or (d) of the Bankruptcy Code, the Chapter 11 Trustee hereby requests that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### 5.4 Elimination of Classes.

Any Class that does not contain any Allowed Claims or any Claims temporarily Allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed not included in this Plan for purposes of (i) voting to accept or reject this Plan and (ii) determining whether such Class has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE VI. MEANS OF IMPLEMENTATION

### 6.1 The Lender Settlement.

This Plan constitutes a settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code between the Releasing Parties and the Third-Party Releasing Parties on the one hand and the Released Parties on the other hand in complete and final resolution of all claims the Releasing Parties and the Third-Party Releasing Parties may have against the Released Parties (the "*Lender Settlement*"). Alleged claims which are being settled include, without limitation, all claims, objections, avoidance actions and other causes of action with respect to (i) the claims and causes of action alleged in that certain Chapter 11 Trustee's Emergency Motion to Limit Romspen Mortgage Limited Partnership's Credit Bid (ECF No. 209), (ii) the Lender's involvement in the Debtor's management (if any), funding and operations; (iii) the Lender's proposals to provide and provision of prepetition and postpetition financing; (iv) the Lender's involvement with the collateral pledged to secure the Lender's loans to the Debtor; (v) the Debtor, the Chapter 11 Case or any Claim or Interest; (vi) the Lender's Allowed Secured Claim, the Lender's Allowed

Deficiency Claim and Unsecured Claim, and the Lender's Allowed Administrative Expense Claim, and (vii) any and all claims and causes of action in existence as of the Effective Date, whether known or unknown, in existence or not in existence, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, held by the Releasing Parties and the Third-Party Release Parties against the Released Parties. The Lender disputes that any such claims are or would be valid or have any merit and would contest them. The Lender Settlement resolves such claims. The Lender Settlement is not and shall not deemed to be an admission of liability of any kind on such claims, and all of the Lender's rights are expressly reserved and preserved on any of such claims, with the Lender Settlement carrying no preclusive effect of any kind whatsoever in any action or proceeding arising from or related in any way to the scope of the claims resolved and settled by the Lender Settlement. Only holders of Claims entitled to vote that agree, by not opting out, to release the Released Parties shall be bound by the Third-Party Releases under this Plan and the Lender Settlement. The Disclosure Statement shall include notification to all holders of Claims entitled to vote of their option to opt-out of the Lender Settlement by completing an Opt-Out Form and become an Opt-Out Party on no less than twenty-one (21) calendar days' notice. Any holders of Claims entitled to vote that do not opt-out of the Lender Settlement by returning a properly completed Opt-Out Form to the balloting agent designated by the Bankruptcy Court on or before the Voting Deadline shall be bound by the Lender Settlement, including the Third-Party Releases. Any portion of the cash proceeds comprising or included in the Lender's Contribution that remain on-hand and held by the Creditor Trustee on behalf of the Creditor Trust that are excess, surplus funds leftover after satisfaction of the obligations set forth in this Plan will be returned to the Lender upon the termination of the Creditor Trust. The Chapter 11 Trustee shall transfer any portion of the funds comprising the Credit Bid Escrow in excess of the Settlement Carve-Out to Lender on the Effective Date of the Plan. To the extent not already covered by the Sale Order, any and all aspects of the TxDOT Proceeding and the PDA Proceeding are not included in the Causes of Action preserved by the Estate and transferred to the Creditor Trust under this Plan. The Debtor's and Estate's rights and interests in the TxDOT Proceeding and the PDA Proceeding are exclusively owned by the Lender as of the Sale Closing Date pursuant to the terms of the Sale Order and this Plan. Further, the Lender shall be responsible for all direction of the TxDOT Proceeding and the PDA Proceeding as of the Sale Closing Date and for the payment of all fees, costs and expenses related to the TxDOT Proceeding and the PDA Proceeding incurred on or after the Sale Closing Date.

    **6.2**    **The Creditor Trust.**

    (a)    <u>Establishment of the Creditor Trust</u>. The Creditor Trust shall be established for the benefit of the holders of Allowed General Unsecured Claims and the Lender's Deficiency Claims. This Section 6.2(a) sets forth the general terms of the Creditor Trust and certain of the rights, duties, and obligations of the Creditor Trustee. In the event of any conflict between the terms of this Section 6.2(a) and the terms of the Creditor Trust Agreement, the terms of the Creditor Trust Agreement shall govern.

    (b)    <u>Execution of Creditor Trust Agreement</u>. On the Effective Date, the Creditor Trust Agreement shall be executed, and all other necessary steps shall be taken to establish the Creditor Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims, the Lender's Unsecured and Deficiency Claims, Panache's Unsecured and Deficiency Claims,

Subordinated Claims, and Equity Interests. The form of the Creditor Trust Agreement and related ancillary documents are subject to Bankruptcy Court approval at the Confirmation Hearing.

(c)     <u>Purpose of the Creditor Trust</u>. The Creditor Trust shall be established for the sole purpose of liquidating and distributing its assets to the holders of interests in the Creditor Trust, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or to engage in the conduct of a trade or business. The Creditor Trust, through the Creditor Trustee, shall (i) collect and reduce the assets of the Creditor Trust to Cash, (ii) prosecute, settle and otherwise administer the Causes of Action as more fully set forth in Section 6.9 and Section 11.8 hereof, (iii) make distributions to the beneficiaries of the Creditors Trust in accordance with the Plan and the Creditor Trust Agreement and (iv) take all such actions as are reasonably necessary to accomplish the purpose hereof, as more fully provided in the Creditor Trust Agreement.

(d)     <u>Creditor Trust Assets</u>. The Creditor Trust shall receive (1) the Lender's Contribution (to be segregated), (2) the Settlement Carve-Out (to be segregated), and (3) the Creditor Trust Assets. Any Cash or other property received from third parties from the prosecution, settlement, or compromise of any Cause of Action shall constitute Creditor Trust Assets for purposes of distributions under the Creditor Trust. On the Effective Date, the Lender's Contribution, the Settlement Carve-Out and Creditor Trust Assets shall automatically vest in the Creditor Trust, free and clear of all Liens, Claims and encumbrances, except to the extent otherwise provided in the Plan.

(e)     <u>Governance of the Creditor Trust</u>. The Creditor Trust shall be governed by the Creditor Trustee in accordance with the Creditor Trust Agreement and consistent with the Plan.

(f)     <u>The Creditor Trustee</u>. The Chapter 11 Trustee shall serve as the Creditor Trustee, subject to Bankruptcy Court approval at the Confirmation Hearing. With respect to the Creditor Trust Assets, the Creditor Trustee shall be a representative of the Estate pursuant to section 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code. The Creditor Trustee may prosecute, settle and otherwise administer the Causes of Action on behalf of the Creditor Trust, without the need for Bankruptcy Court approval or any other notice or approval, except as set forth in the Creditor Trust Agreement, and shall also be responsible for objecting to Claims filed against the Estate that purport to qualify as General Unsecured Claims under the terms of the Plan, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code. The Creditor Trustee shall be exempt from giving any bond or other security in any jurisdiction.

(g)     <u>Classes of Creditor Trust Interests; Nontransferability</u>. There shall be three (3) classes of beneficial interests in the Creditor Trust: Class A beneficial interests for the Allowed General Unsecured Claims (the "***Class A Interests***"), Class B beneficial interests for all Lender's Unsecured and Deficiency Claims, Panache

Unsecured and Deficiency Claims, and Subordinated Claims (the "**Class B Interests**"), and Class C beneficial interests for holders of Equity Interests in the Debtor (the "***Class C Interests***"). The beneficial interests in the Creditor Trust shall not be transferable (except as otherwise provided in the Creditor Trust Agreement).

(h)     <u>Cash</u>. Pending distribution, the Creditor Trustee may invest Creditor Trust Assets only in Cash and Government securities (as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended); *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

(i)     <u>Costs and Expenses of the Creditor Trustee</u>.  The costs and expenses of the Creditor Trust, including the fees and expenses of the Creditor Trustee and his or her retained professionals, shall be paid first out of the Lender's Contribution, then the Creditor Trust Assets, and finally, only to the extent needed, from the Settlement Carve-Out.

(j)     <u>Compensation of the Creditor Trustee</u>. The Creditor Trustee shall be entitled to reasonable compensation at the Creditor Trustee's reasonable and ordinary hourly rate paid from the Lender's Contribution and the Creditor Trust Assets, plus a commission on specific distributions as detailed below and provided for in prior Bankruptcy Court orders. Pursuant to the Panache Stipulation and the M&M Plaintiff Stipulation, respectively, the Creditor Trustee shall additionally be entitled to a fee of three percent (3%) of all disbursements made on account of any Allowed Claims held by Panache and the M&M Plaintiffs from the registry of the Court or by the Lender. Pursuant to the Sale Order, the Creditor Trustee shall additionally be entitled to a fee of three percent (3%) of all disbursements made on account of any 2020 ad valorem taxes secured by the Property. For avoidance of doubt, the Creditor Trustee shall be entitled to a fee of three percent (3%) of any payment made by the Lender, Panache or any other party on account of or to reduce or satisfy any Claim against the Estate. Any portion of funds returned to the Lender (but not then distributed to any other holder of a Claim or on account of a Claim against the Estate) from (1) the Lender Contribution, (2) the Credit Bid Escrow, (3) the funds deposited in the Bankruptcy Court's registry pursuant to the M&M Plaintiff Stipulation or (4) the funds deposited in the Bankruptcy Court's registry pursuant to the Panache Stipulation, shall not qualify the Creditor Trustee to an additional fee of three percent (3%) on such funds refunded to the Lender, provided the Lender does not otherwise satisfy Claims against the Estate on account of such refunds.

(k)     <u>Distribution of the Settlement Carve-Out</u>. The Creditor Trustee shall distribute the Settlement Carve-Out to the Class A Interests on a Pro Rata basis in accordance with the Creditor Trust Agreement, beginning as soon as practicable after the Effective Date. The Creditor Trustee shall not make any distributions to holders of Disputed Claims unless and until such Claims are Allowed. The Creditor Trustee shall ensure that sufficient funds are reserved, as determined by the Creditor

Trustee in his or her sole discretion, to pay Disputed Claims upon Allowance. Upon payment in full of the Class A Interests with interest at the Plan Rate, the Creditor Trustee shall distribute the remaining Settlement Carve-Out, if any, to Class B Interests help by holders of Claims Allowed in Class 9 on a Pro Rata basis.

(l)   _Distribution of Creditor Trust Assets_. The Creditor Trustee shall distribute Cash to the Creditor Trust beneficiaries in accordance with the Creditor Trust Agreement, beginning on the Effective Date or as soon thereafter as is practicable, from the liquidated Creditor Trust Assets on hand as follows: First to any unpaid portion of the Class A Interests after distribution of the Settlement Carve-Out, on a Pro Rata basis; second to Class B Interests; and third to Class C Interests. The Creditor Trustee shall not make any distributions to holders of Disputed Claims unless and until such Claims are Allowed. The Creditor Trustee shall ensure that sufficient funds are reserved, as determined by the Creditor Trustee in his or her sole discretion, to pay Disputed Claims upon Allowance. The Creditor Trustee shall be permitted to distribute amounts that (i) are reasonably necessary to meet contingent liabilities and to maintain the value of the Creditor Trust Assets, (ii) are necessary to pay reasonable expenses (including, but not limited to, any taxes imposed on the Creditor Trust or in respect of the Creditor Trust Assets), and (iii) are required to satisfy other liabilities incurred by the Creditor Trust in accordance with this Plan or the Creditor Trust Agreement.

(m)   _Creditor Trust Certificates_.   Beneficial interests in the Creditor Trust shall not be represented by certificates, receipts, or in any other form or manner, except as maintained on the books and records of the Creditor Trust by the Creditor Trustee, as set forth in the Creditor Trust Agreement.

(n)   _Retention of Professionals by the Creditor Trustee_. The Creditor Trustee may retain and reasonably compensate counsel and other professionals out of the Creditor Trust Assets to assist in its duties as Creditor Trustee on such terms as the Creditor Trustee deems appropriate without Bankruptcy Court approval.   The Creditor Trustee may retain any professional who represented parties in interest, including the Chapter 11 Trustee, in the Chapter 11 Case.

(o)   _Federal Income Tax Treatment of the Creditor Trust; Creditor Trust Assets Treated as Owned by General Unsecured Creditors_. For all federal income tax purposes, all parties (including, without limitation, the Debtor, Chapter 11 Trustee, the Creditor Trustee, and the holders of beneficial interests in the Creditor Trust) shall treat the transfer of the Creditor Trust Assets to the Creditor Trust for the benefit of the beneficiaries thereof, whether Allowed on or after the Effective Date, as (A) a transfer of the Creditor Trust Assets directly to the holders in satisfaction of General Unsecured Claims and Lender's Deficiency Claims (other than to the extent allocable to Disputed General Unsecured Claims), followed by (B) the transfer by such holders to the Creditor Trust of the Creditor Trust Assets in exchange for, beneficial interests in the Creditor Trust. Accordingly, the holders of such General Unsecured Claims and Lender's Deficiency Claims, as applicable,

shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Creditor Trust Assets.

(p)     Tax Reporting.

(i)     The Creditor Trustee shall file income tax returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulation section l.671-4(a) and in accordance with this Section 6.2(p)(i). The Creditor Trustee shall annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Creditor Trust's taxable income, gain, loss, deduction, or credit will be allocated among the beneficial holders of the interests in the Creditor Trust in accordance with each holder's relative beneficial interests in the Creditor Trust.

(ii)     As soon as possible after the Effective Date, but in no event later than ninety (90) days after the Effective Date, the Creditor Trustee shall make a good faith valuation of the Creditor Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including, without limitation the, Debtor, the Chapter 11 Trustee, the Creditor Trustee, and the holders of beneficial interests in the Creditor Trust, as applicable) for all federal income tax purposes. The Creditor Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Creditor Trust that are required by any governmental unit.

(iii)     Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Creditor Trustee of a private letter ruling if the Creditor Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Creditor Trustee), the Creditor Trustee shall (i) treat any Creditor Trust Assets allocable to, or retained on account of, Disputed General Unsecured Claims as held by one or more discrete trusts for federal income tax purposes (the "**Trust Claims Reserve**"), consisting of separate and independent shares to be established in respect of each Disputed General Unsecured Claim, in accordance with the trust provisions of the Tax Code (section 641 *et seq.*), (ii) treat as taxable income or loss of the Trust Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Creditor Trust that would have been allocated to the Holders of Disputed General Unsecured Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (iii) treat as a Distribution from the Trust Claims Reserve any increased amounts distributed by the Creditor Trust as a result of any Disputed General Unsecured Claims resolved earlier in the taxable year, to the extent such Distributions relate to taxable income or loss of the Trust Claims Reserve determined in accordance with the provisions hereof, and (iv) to the extent permitted by applicable laws report consistent with the

foregoing for state and local income tax purposes. All Creditor Trust beneficiaries shall report, for tax purposes, consistent with the foregoing.

(iv)    The Creditor Trustee shall be responsible for payments, out of the Creditor Trust Assets, of any taxes imposed on the Creditor Trust or the Creditor Trust Assets, including the Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed General Unsecured Claims in the Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed General Unsecured Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed General Unsecured Claims, or (ii) to the extent such Disputed General Unsecured Claims have subsequently been resolved, deducted from any amounts distributable by the Creditor Trustee as a result of the resolutions of such Disputed General Unsecured Claims.

(v)    The Creditor Trustee may request an expedited determination of taxes of the Creditor Trust, including the Trust Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Creditor Trust for all taxable periods through the dissolution of the Creditor Trust.

(q)    <u>Dissolution</u>. The Creditor Trust and the Creditor Trustee shall be discharged or dissolved, as the case may be, no later than the fifth (5th) anniversary of the Effective Date; *provided, however*, that, on or prior to the date that is ninety (90) days prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Creditor Trust if it is necessary to the liquidation of the Creditor Trust Assets. Notwithstanding the foregoing, multiple extensions may be obtained so long as Bankruptcy Court approval is obtained not less than ninety (90) days prior to the expiration of each extended term; *provided, however*, that in no event shall the term of the Creditor Trust extend past the tenth (10th) anniversary of the Effective Date. The Creditor Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing the Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code and (ii) the Creditor Trustee has administered all Creditor Trust Assets and performed all other duties required by the Plan, the Confirmation Order, the Creditor Trust Agreement and the Creditor Trust. The Creditor Trustee shall not unduly prolong the duration of the Creditor Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Creditor Trust Assets and to effect the Distribution of the Creditor Trust Assets in accordance with the terms hereof and terminate the Creditor Trust as soon as practicable. Prior to and upon termination of the Creditor Trust, the Creditor Trust Assets will be distributed to the beneficiaries of Creditor Trust, pursuant to the provisions set forth in the Trust Agreement. If at any time the Creditor Trustee determines that the expense of administering the Creditor Trust is likely to exceed the value of the Creditor Trust Assets, the Creditor Trustee shall have the authority to (i) distribute to the beneficiaries of the Creditor Trust any Cash balance remaining in excess of necessary costs to pay outstanding expenses of the Creditor Trust, including any fees

and expenses of the Creditor Trustee and his/her professionals, (ii) donate any Creditor Trust Assets remaining in the Creditor Trust to the Anthony H.N. Schnelling Endowment Fund maintained by the American Bankruptcy Institute, a non-religious charitable organization exempt from federal income tax under section 501(c)(3) of the Tax Code that is unrelated to the Debtor and any insider of the Debtor and (iii) dissolve the Creditor Trust.

(r)     <u>Indemnification of Creditor Trustee</u>. The Creditor Trustee or the individuals comprising the Creditor Trustee, as the case may be, and the Creditor Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Creditor Trustee, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or ultra vires acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Creditor Trustee, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or ultra vires acts. Any indemnification claim of the Creditor Trustee shall be satisfied exclusively from the Creditor Trust Assets. The Creditor Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

**6.3     General Settlement of Claims.**

The Plan constitutes and evidences a compromise and settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.

**6.4     Issuance of Creditor Trust Interests.**

The issuance and distribution of Creditor Trust Interests pursuant to the terms of the Creditor Trust Agreement is authorized without the need for any further corporate action or without any further action by the holders of any claims. All of the Creditor Trust Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. On the Distribution Date, the Creditor Trustee shall issue the Creditor Trust Interests for distribution pursuant to the provisions hereof and the Creditor Trust Agreement. All Creditor Trust Interests to be issued shall be deemed issued as of the Effective Date regardless of the date on which they are actually distributed.

**6.5     Section 1145 Exemption.**

Section 1145 of the Bankruptcy Code shall be applicable to the issuance of the Creditor Trust Interests, if any. To the maximum extent permitted by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, if appropriate, the Creditor Trust Interests, issued pursuant to this Plan and their transfer will be exempt from registration under the Securities Act and all rules

and regulations promulgated thereunder, and any and all applicable state and local laws, rules, and regulations.

### 6.6     Restructuring Transactions.

On or prior to the Effective Date, the Creditor Trust Agreement shall be executed, and on the Effective Date, the Chapter 11 Trustee shall contribute the Creditor Trust Assets to the Creditor Trust free and clear of all Liens, Claims, charges, or other encumbrances. On the Effective Date, the Debtor shall exit chapter 11 as the Reorganized Debtor and the ownership of the Reorganized Debtor shall revest with the holders of Allowed Equity Interests in Class 10.

### 6.7     Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects. All matters provided for in the Plan involving the corporate structure of the Debtor, and any corporate action required by or in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by any Equity Interest holders, directors or officers of the Debtor. The authorizations and approvals contemplated by this Section 6.7 shall be effective notwithstanding any requirements under non-bankruptcy law.

### 6.8     Vesting of Assets.

Except as otherwise provided in the Plan, on the Effective Date, the Creditor Trust Assets shall be automatically transferred to and vest in the Creditor Trust free and clear of all Liens, Claims, charges, or other encumbrances. On the Effective Date, the ownership and management of the Reorganized Debtor shall revest with the holders of Allowed Equity Interests in Class 10. The Creditor Trustee shall be permitted to abandon any asset to the Reorganized Debtor without further order of the Bankruptcy Court.

### 6.9     Preservation of Rights of Action; Settlement of Litigation Claims.

Except as otherwise provided herein or in the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Causes of Action shall be transferred to the Creditor Trust as provided by the Plan, and may be initiated, filed, enforced, abandoned, settled, compromised, released, withdrawn or litigated to judgment without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, except as may otherwise be set forth in the Creditor Trust Agreement. The Creditor Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **No Person may rely on the absence of a specific reference in the Plan, or the Disclosure Statement to any Cause of Action against it as any indication that the Chapter 11 Trustee or the Creditor Trustee, as applicable, will not pursue any and all available Causes of Action against it. All rights to prosecute any and all Causes of Action against any Person are expressly preserved, except as otherwise provided in the Plan.** Unless any Causes of Action against a Person are expressly

waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Creditor Trust expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan. For the sake of clarity, the TxDOT Proceeding and the PDA Proceeding are not included in the Causes of Action preserved by the Estate and transferred to the Creditor Trust under this Plan. The Debtor's and Estate's rights and interests in the TxDOT Proceeding and the PDA Proceeding are exclusively owned by the Lender as of the Sale Closing Date pursuant to the terms of the Sale Order and this Plan.

### 6.10    Effectuating Documents; Further Transactions.

On and after the Effective Date, the Chapter 11 Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 6.11    Exemption from Certain Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, sales or use tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment: (a) the creation of any mortgage, deed of trust, lien or other security interest under or pursuant to this Plan; (b) the release or assignment of liens; (c) the transfer of any assets of the Estate to the Creditor Trust; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, in connection with or pursuant to this Plan, including any restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing.

### 6.12    Management and Winddown of the Reorganized Debtor.

As provided by the treatment of Class 10 Allowed Equity Interests, the Debtor's existing equity owners will own, manage and control the Reorganized Debtor as of the Effective Date and may proceed to operate, winddown or dissolve the Reorganized Debtor subject to their business judgment. The Chapter 11 Trustee and the Creditor Trustee shall have no obligation to manage, winddown or dissolve the Reorganized Debtor.

### 6.13    Cooperation with the Creditor Trustee.

All holders of Claims and Equity Interests, the Reorganized Debtor, the Lender, Panache, the White Parties, and any owner or assignee of the Property shall fully cooperate with the Creditor Trustee in the administration of the Creditor Trust, including the prosecution of the Causes of

Action and objections to any Claims. The Bankruptcy Court retains jurisdiction to order appropriate relief under this Plan provision.

## ARTICLE VII. DISTRIBUTIONS

### 7.1    Date of Distributions.

Unless otherwise provided in this Plan, any distributions or deliveries to be made under this Plan shall be made on the Effective Date or as soon as practicable thereafter in accordance with the Creditor Trust Agreement. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 7.2    Sources of Cash for Plan Distributions.

All distributions made by the Creditor Trustee to beneficiaries of the Creditor Trust shall be obtained from the Settlement Carve-Out (only to Allowed Class 6 Claims and then Class 9 Claims) and Creditor Trust Assets. All payments made by the Creditor Trustee to fund the Creditor Trust's fees and expenses shall be obtained first, from the Lender's Contribution, second, from the Creditor Trust Assets, and third, only to the extent needed, from the Settlement Carve-Out. No portion of the Lender's Contribution shall be used to fund the payment of Allowed General Unsecured Claims.

### 7.3    Creditor Trustee.

All distributions under the Plan shall be made by the Creditor Trustee. The Creditor Trustee shall not be required to post any bond, surety or other security for the performance of its duties hereunder unless otherwise ordered by the Bankruptcy Court. The Creditor Trustee shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Creditor Trustee by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Creditor Trustee to be necessary and proper to implement the provisions hereof.

### 7.4    Record Date for Distributions.

At the close of business on the Distribution Record Date, the transfer ledgers or registers for Claims against and Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. Neither the Chapter 11 Trustee nor the Creditor Trustee shall have any obligation to recognize any transfer of any of the foregoing occurring after the Distribution Record Date, and shall be entitled instead to recognize for all purposes hereunder, including to effect distributions hereunder, only those record holders stated on the transfer ledgers or registers maintained by the Chapter 11 Trustee as of the close of business on the Distribution Record Date.

### 7.5    Recipients of Distributions.

All distributions to holders of Allowed Claims and Allowed Equity Interests under the Plan shall be made to the holder of the Claim or Equity Interest as of the Distribution Record Date. Changes as to the holder of a Claim or Equity Interest after the Distribution Record Date shall only be valid and recognized for distribution if notice of such change is filed with the Bankruptcy Court, in accordance with Bankruptcy Rule 3001 (if applicable) and served upon the Chapter 11 Trustee and his counsel and, if applicable, the Creditor Trustee.

### 7.6    Delivery of Distributions; Unclaimed Property.

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made at the address of each holder of an Allowed Claim or Allowed Equity Interest as set forth in the books and records of the Debtor, Chapter 11 Trustee or the Creditor Trustee, as applicable, unless the applicable trustee has been notified in writing of a change of address. If any distribution to the holder of an Allowed Claim or Allowed Equity Interest is returned as undeliverable, no further distributions to such holder shall be made unless and until the Chapter 11 Trustee or Creditor Trustee, as applicable, is notified of such holder's then-current address, at which time all missed distributions shall be made to such holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days after the date of the distribution in question. After such 90th day, and notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary (i) all unclaimed property or interest in property in respect of the distribution in question shall revert to the Creditor Trust, and thereafter be distributed Pro Rata to the holders of Allowed Claims and Allowed Equity Interests in accordance with the terms of this Plan, and (ii) the Claim or Equity Interest of any holder with respect to such unclaimed property or interest in property shall be discharged and forever barred. If, at the time the Creditor Trust terminates there is unclaimed property remaining in the Creditor Trust, such property shall be donated to the Anthony H.N. Schnelling Endowment Fund maintained by the American Bankruptcy Institute, to assist in the provision of resources for research and education.

### 7.7    Means of Payment.

All distributions made pursuant to the Plan shall be in Cash.

### 7.8    Setoffs and Recoupment.

The Chapter 11 Trustee or the Creditor Trust, as applicable, may, but shall not be required to, setoff against or recoup from any Claim or Equity Interest any rights to payment that the Estate may have against the holder of such Claim or Equity Interest. Neither the failure of the Chapter 11 Trustee nor the Creditor Trust, as applicable, to setoff or recoup, nor the Allowance of any Claim or Equity Interest shall constitute a waiver or release by the Estate or the Creditor Trust of any right to payment, or right of setoff or recoupment.

### 7.9    Distributions After Effective Date.

Distributions made pursuant to this Plan after the Effective Date to holders of Disputed Claims and Disputed Equity Interests that are not Allowed as of the Effective Date, shall be deemed

to have been made on the Effective Date. After the initial distribution, the Creditor Trustee shall make additional interim distributions to holders of Allowed Claims and Allowed Equity Interests at such time as the Creditor Trustee may deem appropriate, in accordance with the terms of this Plan.

###### 7.10    Withholding and Reporting Requirements.

In connection with this Plan and all instruments issued under this Plan, any party issuing any instrument or making any such distribution under this Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Allowed Equity Interest that is entitled to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any applicable tax obligations, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under this Plan to any holder of any Allowed Claim or Allowed Equity Interest has the right, but not the obligation, to not issue such instrument or make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

###### 7.11    No Postpetition Interest.

Unless otherwise specifically provided for in this Plan or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Equity Interests, and no holder of a Claim or Equity Interest shall be entitled to interest accruing on or after the Petition Date. Notwithstanding the foregoing, the Lender's Allowed Administrative Expense Claim accruing and arising under and pursuant to the Postpetition Financing Order shall be permitted to accrue postpetition interest pursuant to the terms of the Postpetition Financing Order.

###### 7.12    Time Bar to Payments.

Checks issued by the Creditor Trustee under this Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance. Requests for reissuance of any check shall be made in writing directly to the Creditor Trustee by the person to whom such check was originally issued. Any request for re-issuance of a voided check must be made on or before the end of the 90-day period referenced in this Section 7.12. After such  90-day period, if no request for re-issuance of a voided check was timely made, such amounts shall constitute unclaimed property and be treated in accordance with Section 7.6 of this Plan, and all Claims or Equity Interests in respect of such void checks shall be discharged and forever barred.

###### 7.13    De Minimis Distributions.

Neither the Chapter 11 Trustee nor the Creditor Trustee shall have any obligation to make a distribution that is less than Ten Dollars ($10) in Cash. If an interim distribution to the holder of an Allowed Claim or Equity interest is less than $10, such distribution shall be held for future distributions. If the final distribution to any holder of an Allowed Claim or Equity Interest is less

than $10, such amount shall become and constitute unclaimed property and be treated in accordance with Section 7.6 of the Plan.

## ARTICLE VIII. PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

**8.1    Objections to Claims.**

Except insofar as a Claim or Equity Interest is Allowed under the Plan or pursuant to Final Order of the Bankruptcy Court, the Creditor Trustee, the Chapter 11 Trustee or any other party in interest with standing, shall be entitled to object to Claims and Equity Interests, including objections seeking reclassification or subordination of Claims. Any objections to Claims and Equity Interests shall be served and filed by the Objection Deadline. Any Claim or Equity Interest as to which an objection is timely filed shall be a Disputed Claim or Disputed Equity Interest, respectively. On the Effective Date, the Creditor Trustee shall assume standing to continue to prosecute, settle or resolve any objection to Claims filed by the Chapter 11 Trustee. Notwithstanding the foregoing, included within the Lender Settlement, the Releasing Parties and Third Party Releasing Parties waive and release any and all objections to any Claims held by or in favor of the Lender, including, without limitation, Lender's Allowed Administrative Expense Claim pursuant to the Postpetition Financing Order, Lender's Allowed Secured Claim and Lender's Allowed Deficiency Claim.

**8.2    Post-Sale Closing Date Reporting on Payments on Account of Claims.**

Beginning on the Effective Date, on or before the tenth (10th) calendar day of each month, the Lender, Panache, and any of their successors or assigns, including any assignee or subsequent owner of the Property, shall provide the Chapter 11 Trustee and the Creditor Trustee and his or her counsel, respectively, by email, a detailed accounting of all payments, settlements or other transfers of value of any kind to any holder of a Claim against the Estate. The receipt of any payment, settlement, or transfer of value on account of any Claim against the Estate shall be the basis for the reduction or disallowance of the Claim against the Estate. The Creditor Trustee may waive this reporting requirement if, in his business judgment, the reports are no longer necessary to administer the Creditor Trust. The Lender, Panache, and any of their successors or assigns, including any assignee or subsequent owner of the Property, are obligated to make reports under this Section 8.2 until the Creditor Trust is dissolved.

**8.3    No Distributions Pending Allowance.**

If a timely objection is made with respect to any Claim or Equity Interest, no payment or distribution under the Plan shall be made on account of such Claim or Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes Allowed.

**8.4    Distributions After Allowance.**

To the extent that a Disputed Claim or Disputed Equity Interest ultimately becomes an Allowed Claim or Allowed Equity Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Equity Interest, in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court

allowing any Disputed Claim or Disputed Equity Interest becomes a Final Order, the Creditor Trustee shall provide to the holder of such Claim or Equity Interest the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest.

### 8.5     Disallowance of Late Filed Claims.

Unless otherwise provided in a Final Order of the Bankruptcy Court, any Claim for which a proof of claim is filed after the applicable Bar Date shall be deemed disallowed. The holder of a Claim that is disallowed pursuant to this Section 8.5 shall not receive any distribution on account of such Claim, and neither the Chapter 11 Trustee nor the Distribution Agent shall need to take any affirmative action for such Claim to be deemed disallowed.

## ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 9.1     Rejection of Contracts and Leases.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, Debtor shall be deemed to have rejected each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed, assumed and assigned or rejected by the Chapter 11 Trustee, (ii) previously expired or terminated pursuant to its own terms, or (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Chapter 11 Trustee on or before the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

### 9.2     Inclusiveness.

Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease.

### 9.3     Claims Based on Rejection of Executory Contracts or Unexpired Leases.

All Claims arising out of the rejection of executory contracts and unexpired leases (if any) must be served upon the Chapter 11 Trustee and his counsel within thirty (30) days after the earlier of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the Effective Date. Any Claims not filed within such time shall be forever barred from assertion against the Debtor, the Estate, its property and the Creditor Trust.

### 9.4     No Effect on Insurance

The rejection of executory contracts shall not apply to, and shall have no effect upon, any insurance policy which the Debtor owns or pursuant to which the Debtor is an insured party, beneficiary, claimant or in which the Debtor has any interest, including any directors and officers' insurance policies (together, the "***Insurance Policies***"). All Insurance Policies to which the Debtor

or the Estate is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the Debtor, assigned to the Creditor Trust and shall continue in full force and effect thereafter in accordance with their respective terms. All Insurance Policies shall vest in the Creditor Trust as of the Effective Date, including the right to (a) control any Insurance Policy that provides or may provide coverage for the Causes of Action or may become available to provide such coverage; (b) pursue and receive the benefits and proceeds of the Insurance Policies; (c) pursue and receive recovery from or as a result of any Causes of Action, including consequential, contractual, extracontractual and/or statutory damages, or other proceeds, distributions, awards or benefits; and (d) pursue and receive any other recovery related to the Causes of Action, including negotiations relating thereto and settlements thereof. Nothing in this paragraph nor the Plan limits, excuses or in any way affects or impairs any coverage to which the Debtor's or the Estate's current and/or former officers and directors are entitled to with respect to any and all insurance or other applicable Insurance Policies of the Debtor.

## ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### 10.1 Conditions to Confirmation of Plan.

Confirmation of the Plan shall not occur, and the Confirmation Order shall not be entered, until an order, finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered.

### 10.2 Conditions to Effective Date of Plan.

The Effective Date of the Plan shall not occur until each of the following conditions precedent have been satisfied or waived:

(a) The clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Case and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto;

(b) The Chapter 11 Trustee shall have received the Lender's Contribution and the Settlement Carve-Out;

(c) The Creditor Trust Agreement shall have been fully executed;

(d) The Creditor Trustee shall have been appointed, accepted the appointment, and performed any other appropriate duties prior to accepting the Creditor Trust Assets; and

(e) All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan shall have been executed and delivered by the parties thereto, and, in each case, all conditions to their effectiveness shall have been satisfied or waived as provided therein.

Within five (5) Business Days of the Effective Date, the Chapter 11 Trustee shall file a notice of the occurrence of the Effective Date.

### 10.3    Waiver of Conditions Precedent.

Any of the foregoing conditions (with the exception of the conditions set forth in Sections 10.1(a) and 10.2(a) may be waived by the Chapter 11 Trustee without notice to or order of the Bankruptcy Court. The Chapter 11 Trustee may assert a failure to satisfy or waiver of any condition regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Chapter 11 Trustee to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right will be deemed an on-going right that may be asserted at any time.

### 10.4    Effect of Failure of Conditions.

If the foregoing conditions have not been satisfied or waived in the manner provided in Sections 10.1, 10.2 and 10.3 hereof, then (i) the Confirmation Order shall be of no further force or effect; (ii) no distributions under the Plan shall be made; (iii) the Estate and all holders of Claims against and Equity Interests in the Debtor shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (iv) all of the Estate's obligations with respect to Claims and Equity Interests shall remain unaffected by the Plan; (v) nothing contained in this Plan shall be deemed to constitute a waiver or release of any Claims by or against the Estate or any other Person or to prejudice in any manner the rights of the Estate or any Person in any further proceedings involving the Debtor or the Estate; and (vi) this Plan shall be deemed withdrawn. Upon such occurrence, the Chapter 11 Trustee shall file a written notification with the Bankruptcy Court and serve it on the parties appearing on the service list maintained in the Chapter 11 Case.

### 10.5    Reservation of Rights.

The Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Chapter 11 Trustee with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Estate or any other party with respect to any Claims or Equity Interests or any other matter.

## ARTICLE XI. EFFECT OF CONSUMMATION

### 11.1    Vesting of Assets.

Upon the Confirmation Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Creditor Trust Assets shall vest in the Creditor Trust, free and clear of all Claims, Liens, encumbrances, charges and other interests, except as otherwise provided in this Plan.

### 11.2    Discharge of Claims and Interests in the Debtor.

Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise provided in this Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, where such Claim or Interest has been fully paid or otherwise satisfied in accordance with this Plan, and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest

extent permitted under § 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, all such holders of Claims and Interests, and their affiliates shall be forever precluded and enjoined, pursuant to §§ 105, 525, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtor.

### 11.3    Injunction against Interference with Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 11.4    Exculpation.

Neither the Exculpated Parties nor any of their respective present or former members, managers, officers, directors, employees, equity holders, partners, affiliates, funds, advisors, attorneys or agents, or any of their predecessors, successors or assigns, shall have or incur any liability to any holder of a Claim or an Equity Interest, or any other party-in-interest, or any of their respective agents, employees, equity holders, partners, members, affiliates, funds, advisors, attorneys or agents, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the administration of the Chapter 11 Case, the negotiation and pursuit of approval of the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the funding of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and shall be deemed to have acted in good faith in connection therewith and entitled to the protections of section 1125(e) of the Bankruptcy Code. Notwithstanding anything to the contrary contained in this Plan, this Section 11.4 shall not exculpate any party from any liability based upon gross negligence or willful misconduct.

### 11.5    Debtor and Estate Releases

As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, the service of the Released Parties to facilitate the administration of the Estate, a substantial recovery for holders of Allowed Claims, and the implementation of this Plan, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtor, the Reorganized Debtor, the Chapter 11 Trustee, the Creditor Trustee, the Creditor Trust and the Estate on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities that may purport to assert any cause of action derivatively, by or through the foregoing entities (together, the ***"Releasing Parties"***), from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, remedies, or liabilities, whatsoever, including any derivative claims, asserted or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right, or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any

manner arising from, in whole or in part, the Debtor, the Estate, the Chapter 11 Case, the Lender Settlement, the subject matter of, or the loans or other transactions or events giving rise to, any Claim or Interest (including without limitation any collateral pledged to the Lender in connection with any such transactions or loans), the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the restructuring transactions, the negotiation, formulation, or preparation of the Disclosure Statement and this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, or any other act or omission, transaction, agreement, event, or other occurrence, other than claims or causes of action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, and willful misconduct.

### 11.6    Releases by Holders of Claims and Interests

**As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, the service of the Released Parties to facilitate the administration of the Estate, a substantial recovery for holders of Claims and Interests, and the implementation of this Plan, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the holders of all Claims and Interests and the successors and assigns (other than the Opt-Out Parties, the "_Third-Party Releasing Parties_") from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the holder of the Claim or Interest, or the Debtor or Estate, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale, or recission of the purchase or sale of any security of or investment or interest in the Debtor, the Lender Settlement, the subject matter or, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan (including without limitation any collateral pledged to the Lender in connection with any such transactions or loans with the Debtor), the business or contractual arrangements between any holder of a Claim or Interest, and the Debtor or any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the negotiation, formulation, or preparation of the Disclosure Statement, this Plan, related agreements, instruments, and other documents, the solicitation of votes with**

respect to this Plan, or any other act or omission (the "*__Third-Party Releases__*"), other than the claims or causes of action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

With regard to holders of Claims or Interests that are Unimpaired under this Plan and holders of Claims or Interests whose vote to accept or reject this Plan was solicited or who were deemed to reject the Plan but who did not return a ballot or Opt-Out Form (and thus did not opt-out of this release), if such holder of Claims or Interests wishes to pursue a claim or cause of action against any Released Party, such holder must first petition the Bankruptcy Court for a determination of whether this release applies to such holder. If the Bankruptcy Court determines that such holder's claim is not released by this provision, such holder must bring any claim or cause of action in the United States Bankruptcy Court for the Western District of Texas or must obtain leave of this Bankruptcy Court to bring such claim or cause of action before a court of another jurisdiction.

11.7    **Injunction and Stay.**

(a)    Except as otherwise expressly provided in this Plan, all Persons or entities who have held, hold, or may hold Claims or causes of action against the Debtor or any Released Party or Equity Interests in the Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim, cause of action or Equity Interest against the Estate, the Creditor Trust or other entity released, discharged or exculpated hereunder, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Estate or the Creditor Trust with respect to any such Claim or Equity Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Estate, the Creditor Trust, or against the property or interests in property of any Estate or the Creditor Trust, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Estate or the Creditor Trust, or against the property or interests in property of any Estate or the Creditor Trust with respect to any such Claim or Equity Interest, or (v) pursuing any Claim or causes of action released under the Plan.

(b)    Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

(c)    The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, or liabilities released pursuant to this Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities released or exculpated in this Plan.

**11.8    Preservation of Claims.**

(a)    Except as otherwise provided herein, as of the Confirmation Date, pursuant to sections 1123(b)(3)(B) of the Bankruptcy Code, any action, cause of action, claim, liability, obligation, right, suit, debt, sum of money, damage, judgment, Claim, and demand whatsoever, whether known or unknown, at law, in equity, or otherwise, including causes of action under Chapter 5 of the Bankruptcy Code, but not including any causes of action against the Exculpated Parties, and specifically excluding the TxDOT Proceeding and PDA Proceeding exclusively owned by the Lender pursuant to the Sale Order and this Plan (collectively, "***Causes of Action***") owned by or otherwise accruing to the Debtor or the Estate shall constitute assets of, and shall immediately be transferred to and vest in, the Creditor Trust. Thereafter, the Creditor Trustee, as a representative of the Debtor and the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, shall have sole and full authority to commence and prosecute Causes of Action for the benefit of the holders of Allowed General Unsecured Claims. For the avoidance of doubt, the Causes of Action include, but are not limited to, (a) all of the Debtor's commercial tort claims (as such term is defined in the Uniform Commercial Code as in effect in the State of Texas) arising on or before the Effective Date, including without limitation, all causes of action against (i) present and former directors and officers of the Debtor, and (ii) direct and indirect equity holders of the Debtor, and the proceeds of all of the foregoing; (b) all Actions or Claims (i) against the Debtor's contract counterparties (other than counterparties to Assigned Contracts) and the proceeds thereof, (ii) against any of the Debtor's agents, employees, or contractors, , and any of their affiliates, professionals, owners, managers, members, officers, directors, employees, agents, insurers, successors or assigns, (iii) against any insurance carrier, policy, or coverage of the Debtor; and (c) the Estate's Avoidance Actions.

(b)    Reservation of White Parties' Litigation. Reservation of White Parties' Litigation. The releases and injunctions in favor of Lender contained in this Plan do not extend to or otherwise apply to any valid, viable, ripe, live / non-moot, and currently existing claims and causes of action to which the White Parties have standing to assert against Lender in Adversary Case Number 20-1047, currently pending before the Bankruptcy Court ("***White Adversary***"). All parties' rights, claims, liabilities, defenses, affirmative defenses, causes of action and other interests asserted in the White Adversary, including without limitation, all dispositive motions and other forms of relief requested, are expressly reserved and preserved by this Plan. For the sake of clarity, Lender is expressly released under the Plan by all Releasing Parties and Third Party Releasing Parties on any and all Claims, causes of action, disputes and challenges (specifically including any claims objections, lien challenges and requests for subordination), except the causes of action held by the White Parties based on any timely and properly asserted claims in the

White Adversary that are valid, viable, live / not moot and to which the White Parties have standing to assert against Romspen, subject to any motions to dismiss and/or other dispositive motions filed by Romspen to be adjudicated in the White Adversary in due course. Any moot claims and claims to which the White Parties lack standing (including any potential overlap with the Claims already settled by the Trustee under the Lender Settlement) would be disposed of by the Lender Settlement because only the Trustee has standing to assert and settle the Claim. Those "overlapping" claims will be likewise be disposed of in the White Adversary pursuant to Romspen's pending motion to dismiss, such that the any claims asserted by the White Parties in the White Adversary that qualify as the Claims settled by the Trustee under the Lender Settlement will be dismissed with prejudice. To the extent the White Parties have asserted any claims in the White Adversary that the White Parties do not have standing to assert (including, without limitation, the Claims settled by the Trustee under the Lender Settlement) will NOT be preserved under this Plan and will be completely and finally disposed of by the Lender Settlement under this Plan. Only those valid, viable, live / non-moot claims that the White Parties have standing to assert against Romspen in the pending White Adversary are hereby preserved to be prosecuted only by the White Parties and only through the White Adversary. To the extent the White Parties have standing to bring any ripe / non-moot, valid causes of action against Romspen in the White Adversary, then only those timely filed, viable causes of action will survive the Lender Settlement and be preserved under this Plan. The White Parties' rights to continue prosecuting only those ripe / non-moot, valid causes of action and challenges asserted against Romspen in the White Adversary to which the White Parties have standing ("*Viable Claims*") will continue. Romspen's and the White Parties' respective rights and defenses as to those Viable Claims are expressly preserved and reserved to be determined in due course of the White Adversary without substantive determination through the Plan.

(c) <u>Reservation of M&M Lien Claimants Litigation</u>. The releases and injunctions in favor of the Lender contained in this Plan do not extend to or otherwise apply to the claims and causes of action asserted against the Lender in Adversary Case Number 20-1048, currently pending before the Bankruptcy Court ("*M&M Lien Claimant Adversary*"). All parties' rights, claims, liabilities, defenses, affirmative defenses, causes of action and other interests asserted in the M&M Lien Claimant Adversary are expressly reserved and preserved by this Plan. To the extent the M&M Plaintiffs' claims are derivative of the Debtor's rights or the Estate's rights, those claims will be released under the Plan; however, the M&M Plaintiffs' claims that are not derivative of the Debtor's or Estate's rights are expressly preserved and unaffected by the Plan.

## 11.9    Compromise of Controversies.

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019 and section 1123(b)(3)(A).

## ARTICLE XII. RETENTION OF JURISDICTION

(a)     The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)     To hear and determine pending applications for the assumption, assignment or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(ii)     To determine any and all adversary proceedings, applications, and contested matters in the Chapter 11 Case and grant or deny any application involving the Debtor or the Estate that may be pending on the Effective Date or that are retained and preserved by the Chapter 11 Trustee herein;

(iii)     To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are effected as provided in the Plan;

(iv)     To hear and determine any timely objections to Administrative Expense Claims or to proofs of Claim and Equity Interests, including any objections to the classification of any Claim or Equity Interest, and to allow or disallow any Disputed Claim or Disputed Equity Interest, in whole or in part;

(v)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(vi)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or maintain the integrity of the Plan following consummation;

(vii)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Trust Agreement or maintain the integrity of the Trust Agreement following the Effective Date;

(viii)     To consider any amendments to or modifications of the Plan, or to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(ix)     To hear and determine all requests for payment of Fee Claims;

(x)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the documents that are ancillary to and aid in effectuating the Plan or any agreement, instrument, or other document governing or relating to any of the foregoing;

(xi)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(xii)     To hear any other matter not inconsistent with the Bankruptcy Code;

(xiii)     To hear and determine all disputes involving the existence, scope, and nature of the exculpations and releases granted hereunder;

(xiv)     To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Plan; and

(xv)     To enter a final decree(s) closing the Chapter 11 Case.

## ARTICLE XIII. MISCELLANEOUS

### 13.1     Payment of Statutory Fees.

All fees payable under 28 U.S.C. § 1930 shall be paid on the Effective Date and thereafter, as appropriate.

### 13.2     Filing of Additional Documents.

The Chapter 11 Trustee or Creditor Trustee may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 13.3     Schedules, Exhibits and Plan Supplement Incorporated.

All exhibits and schedules to the Plan, and the documents contained in the Plan Supplement, are incorporated into and are a part of the Plan as if fully set forth herein.

### 13.4     Amendment or Modification of the Plan.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Chapter 11 Trustee at any time prior to or after the Confirmation Date. Holders of Claims and Equity Interests that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified; *provided*, *however*, that any holders of Claims and Equity Interests who were deemed to accept the Plan because such Claims and Equity Interests were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims and Equity Interests continue to be unimpaired.

**13.5    Inconsistency.**

In the event of any inconsistency among the Plan, the Disclosure Statement, and any exhibit or schedule to the Disclosure Statement, the provisions of the Plan shall govern. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

**13.6    Exemption from Certain Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax. All sale transactions consummated by the Chapter 11 Trustee and the Estate and approved by the Bankruptcy Court on and after the Petition Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Chapter 11 Trustee of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Estate of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, if any, shall be deemed to have been made under, in furtherance of, or in connection with the Plan, and thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**13.7    Expedited Tax Determination.**

The Chapter 11 Trustee or the Creditor Trustee, as successor to the Chapter 11 Trustee, may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtor for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

**13.8    Binding Effect.**

Except as otherwise provided in § 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of this Plan and Confirmation Order shall be binding upon and inure to the benefit of the Debtor, the Estate, the Released Parties, the Releasing Parties, the Third-Party Releasing Parties, any holder of any Claim or Interest, or any Person named or referred to in this Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, as to the binding effect, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by this Plan and Confirmation Order.

**13.9    Severability.**

If the Bankruptcy Court determines that any provision of this Plan is unenforceable either on its face or as applied to any Claim or Equity Interest, the Chapter 11 Trustee may modify this Plan in accordance with Section 13.4 hereof so that such provision shall not be applicable to the

holder of any Claim or Equity Interest. Any determination of unenforceability shall not (i) limit or affect the enforceability and operative effect of any other provisions of this Plan; or (ii) require the re-solicitation of any acceptance or rejection of this Plan unless otherwise ordered by the Bankruptcy Court.

### 13.10   No Admissions.

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any claims by or against, or any interests in, the Debtor, (b) prejudice in any manner the rights of the Chapter 11 Trustee, the Estate or the Debtor or any other party in interest, or (c) constitute an admission of any sort by the Chapter 11 Trustee, the Estate or the Debtor or other party in interest.

### 13.11   No Payment of Attorneys' Fees.

Except for the fees of Professional Persons, no attorneys' fees shall be paid by the Estate with respect to any Claim or Equity Interest unless otherwise specified in this Plan or a Final Order of the Bankruptcy Court.

### 13.12   Notices.

All notices, requests, and demands to or upon the Estate to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> GREGORY S. MILLIGAN
> Chapter 11 Trustee, *3443 Zen Garden, L.P.*
> Harney Partners
> P.O. Box 90099
> Austin, TX 78709-0099
> gmilligan@harneypartners.com

> with a copy to:

> WICK PHILLIPS GOULD & MARTIN, LLP
> Attention: Jason M. Rudd
> 3131 McKinney Ave, Suite 100
> Dallas, Texas 75204
> Telephone: 214-740-4038
> jason.rudd@wickphillips.com

### 13.13   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas,

without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

<div align="center">

**3443 ZEN GARDEN, L.P.**

</div>

By:  */s/ Gregory S. Milligan*

Gregory S. Milligan, Chapter 11 Trustee

**WICK PHILLIPS GOULD & MARTIN, LLP**

 */s/ Scott D. Lawrence*
Jason M. Rudd
State Bar No. 24028786
Scott D. Lawrence
State Bar No. 24087896
Lauren K. Drawhorn
State Bar No. 24074528
Daniella G. Heringer
State Bar No. 24103460
Emails:     jason.rudd@wickphillips.com
                  scott.lawrence@wickphillips.com
                  lauren.drawhorn@wickphillips.com
                  daniella.heringer@wickphillips.com

**COUNSEL FOR GREGORY S. MILLIGAN,
CH. 11 TRUSTEE FOR 3443 ZEN GARDEN, L.P.**

**Exhibit B**

**Summary of Scheduled and Filed Claims against the Estate**

**3443 Zen Garden, LP**
Summary of Claims Pool

## SUMMARY SCHEDULE

| | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| Class 1: Priority Non-Tax Claims | $ - | $ - | $ - |
| Class 2: Lender's Secured Claim | $ 92,994,676.89 | $ 96,495,021.72 | $ 45,000,000.00 |
| Class 3: M&M Plaintiff Secured Claims | $ 3,963,615.43 | $ 3,760,066.67 | $ 3,787,597.80 |
| Class 4: Panache Secured Claims | $ 14,176,623.58 | $ 5,024,149.99 | $ 1,387,100.46 |
| Class 5: Other Secured Claims | $ 1,370,294.87 | $ 972,391.24 | $ - |
| Class 6: General Unsecured Claims | $ 315,242.47 | $ 179,393.46 | $ 1,466,313.65 |
| Class 7: Lender's Deficiency and Unsecured Claims | $ - | $ - | $ 56,511,950.72 |
| Class 8: Panache and M&M Plantiffs Deficiency and Unsecured Claims | $ 1,026,874.03 | $ 6,802,645.54 | $ 7,153,622.84 |
| Class 9: Subordinated Claims | $ 204,412.31 | $ - | $ 204,412.31 |
| Class 10: Equity Interests | $ - | $ - | $ - |

## DETAILED SCHEDULES

| Class 2: Lender's Secured Claim | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| Romspen Mortgage Limited Partnership | $ 92,994,676.89 | $ 96,495,021.72 | $ 45,000,000.00 |
| **Total Class 2** | **$ 92,994,676.89** | **$ 96,495,021.72** | **$ 45,000,000.00** |

| CLASS 3: M&M Plaintiff Secured Claims | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| ABC Supply Co., Inc. | $ 142,840.19 | $ 142,840.19 | $ 142,840.19 |
| ACM Services, LLC | $ 486,914.56 | $ 401,520.90 | $ 401,520.90 |
| Austin Glass & Mirror, Inc. | $ 714,789.54 | $ 686,374.14 | $ 686,374.14 |
| Capital Industries, LLC | $ 478,659.78 | $ 600,224.24 | $ 600,224.24 |
| Ferguson Enterprises, LLC (includes Waterworks) | $ 88,498.25 | $ 88,013.52 | $ 88,013.52 |
| Hill Country Electric Supply, LP | $ 89,782.23 | $ 84,751.82 | $ 84,751.82 |
| Koetter Fire Protection of Austin, LLC | $ 344,345.98 | $ 341,688.09 | $ 341,688.09 |
| Lyle America, Inc. | $ 623,200.00 | $ 442,600.00 | $ 442,600.00 |
| Summer Legacy, LLC | $ 932,577.90 | $ 905,046.77 | $ 932,577.90 |
| Texas Air Industries | $ 62,007.00 | $ 67,007.00 | $ 67,007.00 |
| **Total Class 3** | **$ 3,963,615.43** | **$ 3,760,066.67** | **$ 3,787,597.80** |

| CLASS 4: Panache Secured Claims | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| Panache Development & Construction, Inc. | $ 14,176,623.58 | $ 5,024,149.99 | $ 1,387,100.46 |
| **Total Class 4** | **$ 14,176,623.58** | **$ 5,024,149.99** | **$ 1,387,100.46** |

| CLASS 5: Other Secured Claims | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| Dealers Electrical Supply Company | $ 10,929.70 | $ - | $ - |
| H&H Crane Services, Inc. dba Texas Crane Service | $ 11,270.45 | $ 11,270.45 | $ - |
| Hinshaw & Culbertson LLP | $ 339,734.24 | $ 323,222.04 | $ - |
| Lone Star Materials, Inc. | $ 120,276.72 | $ 120,276.72 | $ - |
| Ram Tool Supply | $ 27,587.82 | $ 28,542.59 | $ - |
| Roca | $ 32,079.48 | $ - | $ - |
| Schindler Elevator Corporation | $ 430,481.00 | $ 407,315.00 | $ - |
| Trane | $ 273,863.90 | $ - | $ - |
| Wembley Metal Buildings, LLC | $ 124,071.56 | $ 81,764.44 | $ - |
| **Total Class 5** | **$ 1,370,294.87** | **$ 972,391.24** | **$ -** |

**3443 Zen Garden, LP**
Summary of Claims Pool

| CLASS 6: General Unsecured Claims | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| Dealers Electrical Supply Company | $ - | $ - | $ 10,929.70 |
| Doucet & Associates | $ 15,833.05 | $ - | $ - |
| Equipmentshare.com, Inc. | $ 95,095.51 | $ 95,095.51 | $ 95,095.51 |
| Fritz, Byrne, Head & Gilstrap, PLLC | $ 4,125.00 | $ 4,675.00 | $ 4,675.00 |
| Frontier Plastering | $ - | $ 27,431.00 | $ 27,431.00 |
| GSC Architects | $ 79,912.56 | $ - | $ - |
| Hilti Inc. | $ 6,982.15 | $ - | $ - |
| H&H Crane Services, Inc. dba Texas Crane Service | $ - | $ - | $ 11,270.45 |
| Hinshaw & Culbertson LLP | $ - | $ - | $ 323,222.04 |
| Hollandstone | $ 6,950.00 | $ 6,950.00 | $ 6,950.00 |
| Lone Star Materials, Inc. | $ - | $ - | $ 120,276.72 |
| Mark Schiffgens, CPA | $ 21,157.00 | $ - | $ 21,157.00 |
| McMinn Land Surveying Company | $ 19,678.75 | $ - | $ - |
| Mint Engineering, LLC | $ 14,870.00 | $ - | $ - |
| Professional Flooring | $ 2,310.82 | $ 2,310.82 | $ 2,310.82 |
| Ram Tool Supply | $ - | $ - | $ 28,542.59 |
| Roca | $ - | $ - | $ 32,079.48 |
| Ruiz Testing Services, Inc. | $ 15,400.00 | $ 15,400.00 | $ 15,400.00 |
| Schindler Elevator Corporation | $ - | $ - | $ 407,315.00 |
| Sprouse Shrader Smith PLLC | $ 4,030.00 | $ - | $ 4,030.00 |
| Structures | $ 13,787.50 | $ - | $ - |
| Summer Legacy, LLC | $ - | $ 27,531.13 | $ - |
| Texas Concrete | $ 15,110.13 | $ - | $ - |
| Trane | $ - | $ - | $ 273,863.90 |
| Wembley Metal Buildings, LLC | $ - | $ - | $ 81,764.44 |
| **Total Class 6** | **$ 315,242.47** | **$ 179,393.46** | **$ 1,466,313.65** |

| CLASS 7: Lender's Deficiency and Unsecured Claims | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| Romspen Mortgage Limited Partnership | $ - | $ - | 56,511,950.72 |
| **Total Class 7** | **$ -** | **$ -** | **$ 56,511,950.72** |

| CLASS 8: Panache and M&M Plaintiffs Deficiency and Unsecured Claims | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| M&M Plaintiffs Deficiency and Unsecured Claims | $ - | $ - | $ 865,039.12 |
| Panache Development & Construction, Inc. | $ 1,026,874.03 | $ 6,802,645.54 | $ 6,288,583.72 |
| **Total Class 8** | **$ 1,026,874.03** | **$ 6,802,645.54** | **$ 7,153,622.84** |

| CLASS 9: Subordinated Claims | Per Bankruptcy Schedules | Per Proof of Claim | Estimated Allowed Claim |
|---|---|---|---|
| Aero Photo | $ 710.12 | $ - | $ 710.12 |
| Ahern Rentals | $ 6,665.09 | $ - | $ 6,665.09 |
| Allied Sales Company | $ 5,021.79 | $ - | $ 5,021.79 |
| Austin Commercial & Residential Plumbing | $ 17,280.00 | $ - | $ 17,280.00 |
| Blue Fish Collaborative, Inc. | $ 9,972.50 | $ - | $ 9,972.50 |
| BPI | $ 10,721.72 | $ - | $ 10,721.72 |
| Capital Pumping, LP | $ 2,240.00 | $ - | $ 2,240.00 |
| CT Laborers Electric, LLC | $ 743.42 | $ - | $ 743.42 |
| Great Lakes Lifting Solutions | $ 28,200.00 | $ - | $ 28,200.00 |
| Jeremie Schultz | $ 5,450.00 | $ - | $ 5,450.00 |
| Keytech North America | $ 4,714.48 | $ - | $ 4,714.48 |
| MLA Geotechnical | $ 397.00 | $ - | $ 397.00 |
| Mobile Mini Storage Solutions | $ 1,049.00 | $ - | $ 1,049.00 |
| MOHD Service Solutions LLC | $ 4,000.00 | $ - | $ 4,000.00 |
| Nathan Olson | $ 9,590.00 | $ - | $ 9,590.00 |
| Niilo Studios, LLC | $ 1,600.00 | $ - | $ 1,600.00 |
| NLB Corp. | $ 25,026.42 | $ - | $ 25,026.42 |
| Paradigm Glass | $ 28,864.38 | $ - | $ 28,864.38 |
| Praxair Distribution, Inc. | $ 7,738.67 | $ - | $ 7,738.67 |
| Professional StruCivil Engineering | $ 11,700.00 | $ - | $ 11,700.00 |
| Regal Plastics Supply Company, Inc. | $ 1,693.45 | $ - | $ 1,693.45 |
| Reinhart & Associates, Inc. | $ 1,020.00 | $ - | $ 1,020.00 |
| Sigmax Corporation | $ 19,381.00 | $ - | $ 19,381.00 |
| Sweep Across Texas | $ 497.96 | $ - | $ 497.96 |
| The Bug Master | $ 135.31 | $ - | $ 135.31 |
| **Total Class 9** | **$ 204,412.31** | **$ -** | **$ 204,412.31** |

**Exhibit C**

**Retained Causes of Action**

Under the Plan, the Estate preserves, and transfers to the Creditor Trust the Estate's rights, claims, counterclaims, causes of action, setoffs, and recoupments

- arising in or under 11 U.S.C. §§ 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, or 553;
- arising from breaches of contract, negligence, commercial torts, breach of duty, breach of fiduciary duty, fraud, or misrepresentations;
- to collect accounts receivable or
- seeking declaratory judgment; or
- seeking equitable subordination;

which accrue on or before the Effective Date against:

| | |
|---|---|
| 3443 Zen Garden GP, LLC | Debtor's General Partner (2%) |
| Lincoln 1861, Inc. | Debtor 74% Limited Partner |
| Blue Roots International, Ltd. | 100% owner of Lincoln 1861, Inc. |
| Purple Tree International, Ltd. | 50% owner of Debtor's General Partner |
| 1468527 Alberta, Ltd. | 100% owner of Blue Roots & Purple Tree |
| Eightfold Development LLC | Debtor fka, Guarantor on Romspen Loan |
| Lot 11 GP Ltd. | Guarantor on Romspen Loan |
| Lot 11 Limited Partnership | Guarantor on Romspen Loan |
| Eco Industrial Business Park Inc. | Guarantor on Romspen Loan |
| Absolute Environmental Waste Management, Inc. | Guarantor on Romspen Loan |
| Absolute Energy Resources, Inc. | Guarantor on Romspen Loan |
| Dan White | Affiliate of Debtor's Partners |
| Symmetry Asset Management Inc. | Affiliate of Dan White |
| | |
| Jefferson 1801 Ventures, LLC | Debtor 24% Limited Partner |
| Adam Zarafshani | Various Capacities |
| Fara Ranjbaran | 5% owner of Jefferson 1801 Ventures, LLC |
| | |
| Panache Development & Construction, Inc. | Debtor's General Contractor |
| | |
| Hinshaw & Culbertson LLP | Debtor's Prepetition Counsel, Asserts Lien |
| ABC Supply Co., Inc. | Asserts Lien Against Debtor |
| ACM Services, LLC | Asserts Lien Against Debtor |
| Austin Glass & Mirror, Inc. | Asserts Lien Against Debtor |
| Capital Industries, LLC | Asserts Lien Against Debtor |
| Dealers Electrical Supply Company | Asserts Lien Against Debtor |
| Ferguson Enterprises, Inc. | Asserts Lien Against Debtor |
| Ferguson Waterworks, LLC | Asserts Lien Against Debtor |
| Glass.com of Illinois | Asserts Lien Against Debtor |
| H&H Crane Services, Inc. | Asserts Lien Against Debtor |
| Hill Country Electric Supply | Asserts Lien Against Debtor |
| Koetter Fire Protection of Austin, LLC | Asserts Lien Against Debtor |
| Lone Star Materials, Inc. | Asserts Lien Against Debtor |
| Roca | Asserts Lien Against Debtor |
| Schindler Elevator Corp. | Asserts Lien Against Debtor |
| Summer Legacy LLC | Asserts Lien Against Debtor |

| | |
|---|---|
| Texas Air Industries, LLC | Asserts Lien Against Debtor |
| Texas Concrete | Asserts Lien Against Debtor |
| Texas Materials Group, Inc. | Asserts Lien Against Debtor |
| Trane | Asserts Lien Against Debtor |
| | |
| Construction Integrated Services, LLC | Prepetition service provider to the Debtor |
| Construction Integrated Services, LLC dba North American Contractors | Prepetition service provider to the Debtor |
| North American Contractors | Prepetition service provider to the Debtor |
| Texas Wide Insurance Agency | Insurance Agent to Construction Integrated Services, LLC dba North American Contractors |
| International Insurance Co of Hannover | Insurer to Construction Integrated Services, LLC dba North American Contractors |
| Kinsdale Insurance Co | Insurer to Construction Integrated Services, LLC dba North American Contractors |
| A-1 Engineering, LLC | Prepetition service provider to the Debtor |
| Admiral Insurance Company | Insurer to A-1 Engineering, LLC |

For the avoidance of doubt, under the Plan, the Estate preserves, and transfers to the Creditor Trust the Estate's rights, claims, counterclaims, causes of action, setoffs, and recoupments asserted or that may be asserted by the Debtor or in the name of the Debtor or derivative of the Debtor in the Court of Queen's Bench of Alberta, Canada, Edmonton Judicial Center, Court File Number 2003 06728.

**Exhibit D**

**Disclosure Statement Solicitation Order**

[*To be Attached After Court's Entry*]

**Exhibit E**

**Trust Agreement**

# ZG CREDITOR TRUST AGREEMENT

THIS ZG CREDITOR TRUST AGREEMENT (this "Trust Agreement") dated as of the date of complete execution by all parties hereto, by and among Gregory S. Milligan, in his capacity as the chapter 11 trustee (the "Chapter 11 Trustee") for the bankruptcy estate (the "Estate") of 3443 Zen Garden, LP (the "Debtor"), and Gregory S. Milligan as trustee (in such capacity as trustee of the Creditor Trust, the "Creditor Trustee"), is executed to facilitate the implementation of the Chapter 11 Trustee's Liquidating Plan dated October 19, 2020 (as amended, modified and supplemented from time to time, the "Plan"). All capitalized terms used and not otherwise defined in this Trust Agreement but defined in the Plan have the meanings ascribed to them in the Plan.

**WHEREAS**, on March 22, 2020 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court");

**WHEREAS**, the Plan provides for, among other things, (i) the transfer of all Creditor Trust Assets to the trust to be known as the ZG Creditor Trust (the "Creditor Trust"), (ii) the management of the Creditor Trust Assets by the Creditor Trustee, and (iii) the making of payments and distributions, as applicable, by the Creditor Trust to the holders of Creditor Trust Interests (the "Creditor Trust Beneficiaries") pursuant to the terms of the Plan; and

**WHEREAS**, the Creditor Trust is intended to qualify as a liquidating trust treated as a grantor trust within the meaning of Treasury Regulations Section 301.7701-(4)(d) and is established for the purpose of liquidating and distributing the Creditor Trust Assets for the benefit of the holders of Creditor Trust Interests in accordance therewith;

**NOW**, **THEREFORE**, in consideration of the premises and mutual covenants and agreements contained herein and in the Plan, the parties hereto agree as follows:

## ARTICLE I. ESTABLISHMENT OF THE CREDITOR TRUST

1.1  **Establishment of Creditor Trust**. Pursuant to the Plan, the Chapter 11 Trustee and the Creditor Trustee hereby establish the Creditor Trust on behalf of the Creditor Trust Beneficiaries. The Creditor Trustee accepts and will hold the Creditor Trust Assets in trust for the Creditor Trust Beneficiaries subject to the terms of the Plan and this Trust Agreement. The Creditor Trust is established as a liquidating trust treated as a grantor trust within the meaning of Treasury Regulations Section 301.7701-(4)(d) with no objective or authority to carry on or conduct a trade or business, or to accept an assignment of any claim or right of action from, or assume any liabilities of, any person or entity other than the Debtor, the Estate or the Chapter 11 Trustee, and no part of the Creditor Trust Assets or the proceeds, revenue, or income from the Creditor Trust Assets may be used or disposed of by the Creditor Trustee in furtherance of any trade or business.

1.2  **Purpose of Creditor Trust**. The sole purpose of the Creditor Trust is to liquidate and distribute the Creditor Trust Assets in a manner calculated to conserve, protect, and maximize the value of the Creditor Trust Assets. In exercising this purpose, in addition to the powers listed in Section 4.1 of this Trust Agreement, as set forth in the Plan, the Creditor Trustee is authorized to, among other things,

(a)  collect and reduce the assets of the Creditor Trust to Cash,

(b)  prosecute, settle and otherwise administer the Causes of Action that are Creditor Trust Assets,

(c)  file all federal state and local tax returns of the Creditor Trust and furnish appropriate tax reporting information to the Creditor Trust Beneficiaries,

(d)  establish reserves and open, maintain, and administer bank accounts as necessary to discharge the duties of the Creditor Trustee,

(e)  represent the Creditor Trust before the Bankruptcy Court or other courts of competent jurisdiction with respect to matters concerning the Creditor Trust and Creditor Trust Assets; and

(f)  make distributions to the Creditor Trust Beneficiaries in accordance with the Plan.

1.3   **No Additional Beneficiaries**. The Creditor Trust exists solely for the benefit of the Creditor Trust Beneficiaries.

1.4   **Transfer of Creditor Trust Assets and Rights to the Creditor Trust**. As of the Effective Date, the Estate hereby conveys, transfers, assigns, and delivers to the Creditor Trust (a) all of its rights, title, and interests in the Creditor Trust Assets; and (b) all of its rights with respect to the Creditor Trust Assets, including the attorney-client privilege and the protections afforded by the work product doctrine, and hereby waives its rights and the rights of any legal, financial, or other advisors to assert such rights as a defense or otherwise except to the extent authorized by the Creditor Trustee.

1.5   **Title to Creditor Trust Assets**. On the Effective Date, the Creditor Trust Assets will be vested in, and transferred to, the Creditor Trust pursuant to the Plan for the benefit of the Creditor Trust Beneficiaries. As of the Effective Date, the Creditor Trust will hold legal title to all Creditor Trust Assets and will succeed to all of the Estate's right, title, and interest in and to the Creditor Trust Assets, and the Estate will have no further interest in or with respect to the Creditor Trust Assets or the Creditor Trust, except as provided in the Plan. The Creditor Trustee hereby declares that he will hold the Creditor Trust Assets in trust to be administered and disposed of pursuant to the terms of this Trust Agreement and the Plan.

1.6   **Reliance**. The Creditor Trustee may rely upon the bankruptcy schedules and all other information provided by the Estate, its representatives, general contractor and pre-petition management concerning Claims against the Estate, as well as such Persons' reconciliations and documents supporting such reconciliations.

1.7   **Valuation of Trust Assets**. The fair market value of the Creditor Trust Assets as of the Effective Date will be determined by the Creditor Trustee. As soon as practicable after the Effective Date, the Creditor Trustee must inform the Creditor Trust Beneficiaries in writing of the agreed upon value of the Creditor Trust Assets transferred to the Creditor Trust. Such valuation must be used consistently by all parties, including, without limitation, the Debtor, the Estate, the

Chapter 11 Trustee, the Creditor Trustee and the Creditor Trust Beneficiaries, for all federal income tax purposes.

1.8  **Governance of the Creditor Trust**. The Creditor Trust will be governed by the Creditor Trustee. The Creditor Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of this Trust Agreement and the Plan but not otherwise. Subject to the terms and conditions of this Trust Agreement, the Creditor Trustee may delegate responsibility for discrete issues or decisions to one or more third parties subject to continued oversight by the Creditor Trustee.

1.9  **Appointment of the Creditor Trustee**. As of the date hereof, the Creditor Trustee is Gregory S. Milligan. The Creditor Trustee accepts the trust imposed on him by this Trust Agreement and agrees to observe and perform that trust on and subject to the terms and conditions set forth in this Trust Agreement and the Plan.

1.10  **Creditor Trust Interests; Transferability**.

(a)  Creditor Trust Interests will be issued by the Creditor Trustee to the Creditor Trust Beneficiaries. In lieu of certificates evidencing Creditor Trust Interests, the Creditor Trustee will maintain a register of the names, addresses, and interest percentages of the Creditor Trust Beneficiaries based upon the provisions of the Plan that designate the Persons who are entitled to receive the Creditor Trust Interests.

(b)  The Creditor Trust Interests may not be transferred, sold, pledged, or otherwise disposed of, nor offered for transfer, sale, or pledge, except for transfers that occur by operation of law.

## ARTICLE II. DURATION AND TERMINATION OF CREDITOR TRUST

2.1  **Duration**. The duties, responsibilities, and powers of the Creditor Trustee will terminate after all Creditor Trust Assets, including Causes of Action transferred and assigned to the Creditor Trust, are fully resolved, abandoned, or liquidated and the cash and other amounts held in reserve have been distributed in accordance with the Plan and this Trust Agreement. Except in the circumstances set forth below, the Creditor Trust will terminate no later than five (5) years after the Effective Date. However, if warranted by appropriate facts and circumstances as determined by the Creditor Trustee, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purposes of the Creditor Trust, the term of the Creditor Trust may be extended one or more times (not to exceed a total of five extensions, unless the Creditor Trustee received a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the state of the Creditor Trust as a grantor trust for federal income tax purposes) for a finite period, not to exceed six months each, based on the particular circumstances at issue. Each such extension must be approved by the Bankruptcy Court with notice thereof to all of the unpaid Creditor Trust Beneficiaries, as further provided in section 6.2(q) of the Plan. Upon the termination of the Creditor Trust, the Creditor Trustee must file with the Bankruptcy Court a report thereof, seeking an order discharging the Creditor Trustee.

2.2 **Continuance of Creditor Trust for Winding Up**. After the termination of the Creditor Trust and for the purpose of liquidating and winding up the affairs of the Creditor Trust, the Creditor Trustee will continue to act as such until all duties under the Plan and this Trust Agreement have been fully performed. Upon distribution of all of the Creditor Trust Assets, or the proceeds thereof, the Creditor Trustee must hold the books, records, and files delivered to or created by the Creditor Trustee for a period of four (4) years after the last distribution of Creditor Trust Assets. All costs and expenses associated with the storage of such documents will be paid by the Creditor Trust. At the Creditor Trustee's discretion, all such records and documents may be destroyed at any time after four years from the last distribution of the Creditor Trust Assets. Except as otherwise specifically provided herein, upon the distribution of all of the Creditor Trust Assets, the Creditor Trustee will have no further duties or obligations hereunder except

      (a)      to account and report as provided in Sections 2.3 and 3.9 hereof, and

      (b)      to perform such other acts as may be required by law.

2.3 **Final Accounting**. In the event the Chapter 11 Case is open at the time of the termination of the Creditor Trust, the Creditor Trustee shall file an accounting with the Bankruptcy Court setting forth the amount he has collected and disbursed, and the fees and expenses incurred in administering the Creditor Trust, including the fees and expenses incurred by the Creditor Trustee and his professionals. The Creditor Trustee may seek the issuance and entry of any orders necessary to approve such accounting and discharge him from any and all liability for acting as Trustee under the Plan and this Trust Agreement. The Creditor Trust's professionals are required to maintain accurate time and expense records.

## ARTICLE III. ADMINISTRATION OF TRUST ESTATE

3.1 **Payment of Expenses**. The Creditor Trustee may pay all Creditor Trust expenses and the costs associated with winding up the Creditor Trust, first, from the Lender's Contribution, until it is exhausted, and second, from the Creditor Trust Assets or the proceeds thereof.

3.2 **Sequestration of the Lender's Contribution, the Settlement Carve-Out, and the Creditor Trust Assets**. As set forth in section 6.2(d) of the Plan, the Lender's Contribution and the Settlement Carve-Out are to be segregated and accounted separately from the Creditor Trust Assets.

3.3 **Payments and distributions to Holders of Allowed Claims**. Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, distributions and payments, whether cash, Creditor Trust Interests, or otherwise, to be made on account of Allowed Claims, will be made on or as soon as practicable after the Effective Date.

3.4 **Disbursement to Creditor Trust Beneficiaries**. The Creditor Trustee must disburse funds to the Creditor Trust Beneficiaries in accordance with the Plan. Distributions may be made as frequently as the Creditor Trustee determines to be practicable when the Creditor Trustee determines that sufficient cash exists to make a distribution in accordance with the Plan. In the event that the Creditor Trustee does not have sufficient cash to make the distributions called for or permitted under the Plan, then the Creditor Trustee may, from time to time, make interim distributions consistent with the provisions of the Plan. Distributions to holders of Allowed Claims

shall be made by the Creditor Trustee: (a) at the addresses set forth in the proofs of Claim filed by such holders; (b) at the addresses set forth in the most recent written notices of address change filed in the Chapter 11 Case and delivered to the Creditor Trustee, if the address differs from a proof of Claim; or (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim if no proof of Claim has been filed and the Creditor Trustee has not received a written notice of change of address.

3.5     **Fractional Cents/De Minimis distributions**. Payments of fractions of cents will not be made by the Creditor Trustee. Whenever a Creditor Trust Beneficiary's Pro Rata share of a distribution would be a fraction of a cent, actual payment made will reflect a rounding of such fraction down to the nearest whole cent. The Creditor Trustee will not make any payment of less than ten dollars ($10.00).

3.6     **Creditors Must Provide Identifying Information**. To receive distributions or payments, upon the Creditor Trustee's written request, all Creditor Trust Beneficiaries must provide to the Creditor Trustee, at the address set forth in Section 8.4 of this Trust Agreement, a notice identifying such holder's name, address, federal tax identification number, and any other information requested by the Creditor Trustee to facilitate the filing of tax returns, within ten (10) days after requested in writing by the Creditor Trustee. The Creditor Trustee is empowered to withhold distributions from any Creditor Trust Beneficiaries who do not provide such information upon request. In the event an Creditor Trust Beneficiary continues to fail to provide such information for sixty (60) days after the second written request from the Creditor Trustee, then such Creditor Trust Beneficiary's Claim will be deemed disallowed and any withheld distributions will be available for distribution to other Creditor Trust Beneficiaries in accordance with the Plan.

3.7     **Failure to Negotiate Checks**. In accordance with section 7.6 of the Plan, Checks issued in respect of distributions under the Plan are null and void if not negotiated within ninety (90) days after the date of issuance. Any funds returned to the Creditor Trustee for any reason will be held by the Creditor Trustee until such time as they qualify as Unclaimed Property, or if earlier, a request for reissuance is received by the Creditor Trustee. Requests for reissuance of any such check must be made in writing within such 90-day period, directly to the Creditor Trustee, by the holder of the Allowed Claim with respect to which the check originally was issued, so as to be received by the Creditor Trustee. All Claims for which void checks were issued will be forever barred from asserting the Claim against the Creditor Trust. All Unclaimed Property will be deposited back into the Creditor Trust for distribution to other Creditor Trust Beneficiaries in accordance with the Plan.

3.8     **Unclaimed Property**. All property distributed by the Creditor Trustee on account of Allowed Claims must be claimed within the later of (a) ninety (90) days after the Effective Date or (b) ninety (90) days after such distribution is made to the holder or, in the case of a distribution made in the form of a check, must be negotiated or a request for reissuance made as provided for in this Plan. All Unclaimed Property will be deposited back into the Creditor Trust. Nothing contained in the Plan or Trust Agreement shall require Creditor Trustee to attempt to locate any holder of an Allowed Claim other than by reviewing the proofs of Claim and records provided to the Creditor Trustee. After the expiration of the 90-day period, the Claim being paid with the Unclaimed Property shall be deemed Disallowed and the holder of the Disallowed Claim shall be forever barred from asserting the Disallowed Claim in any manner against the Creditor Trust. If,

at the time the Creditor Trust terminates there is unclaimed property remaining in the Creditor Trust, such property shall be donated to the Anthony H.N. Schnelling Endowment Fund maintained by the American Bankruptcy Institute, to assist in the provision of resources for research and education.

3.9    **Reports**.

(a)    The Creditor Trustee must maintain good and sufficient books and records of account relating to the Creditor Trust Assets, the management thereof, all transactions undertaken by the Creditor Trustee, all expenses incurred by or on behalf of the Creditor Trust, and all distributions either contemplated or effectuated under the Plan or this Trust Agreement.

(b)    No later than 35 days after the end of each fiscal year, the Creditor Trustee must furnish to each Creditor Trust Beneficiary a written statement indicating

(i)    the assets and liabilities of the Creditor Trust at the end of such fiscal year and the receipts and disbursements of the Creditor Trust for such fiscal year, and

(ii)    any changes in the Creditor Trust Assets or to the allowance of Claims that have not been previously reported.

(c)    The fiscal year of the Creditor Trust will end on the last day of December of each year unless some other fiscal year-end date is required by applicable law and is permissible under the Internal Revenue Code.

## ARTICLE IV. POWERS OF AND LIMITATIONS ON THE TRUSTEE

4.1    **General Powers of Trustee**. Subject to the express limitations contained in this Trust Agreement or the Plan, the Creditor Trustee has, in addition to any powers conferred by other provisions of this Trust Agreement or the Plan, the power to take any and all actions necessary or advisable to effectuate the purpose of the Creditor Trust, including the following powers, which he may exercise without the approval of the Bankruptcy Court, except to the extent otherwise required under the provisions of the Plan or this Trust Agreement:

(a)    To hold legal title to any and all rights in or arising from the Creditor Trust Assets, including, without limitation, the right to collect and receive any and all money and other property belonging to the Creditor Trust;

(b)    To invest or reinvest Creditor Trust Assets as provided in Section 4.3 hereof and to cause such investments, or any part thereof, to be registered and held in his name, as Trustee, or in the names of nominees;

(c)    To establish and maintain such bank accounts as may be necessary or appropriate, to draw checks on such bank accounts, and to perform such other necessary and appropriate duties with respect to such accounts, or

designate individuals as signatories therefor, as the Creditor Trustee may direct and authorize;

(d)      To engage employees, agents, and professional persons, including, without limitation, former employees or professionals of the Debtor, the Estate, or the Chapter 11 Trustee, to assist the Creditor Trustee with respect to his responsibilities;

(e)      To perform all of the Creditor Trustee's obligations under the Plan and this Trust Agreement, including making all required distributions and payments to holders of Allowed Claims and Creditor Trust Interests, as applicable;

(f)      To pay all expenses of the Creditor Trust;

(g)      To avoid and recover transfers of the Debtor's property or the Estate's property as may be permitted by the Bankruptcy Code, applicable state law, and the Plan, to the extent the right to avoid and recover such transfers are Creditor Trust Assets under the Plan;

(h)      To exercise setoffs, offsets, and recoupments against Claims as permitted under the Plan, to the extent such rights are Creditor Trust Assets under the Plan;

(i)      To object to the allowance of any Claims that are not Allowed under the Plan, by Court Order, or for any other reason, and to compromise and settle Disputed Claims, both as set forth in and subject to the conditions of the Plan;

(j)      To pursue, prosecute, settle, and/or compromise all Causes of Action that are Creditor Trust Assets;

(k)      To institute, join, or defend actions or other requests for relief and to take such other actions, including settlements thereof, on any terms deemed reasonable by the Creditor Trustee, in his discretion, to enforce or collect upon the Causes of Action that are Creditor Trust Assets and any other Creditor Trust Assets;

(l)      To file or cause to be filed all required federal, state, local, and foreign tax filings of the Creditor Trust, make tax elections, if any, available to the Creditor Trust under federal, state, local, or foreign law, and prepare applications for rulings or other administrative determinations from federal, state, local, and foreign tax authorities as may be reasonably necessary to determine the tax liabilities of the Creditor Trust or the Creditor Trust Beneficiaries;

(m)      To request any appropriate tax determination with respect to the Creditor Trust, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(n)  To obtain insurance coverage with respect to his liabilities and obligations as Trustee under this Trust Agreement (in the form of an errors and omissions policy or otherwise);

(o)  To assert any privilege on behalf of the Debtor, on behalf of the Estate, or on behalf of the Creditor Trust; and

(p)  To exercise such other powers as may be vested in or assumed by the Creditor Trustee pursuant to the Plan, this Trust Agreement, or the Confirmation Order or as may be necessary and desirable to carry out the provisions of this Trust Agreement and applicable law.

4.2  **Limitations on Trustee**. The Creditor Trustee must carry out the purposes of the Creditor Trust and the directions contained herein, and must not at any time, on behalf of the Creditor Trust or the Creditor Trust Beneficiaries, (a) enter into or engage in any business or (b) accept an assignment of any right of action from, or assume any liabilities of, any person or entity other than the Debtor, the Estate or the Chapter 11 Trustee, and no part of the Creditor Trust Assets or the proceeds, revenue, or income therefrom may be used or disposed of by the Creditor Trustee in furtherance of any business other than as contemplated by the Plan. This limitation applies irrespective of whether the conduct of any such business activities is deemed by the Creditor Trustee to be necessary or proper for the conservation and protection of the Creditor Trust. The Creditor Trustee must make continuing efforts to liquidate the Creditor Trust Assets, make timely distributions, and not unduly prolong the duration of the Creditor Trust. The Creditor Trustee may not hold a controlling interest in the stock of, or be a partner, an officer, or a director of any of the Creditor Trust Beneficiaries.

4.3  **Investment Power**. The investment power of the Creditor Trustee, other than that reasonably necessary to maintain the value of the Creditor Trust Assets and to further the liquidating purpose of the Creditor Trust, is limited to the power to invest (a) in demand and time deposits, such as short-term certificates of deposit, (b) in banks or other savings institutions, or (c) in other temporary, liquid investments such as Treasury bills. Once funds are so invested, the Creditor Trustee may not sell or otherwise liquidate the investment until such time as such funds are (a) needed to pay expenses incurred pursuant to this Trust Agreement or the Plan, or (b) to be distributed pursuant to this Trust Agreement; *provided*, *however*, that the Creditor Trustee may liquidate such investments if the Creditor Trustee determines in his discretion that such liquidation is necessary to protect the Creditor Trust from loss on the amounts invested. For the avoidance of doubt, the Creditor Trustee may not make any investments that would cause the Creditor Trust to fail to be treated as a "liquidating trust" for purposes of Treasury Regulation section 301.7701-4(d). The Creditor Trustee is restricted to the holding and collection of the Creditor Trust Assets and the payment and distribution thereof for the purposes set forth herein and in the Plan and to the conservation, protection, and maximization of the Creditor Trust Assets and to the administration thereof in accordance with the provisions of this Trust Agreement. The Creditor Trustee must keep all Creditor Trust Assets segregated from and must not commingle any Creditor Trust Assets with any assets of any other Person, including any of the Creditor Trustee's own assets.

4.4     **Additional Powers of Trustee**. Subject to the express limitations contained herein, the Plan, or the Confirmation Order, the Creditor Trustee has, and may exercise with respect to the Creditor Trust Assets or any part thereof, including the administration and distribution of the Creditor Trust Assets, all powers now or hereafter conferred on trustees by the laws of the State of Texas. The powers conferred by this Section 4.4 in no way limit any power conferred on the Creditor Trustee by any other section of this Trust Agreement, but are in addition thereto; *provided, however*, that the powers conferred by this Section 4.4 are conferred and may be exercised only and solely within the limitations and for the limited purposes imposed and expressed in the Plan and this Trust Agreement.

4.5     **Tax and Reporting Duties of the Creditor Trustee**. The Creditor Trustee is responsible for all tax and other matters as set forth in ARTICLE V of this Trust Agreement.

4.6     **Establishment and Maintenance of Accounts and Reserves**. On or after the Effective Date, the Creditor Trustee (i) may establish and maintain such accounts and reserves as may be required by applicable law or by order of the Bankruptcy Court and (ii) may establish and maintain such additional accounts and reserves as he deems necessary or desirable to carry out the provisions of the Plan and this Trust Agreement.

4.7     **Disputed Claims Reserve**. The Creditor Trustee must establish a disputed claims reserve (the "Disputed Claims Reserve") for the sole benefit of the holders of Claims subject to an objection. The Creditor Trustee shall separately account for the Disputed Claims Reserve and this reserve shall be equal to an amount the Creditor Trustee determines, in his or her sole discretion, ensures that sufficient funds are reserved to pay Disputed Claims upon allowance. The Disputed Claims Reserve will be held in trust for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. Once a Disputed Claim is determined by Final Order or settlement to be an Allowed Claim, the Creditor Trustee is authorized to pay the Allowed Amount of such Claim, in accordance with the Plan.

## ARTICLE V. TAX MATTERS

5.1     **Classification of the Creditor Trust.** For all federal and applicable state and local income tax purposes, all Persons (including, without limitation, the Debtor, the Estate, the Chapter 11 Trustee, the Creditor Trustee and the Creditor Trust Beneficiaries) will treat the transfer and assignment of the Creditor Trust Assets to the Creditor Trust for the benefit of the Creditor Trust Beneficiaries as (a) a deemed transfer of title and interest in the Creditor Trust Assets directly to the Creditor Trust Beneficiaries (as creditors) followed by (b) a deemed transfer of title and interest in the Creditor Trust Assets by the Creditor Trust Beneficiaries to the Creditor Trust. The Creditor Trust will be treated as a grantor trust subject to the provisions of section 671 of the Internal Revenue Code and as a liquidating trust under Treasury Regulation section 301.7701-4(d) for United States federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Creditor Trustee must perform his duties and obligations hereunder consistent with the foregoing and must not take any action or inaction which would cause the Creditor Trust not to be treated as a liquidating trust for United States federal income tax purposes. The Creditor Trust Beneficiaries will be treated as the grantors and deemed owners of their allocable portion of the Creditor Trust Assets for federal income tax purposes.

The fair market value of the portion of the Creditor Trust Assets that is treated for U.S. federal income tax purposes as having been transferred to each Creditor Trust Beneficiary, as described in the preceding paragraph, will be determined by the Creditor Trustee in a manner consistent with Section 1.7 of this Trust Agreement, and all parties (including, without limitation, the Creditor Trustee and the Creditor Trust Beneficiaries) must utilize such fair market values determined by the Creditor Trustee for federal and applicable state and local income tax purposes.

The Creditor Trust's taxable income, gain, loss, deduction, or credit will be allocated to the Creditor Trust Beneficiaries in accordance with their relative beneficial interests in the Creditor Trust during the applicable taxable period. Such allocation will be binding on all parties for federal and applicable state and local income tax purposes, and the parties will be responsible for the payment of any federal, state, and local income tax due on the income and gain so allocated to them.

5.2 **General Tax Reporting by the Creditor Trust and the Creditor Trust Beneficiaries**.

(a)     The Creditor Trustee must prepare, consistent with Section 5.1 hereof, and file on behalf of the Creditor Trust, at the time and in the manner prescribed by the Internal Revenue Code and applicable state and local law, such tax returns and reports as may be required, including but not limited to returns and reports required by Treasury Regulations section 1.671-4(a), and must promptly furnish copies of such returns and reports as filed to the Creditor Trust Beneficiaries upon their written request. The Creditor Trustee must pay or cause to be paid any and all taxes imposed on the Creditor Trust from the Creditor Trust Assets. The Creditor Trustee must also file or cause to be filed, all appropriate tax returns with respect to any Creditor Trust Assets allocable to Disputed Claims as set forth in Section 5.2(c)(c) hereof, and pay or cause to be paid any and all taxes imposed with respect to the Disputed Claims.

(b)     As soon as practicable after the close of each fiscal year, the Creditor Trustee must mail to each of the Creditor Trust Beneficiaries a statement setting forth the beneficiary's share of items of the Creditor Trust's income, gain, loss, deduction, or credit and must instruct all such beneficiaries to report such items on their federal income tax returns. The Creditor Trust's taxable income, gain, loss, deduction, or credit will be allocated (subject to subsection (c) hereof, related to Disputed Claims) to the Creditor Trust Beneficiaries in accordance with their relative beneficial interests in the Creditor Trust. Such items are subject to tax to the Creditor Trust Beneficiaries on a current basis, even if no cash distributions are made to the Creditor Trust Beneficiaries.

(c)     Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Creditor Trustee must:

(i)    treat all Creditor Trust Assets allocable to, or retained on account of, Disputed Claims of Creditor Trust Beneficiaries, as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim;

(ii)    treat as taxable income or loss of this separate trust with respect to any given taxable year the portion of the taxable income or loss of the Creditor Trust that would have been allocated to the holders of such Disputed Claims had such claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such claims are unresolved);

(iii)    treat as a distribution from this separate trust any increased amounts distributed by the Creditor Trust as a result of any Disputed Claim resolved earlier in the taxable year, to the extent such distribution relates to taxable income or loss of this separate trust determined in accordance with the provisions hereof, and

(iv)    to the extent permitted by applicable law, report consistently for state and local income tax purposes.

(d)    The Creditor Trustee is responsible for payments, out of the Creditor Trust Assets, of any taxes imposed on the Creditor Trust or its assets. In the event and to the extent any cash retained on account of Disputed Claims in any such reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes paid by the Creditor Trustee will be (i) reimbursed from any subsequent cash amount retained on account of Disputed Claims or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Creditor Trustee as a result of the resolutions of such Disputed Claims.

(e)    The Creditor Trustee may retain professionals to perform the Creditor Trustee's duties under this Section 5.2 and, subject to Section 6.6 hereof, may rely upon the performance and advice of such professionals with respect to such duties.

(f)    The Creditor Trustee may request an expedited determination of taxes of the Creditor Trust, including with respect to the Disputed Claims under section 505(b) of the Bankruptcy Code, for all returns filed for, or on behalf of, the Creditor Trust for all taxable periods through the dissolution of the Creditor Trust.

5.3    **Withholding of Taxes and Other Charges**. To the extent that the Creditor Trustee is required by applicable law to withhold or otherwise deduct any taxes, fees, levies, assessments, or other governmental charges in respect of any distributions, payments, or allocations made

pursuant to the Plan and this Trust Agreement, the Creditor Trustee is entitled to withhold or deduct the amount of such taxes, fees, levies, assessments, or other governmental charges from the gross amounts of such distributions, payments, or allocations and remit such amounts to the applicable taxing or other governmental authorities. The Creditor Trustee, in the exercise of his discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this Section 5.3.

5.4 **Other**. The Creditor Trustee must file, or cause to be filed, any other statements, returns, or disclosures relating to the Creditor Trust that are required by any governmental unit or applicable law.

## ARTICLE VI. THE TRUSTEE

6.1 <u>**Trustee's Compensation and Reimbursement**</u>.

(a) The Creditor Trustee's compensation, on a post-Effective Date basis, will be incurred and paid on an hourly basis. The Creditor Trustee's hourly rate, on the Effective Date will be $500.00 per hour, subject to yearly reasonable annual adjustments. The payment of the fees of the Creditor Trustee and any professionals retained by the Creditor Trustee will be made by the Creditor Trustee first, from the Lender's Contribution, until it is exhausted, and second, from the Creditor Trust Assets or the proceeds thereof, and, as to either source of funds, in accordance with the Plan and this Trust Agreement. The Creditor Trustee's compensation will not be subject to the approval of the Bankruptcy Court.

(b) In addition to the compensation described in Section 6.1(a) of this Trust Agreement, the Creditor Trustee is entitled to certain specific commissions on distributions as provided in certain Bankruptcy Court orders entered prior to the Effective Date, all as more fully described in section 6.2(j) of the Plan to be paid first, from the Lender's Contribution, until it is exhausted, and second, from the Creditor Trust Assets or the proceeds thereof.

(c) The Creditor Trustee has the right to retain the services of attorneys, accountants, and other professionals who, in the discretion of the Creditor Trustee, are necessary to assist the Creditor Trustee in performing his duties. The reasonable fees and expenses of such professionals will be paid by the Creditor Trustee, first, from the Lender's Contribution, until it is exhausted, and second, from the Creditor Trust Assets or the proceeds thereof, and, as to either source of funds, only upon the monthly submission of statements to the Creditor Trustee. The payment of the reasonable fees and expenses of the Creditor Trustee's retained professionals will not be subject to the approval of the Bankruptcy Court.

(d) Subject to the provisions of this Trust Agreement, all costs, expenses, and obligations incurred by the Creditor Trustee in administering the Creditor

Trust Assets, the Creditor Trust, or in any manner connected, incidental, or related thereto, in effectuating distributions from the Creditor Trust thereunder (including the reimbursement of reasonable expenses) will be a charge against first, the Lender's Contribution, until it is exhausted, and second, the Creditor Trust Assets or the proceeds remaining thereof from time to time in the hands of the Creditor Trustee. Such expenses will be paid as they are incurred without the need for Bankruptcy Court approval and shall have payment priority over all Creditor Trust Interests and Creditor Trust Beneficiaries.

6.2 **Resignation**. The Creditor Trustee may resign as trustee hereunder by giving not less than thirty (30) days' prior written notice thereof to the Bankruptcy Court. Such resignation will become effective on the later to occur of: (a) the day specified in such notice or (b) the appointment of a successor Creditor Trustee pursuant to Section 6.2 of this Trust Agreement and the acceptance of such successor Creditor Trustee of such appointment. If a successor Creditor Trustee is not appointed or does not accept his appointment within thirty (30) days following delivery of notice of resignation, the Creditor Trustee may petition the Bankruptcy Court for the appointment of a successor Creditor Trustee.

6.3 **Removal**. The Creditor Trustee (and his successors) may be removed for cause shown by an order of the Bankruptcy Court and upon notice to the Creditor Trustee and a hearing, and the Bankruptcy Court will retain jurisdiction for this purpose under the Plan and this Trust Agreement, and the Creditor Trustee consents to such jurisdiction and waives any right that may otherwise exist to a trial by jury.

6.4 **Appointment of Successor Trustee**. In the event of the resignation, removal, or incapacity of the Creditor Trustee, the Creditor Trustee's counsel must designate a successor Creditor Trustee. The successor Creditor Trustee must give written notice of his or her appointment to the Bankruptcy Court as soon thereafter as is practicable. Any successor Creditor Trustee appointed hereunder must execute, acknowledge, and file with the Bankruptcy Court an instrument duly accepting such appointment and agreeing to be bound by the terms of this Trust Agreement and thereupon such successor Creditor Trustee, without further act, deed, or conveyance, will become vested with all the rights, powers, trusts, and duties of the Creditor Trustee under this Trust Agreement. All fees and expenses of the Creditor Trustee will be paid by the Creditor Trust unless disputed by the successor Creditor Trustee, in which case such dispute will be resolved by the Bankruptcy Court.

6.5 **Creditor Trust Continuance**. The resignation or removal of the Creditor Trustee does not operate to terminate the Creditor Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement or invalidate any action theretofore taken by the Creditor Trustee or any prior Creditor Trustee. In the event of the resignation or removal of the Creditor Trustee, such Creditor Trustee must promptly execute and deliver such documents, instruments, and other writings as may be reasonably requested by the successor Creditor Trustee to effectuate the termination of the Creditor Trustee's capacity under this Trust Agreement and the conveyance of the Creditor Trust Assets then held by the Creditor Trustee to such Creditor Trustee's successor; deliver to the successor Creditor Trustee all documents, instruments, records, and other writings related to the Creditor Trust as may be in the possession of the Creditor Trustee; and otherwise

assist and cooperate in effectuating the assumption of his obligations and functions by such successor Creditor Trustee.

6.6 **Reliance by Trustee**. The Creditor Trustee may rely, and is fully protected personally in acting, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, or other instrument or document which the Creditor Trustee believes to be genuine and to have been signed or presented by the proper party or parties or, in the case of facsimile transmissions or electronic mail, to have been sent by the proper party or parties, in each case without obligation to satisfy himself that the same was given in good faith and without responsibility for errors in delivery, transmission, or receipt. In the absence of fraud, willful misconduct, or gross negligence on the Creditor Trustee's part, the Creditor Trustee may rely as to the truth of any statements contained therein in acting thereon. The Creditor Trustee may consult with and rely on the advice of legal counsel and such other experts, advisors, consultants, or other professionals as have been retained pursuant to this Trust Agreement and is fully protected in respect of any action taken or suffered in accordance with the written opinion of legal counsel. Notwithstanding such authority, the Creditor Trustee is under no obligation to consult with attorneys, accountants, or his agents, and his determination not to do so should not result in imposition of liability on the Creditor Trustee unless such determination is based on willful misconduct, gross negligence, or fraud.

6.7 **Standard of Care**. Except in the case of fraud, willful misconduct, or gross negligence, the Creditor Trustee is not liable for any loss or damage by reason of any action taken or omitted by the Creditor Trustee pursuant to the discretion, power, and authority conferred on the Creditor Trustee by this Trust Agreement, the Plan, or the Confirmation Order.

6.8 **No Liability for Acts of Predecessor Trustees**. No successor Trustee is in any way liable for the acts or omissions of any predecessor Trustee unless a successor Trustee expressly assumes such responsibility.

6.9 **Insurance**. The Creditor Trustee may purchase, at the expense of the Creditor Trust, errors and omissions insurance with regard to any liabilities, losses, damages, claims, costs, and expenses he may incur, including but not limited to attorneys' fees, arising out of or due to his actions or omissions or consequences of such actions or omissions, other than as a result of his fraud, gross negligence, or willful misconduct, with respect to the implementation of this Trust Agreement, the Plan, or the Confirmation Order.

6.10 **No Implied Obligations**. No Trustee is liable for any duties or obligations except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations may be read into this Creditor Trust.

6.11 **No Personal Liability**. Persons dealing with the Creditor Trust must look solely to the Creditor Trust or the Creditor Trust Assets for the enforcement of any claims against the Creditor Trust or to satisfy any liability incurred by the Creditor Trustee to such Persons in carrying out the terms of this Trust Agreement, and neither the Creditor Trustee, the Debtor, the Estate, the Chapter 11 Trustee, nor any of their professionals, nor any other Person has any personal liability or individual obligation to satisfy any such liability.

6.12 **Liability; Indemnification**. The Creditor Trustee is not liable for any act or omission taken or omitted to be taken in his capacity as the Creditor Trustee, other than acts or omissions resulting from willful misconduct, gross negligence, or fraud. The Creditor Trustee may, in connection with the performance of his functions, and in his sole and absolute discretion, consult with attorneys, accountants, and agents, and he is not liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Creditor Trustee is under no obligation to consult with attorneys, accountants, or agents, and his determination not to do so should not result in imposition of liability on the Creditor Trustee unless such determination is based on willful misconduct, gross negligence, or fraud. The Creditor Trust will indemnify and hold harmless the Creditor Trustee and his agents, representatives, professionals, and employees from and against and in respect of any and all liabilities, losses, damages, claims, costs, and expenses, including but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Creditor Trust or the implementation or administration of the Plan; *provided, however*, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence, or fraud.

## ARTICLE VII. AMENDMENTS

7.1 **Amendments**. The parties hereto may make and execute written amendments to this Trust Agreement; *provided*, *however*, that in no event may this Trust Agreement be amended

(a)     so as to change the purpose of the Creditor Trust as set forth in <u>Article I</u> hereof,

(b)     so as to allow funds constituting Creditor Trust Assets to be invested in a manner other than as permitted in Section 4.3 hereof,

(c)     so as to adversely affect the distributions or payments to be made under this Trust Agreement to any Creditor Trust Beneficiaries, or

(d)     so as to adversely affect the U.S. Federal income status of the Creditor Trust in accordance with <u>Article I</u> hereof.

## ARTICLE VIII. MISCELLANEOUS PROVISIONS

8.1 **Applicable Law**. The Creditor Trust created herein shall be construed, regulated, and administered under the laws of the State of Texas without regard to principles of conflicts of law; *provided*, *however*, that, the Creditor Trust and any interpretation or enforcement of the provisions of this Trust Agreement are subject to the jurisdiction of the Bankruptcy Court.

8.2 **No Association, Partnership or Joint Venture**. This Trust Agreement is not intended to create and must not be interpreted as creating an association, partnership, or joint venture of any kind.

8.3 **Partial Invalidity**. If any term or provision of this Trust Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Trust Agreement, such term or provision is fully severable, and this Trust Agreement must be construed

and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Trust Agreement; and the remaining terms and provisions of this Trust Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Trust Agreement, and this Trust Agreement must be construed so as to limit any term or provision to make it a legal, valid, and enforceable provision, provided that such construction, to the maximum extent possible, gives effect to the purposes of the Plan.

8.4 **Notices**. All notices, requests, consents and other communications hereunder must be in writing and must be addressed (i) if to the Creditor Trustee, to *Gregory S. Milligan, Trustee of the ZG Creditor Trust, Harney Partners, P.O. Box 90099, Austin, TX 78709-0099* or such other address as such Trustee or any successor will have furnished; and (ii) if to any Creditor Trust Beneficiary, at the address stated in the proof of claim it filed in the Chapter 11 Case, or in the event that the Creditor Trust Beneficiary did not file a proof of claim, at the address specified in the Debtor's schedules. To the extent a Creditor Trust Beneficiary desires to receive notice at a different address, it is such Person's obligation to notify the Creditor Trustee in writing. All such notices, requests, consents, and other communications must be given to the Creditor Trustee by hand delivery or overnight delivery, or, to a Creditor Trust Beneficiary, by first-class mail, postage prepaid, and will be deemed given when actually delivered (with respect to the Creditor Trustee), or three (3) business days after deposit in the U.S. mail if mailed (with respect to a Creditor Trust Beneficiary).

8.5 **Counterparts**. This Trust Agreement may be executed in any number of counterparts, each of which constitutes an original, but such counterparts together constitute one and the same instrument.

8.6 **Headings**. The section headings contained in this Trust Agreement are solely for convenience of reference and do not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

8.7 **Confidentiality**. The Creditor Trustee must, during the period that he serves in such capacity under this Trust Agreement and following either the termination of this Trust Agreement or such Trustee's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Creditor Trust Assets relates or of which he has become aware in his capacity as Trustee.

8.8 **Retention of Jurisdiction**. The Bankruptcy Court shall retain jurisdiction as set forth in Article XII of the Plan over issues related to the enforcement or interpretation of this Trust Agreement, including the determination of claims, controversies, disputes, and issues arising under or in connection with the Creditor Trust or this Trust Agreement and the management and administration of the Creditor Trust and for all of the purposes contemplated herein.

8.9 **Relationship to Plan**. The principal purpose of this Trust Agreement is to aid in the implementation of the Plan, and therefore this Trust Agreement incorporates and is subject to the provisions of the Plan. In the event any provision of this Trust Agreement is found to be inconsistent with a provision of the Plan or the Confirmation Order, the provision of the Plan or the Confirmation Order controls.

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement as of the day and year last written.

**3443 ZEN GARDEN, L.P.**

By: Gregory S. Milligan, Chapter 11 Trustee for the Bankruptcy Estate of 3443 Zen Garden, L.P.

Signature: _____

Date: _____

**CREDITOR TRUSTEE**

By: Gregory S. Milligan

Signature: _____

Date: _____